

11 CIV 9201

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

U.S. SECURITIES AND EXCHANGE
COMMISSION,

                **Plaintiff,**

v.

RICHARD F. SYRON,
PATRICIA L. COOK, and
DONALD J. BISENIUS,

                **Defendants.**

Civil Action No. 11-cv-_____

ECF CASE

(Jury Trial Demanded)

*[stamp:]* APR 16 2011 U.S.D.C. S.D. N.Y. CASHIERS

---

## COMPLAINT

Plaintiff U.S. Securities and Exchange Commission (the "Commission"), alleges for its Complaint as follows:

### SUMMARY OF ALLEGATIONS

1.    This action arises out of a series of materially false and misleading public disclosures by the Federal Home Loan Mortgage Corporation ("Freddie Mac" or the "Company") and certain of its senior executives relating to the exposure of Freddie Mac's largest business segment – Single Family Guarantee – to subprime mortgage loans.

2.    Between March 23, 2007, and August 6, 2008 (the "Relevant Period"), a period of heightened investor interest in the credit risks associated with subprime loans, Freddie Mac and defendants Richard F. Syron ("Syron"), Patricia L. Cook ("Cook"), and Donald J. Bisenius ("Bisenius") misled investors into believing that the Company had far less exposure to these riskier mortgages than in fact existed. To that end, at various times, each made or substantially assisted Freddie Mac and each other in making materially false and misleading statements that

claimed in substance that Freddie Mac had little or no exposure to subprime loans in its Single Family Guarantee business.

3.  While Freddie Mac disclosed during the Relevant Period that the exposure of its Single Family Guarantee business to subprime loans was between $2 billion and $6 billion, or between 0.1 percent and 0.2 percent, of Freddie Mac's Single Family Guarantee portfolio – its exposure to subprime was materially greater.  As of December 31, 2006, Freddie Mac's Single Family Guarantee business was exposed to approximately $141 billion (or 10 percent of the portfolio) in loans the Company internally referred to as "subprime," "otherwise subprime" or "subprime-like" and its exposure grew to approximately $244 billion (or 14 percent of the portfolio) by June 30, 2008, as the Company sought to win back lost market share by increasing its acquisition of such loans.

4.  Syron had ultimate authority over the subprime disclosures in Freddie Mac's Information Statements and supplements to the Information Statements published between March 23, 2007 and May 14, 2008, and in its Form 10-Q filed with the Commission on August 6, 2008, and also in speeches he gave or public statements he made in 2007 and 2008.  Cook spoke at an investor conference on May 17, 2007, in which she told investors that Freddie Mac had "basically no subprime exposure" and she provided substantial assistance to Syron and Freddie Mac in making subprime disclosures in the Information Statements and supplements and a Form 10-Q by certifying to the accuracy of the disclosures, which related to her area of responsibility.  Bisenius also certified to the accuracy of the subprime disclosures in certain Information Statements and supplements published during the Relevant Period and the Form 10-Q and thus substantially assisted Syron and Freddie Mac in making the misleading statements in these documents; he also substantially assisted Syron and Cook in making oral misstatements

about subprime by failing to correct statements in their prepared speeches that he knew misstated the Company's subprime exposure. Each defendant made, or substantially assisted others in the making of, these misleading subprime disclosures at a time when each knew, or was reckless in not knowing, that the Company was increasing its acquisition of higher-risk loans that it internally referred to as "subprime," "otherwise subprime" or "subprime-like."

5.      By this conduct, Syron and Cook violated, and Syron, Cook and Bisenius aided and abetted violations of, the antifraud and reporting provisions of the federal securities laws.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), and 78aa] and 28 U.S.C. § 1331.

7.      Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain of the acts, practices, transactions and courses of business constituting the violations alleged herein occurred within this judicial district.

8.      In connection with the transactions, acts, practices and courses of business alleged in this Complaint, Syron, Cook and Bisenius have directly or indirectly made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

## RELEVANT ENTITY

9.      **Freddie Mac** was, at all times relevant to this Complaint, a shareholder-owned Government Sponsored Enterprise ("GSE") established by the U.S. Congress on July 24, 1970, with the passage of the Federal Home Loan Mortgage Corporation Act (the "FHLMC Act"), to provide a continuous flow of funds for residential mortgages.  Freddie Mac performed this function by buying and guaranteeing residential mortgage loans and mortgage-related securities, which it financed by issuing mortgage-related securities, debt securities and equity securities. Under the FHLMC Act, the Company's securities were "exempt securities," meaning they were exempt from the registration and disclosure requirements of the federal securities laws.  On July 18, 2008, Freddie Mac voluntarily registered its common and preferred stock under Section 12(g) of the Exchange Act by filing a Form 10 registration statement with the Commission. Prior to July 18, 2008, Freddie Mac publicly disseminated annual and quarterly reports of its financial condition and results of operations in Information Statements and Information Statement Supplements, which were virtually identical in presentation to annual and quarterly reports filed with the Commission by registrants.  Since July 18, 2008, Freddie Mac has been subject to the reporting requirements of the federal securities laws.  During the Relevant Period, Freddie Mac's common stock was actively traded on the New York Stock Exchange under the ticker symbol "FRE."  Its principal place of business was, and is, in McLean, Virginia.

10.     Freddie Mac manages its business through three reportable segments: (i) Single Family Guarantee ("Single Family"), (ii) Investments, and (iii) Multifamily.

11.     Single Family is Freddie Mac's primary business segment.  During the Relevant Period, Freddie Mac reported that the size of its Single Family business was $1.4 trillion as of December 31, 2006, $1.7 trillion as of December 31, 2007 and $1.8 trillion as of June 30, 2008.

12.     Through its Single Family business, Freddie Mac purchases residential mortgages and mortgage-related securities in the secondary mortgage market and securitizes them as Freddie Mac mortgage-backed securities, known as Participation Certificates ("PCs"). Freddie Mac guarantees the payment of principal and interest on the mortgage loans that underlie these PCs in exchange for guarantee fees.

13.     During the Relevant Period, Freddie Mac completed at least four preferred stock offerings, raising approximately $7.5 billion: (i) pursuant to an Offering Circular dated April 10, 2007, it issued $500 million worth of 5.66 percent non-cumulative perpetual preferred stock, (ii) pursuant to an Offering Circulated dated July 17, 2007, it issued $500 million worth of 6.02 percent non-cumulative perpetual preferred stock, (iii) pursuant to an Offering Circular dated September 25, 2007, it issued $500 million of 6.55 percent non-cumulative perpetual preferred stock and (iv) pursuant to an Offering Circular dated November 29, 2007, it issued $6 billion fixed-to-floating rate non-cumulative perpetual preferred stock. Additionally, in mid-2008, Freddie Mac executives attempted to make at least one additional preferred stock offering in the amount of $5.5 billion. Throughout the Relevant Period, Freddie Mac also routinely issued debt securities.

14.     On September 6, 2008, following mounting losses, Freddie Mac's primary regulator, the FHFA, placed it into conservatorship. On September 7, 2008, FHFA, as conservator, adopted a resolution eliminating the par value of Freddie Mac's common stock, increasing the number of shares of Freddie Mac common stock authorized for issuance to four billion, preventing Freddie Mac from making any payment to purchase or redeem its capital stock or pay any dividends to holders of Freddie Mac's common stock, and limiting the voting rights of holders of Freddie Mac's common stock.

**DEFENDANTS**

15.  **Richard F. Syron**, age 68, was Chairman of the Board of Directors ("Chairman")
and Chief Executive Officer ("CEO") of Freddie Mac from December 2003 until September 7,
2008, when Freddie Mac's regulator, the Federal Housing Finance Agency ("FHFA"), placed it
into conservatorship.  Syron's compensation grew from approximately $14.7 million in 2006 to
$18.3 million in 2007 – tied, in part, to the "Touch More Loans" initiative discussed further
below in Paragraph 45 and to quarterly financial reporting.  Syron formally ceased to be an
employee of Freddie Mac on November 7, 2008, and was deemed to have resigned from the
Board of Directors, effective as of that date.  Syron is a resident of Massachusetts.

16.  As Chairman and CEO of Freddie Mac, Syron oversaw all three of Freddie Mac's
reportable segments, including Single Family.  As Chairman, Syron was a regular attendee at
Board meetings and Board committee meetings, including the Board's Mission, Sourcing and
Technology Committee meetings.  As CEO, he chaired a team that he personally selected from
the upper echelons of executive management called the "SET" or "Senior Executive Team,"
which met periodically to consider Freddie Mac's strategic direction.  Syron also regularly
attended monthly meetings of the Enterprise Risk Management Committee (the "ERMC"),
which was a committee comprised of executives and senior management from Freddie Mac's
three reportable segments that considered the status of credit, market and operational risks,
among others, to the Freddie Mac enterprise.  Syron received monthly materials from the ERMC
that apprised him of the credit, market and operational risks, among others, to the Freddie Mac
enterprise. Syron also attended meetings of the ERMC.

17.  Syron had extensive knowledge and experience in housing market-related issues.
He wrote a dissertation about the housing market and served in various leadership positions at

6

both the Federal Reserve Bank of Boston and the Federal Home Loan Bank of Boston, including President and CEO.  Syron was knowledgeable about the housing market and mortgage-related risks, and familiar with the views held by other market participants.

18.    Syron regularly received and reviewed drafts of the Freddie Mac Information Statements and Annual Reports to Stockholders ("Information Statements") and supplements to the Information Statements ("Information Statement Supplements") and, once Freddie Mac became an SEC-reporting company, drafts of Freddie Mac's first Form 10-Q.  Syron certified Freddie Mac's Information Statements and Supplements published between March 23, 2007 and May 14, 2008, and Freddie Mac's Form 10-Q filed with the Commission on August 6, 2008.

19.    **Patricia L. Cook**, age 58, was an officer of Freddie Mac and held several titles, including Executive Vice President ("EVP") of Investments and Capital Markets and Chief Business Officer ("CBO"), from August 2004 through September 26, 2008.   Cook's compensation was $4.9 million in 2006 and $4.8 million in 2007 – tied, in part, to the Touch More Loans strategy discussed below in Paragraph 45 and to quarterly financial reporting.  Cook formally ceased to be an employee of the Company on November 17, 2008, approximately two months after the Company announced certain management and organizational changes, including the elimination of her position.  Cook is a resident of Washington, D.C.

20.    As EVP of Investments and Capital Markets and as CBO, Cook oversaw Single Family.  Cook attended Board meetings and Board committee meetings, including the Board's Mission, Sourcing and Technology Committee meetings.  Cook was one of the senior executives who served on Syron's SET.  She also attended or, on occasion, sent representatives on her behalf, to the monthly ERMC meetings.  She received materials from the ERMC that apprised her of the credit, market and operational risks, among others, to the Freddie Mac enterprise.  As

the senior executive in charge of the Single Family business, Cook was knowledgeable about Freddie Mac's acquisitions and the performance of Freddie Mac's high risk loan portfolio, including certain loans the Company internally considered to be subprime.

21.     The Touch More Loans strategy, discussed below in Paragraph 45, also played a role in Cook's compensation.  In 2006, Cook's target bonus was $2 million and her target long-term equity award for performance was $2.4 million.  Cook received a bonus of $2.3 million, or $300,000 in excess of her target, and a long-term equity award equating to $2.763 million, or $363,000 greater than her target, in part due to Cook's Touch More Loans strategy.  In 2007, Cook received a bonus of $1.4 million dollars plus a supplemental bonus of $200,000 with a three-year vesting schedule, again in part because of Touch More Loans.

22.     Cook was responsible for ensuring that Single Family's public disclosures were accurate.  Cook was considered an expert on credit risk within Freddie Mac.  Furthermore, during the Relevant Period, the Disclosure Committee consulted Cook at least once regarding the Company's public disclosures concerning subprime.

23.     Cook signed sub-certifications directed to Syron and other senior executives for each Freddie Mac Information Statement and Information Statement Supplement published between March 23, 2007 and May 14, 2008, and for Freddie Mac's Form 10-Q filed with the Commission on August 6, 2008.  Each of Cook's sub-certifications covered the Company's subprime disclosures.

24.     **Donald J. Bisenius**, age 53, was employed by Freddie Mac from 1992 through April 1, 2011, and held a number of titles, including Senior Vice President ("SVP") of Credit Policy and Portfolio Management from November 2003 to April 2008, SVP of Single Family

Credit Guarantee from May 2008 to May 2009 and, most recently, EVP of Single Family Credit Guarantee. Bisenius is a resident of Virginia.

25.     In 2007 and 2008, Bisenius reported directly to Cook and was the senior-most officer for credit risk in Single Family during the periods covered by the Information Statement and Information Statement Supplements for the periods ended December 31, 2006, March 31 and June 30, 2007, the Information Statement Supplement for the period ended March 31, 2008, and the Form 10-Q for the period ended June 30, 2008. As the senior-most officer for credit risk in Single Family, Bisenius was recognized within Freddie Mac as an expert on single-family mortgages and on credit risk and was responsible for developing credit policies for Freddie Mac's guarantee of loans.

26.     Between approximately March 2007 and April 2008, Bisenius also focused on certain "special projects," including a "Model Subprime Offering" discussed below in Paragraph 61, aimed at borrowers previously serviced by lenders who self-identified as subprime originators.

27.     Bisenius signed sub-certifications for each Freddie Mac Information Statement and Information Statement Supplement published between March 23, 2007, and August 30, 2007, Freddie Mac's Information Statement Supplement published on May 14, 2008, and Freddie Mac's Form 10-Q filed with the Commission on August 6, 2008. Each of Bisenius' sub-certifications covered the Company's subprime disclosures. Bisenius also served on the Disclosure Committee that considered Freddie Mac's Information Statement Supplement for the period ended March 31, 2008, and its Form 10-Q for the period ended June 30, 2008.

## *Background*

28.     As described below, in or about June 2006, Freddie Mac began to quantify in its public disclosures the approximate amount of exposure to subprime loans in the Single Family guarantee business. During the Relevant Period, Freddie Mac provided various such estimates – ranging between $2 and $6 billion, or 0.1 to 0.2 percent of its Single Family guarantee business. In fact, during this period, Single Family had exposure to between approximately $140 billion and $244 billion of loans that Freddie Mac internally recognized were "subprime," "otherwise subprime" or "subprime-like." The misleading statements identified herein all relate to attempts by Freddie Mac and its senior executives, including defendants, to minimize and mislead investors concerning the exposure of Freddie Mac's Single Family guarantee business to subprime loans.

29.     Beginning with its Information Statement for the fiscal year ended December 31, 2003 (the "2003 Information Statement"), and continuing through the Relevant Period, Freddie Mac published tables of credit risk characteristics for Single Family loans (the "Credit Risk Tables"). Those Credit Risk Tables contain information describing risk characteristics such as original loan-to-value ("LTV") ratio bands, product type, property type, occupancy type, FICO credit score bands, loan purpose, geographic concentration, and origination year. The Credit Risk Tables did not quantify or otherwise provide estimates of Freddie Mac's exposure to subprime loans.

30.     In or about March 2007, as investor interest in the credit risk associated with subprime loans continued to increase, Freddie Mac began to provide narrative disclosure describing and estimating the exposure of its Single Family guarantee business to subprime

loans. These disclosures contained blatantly false and misleading statements for the reasons described below.

### Since the 1990s, Freddie Mac Internally Categorized Loans As Subprime Or Subprime-Like As Part Of Its Loan Acquisition Programs And In Connection With Monitoring The Risk Of Its Portfolios

31.     As part of its loan acquisition and securitization process in the Single Family credit guarantee portfolio, Freddie Mac provided mortgage loan originators with a series of mortgage underwriting standards and/or automated underwriting software tools, including, since at least 1995, its proprietary automated underwriting system ("AUS") called "Loan Prospector."

32.     Loan Prospector generated a credit risk classification for each loan and was used to determine the terms on which a loan could be sold to Freddie Mac, including whether a loan could be sold to Freddie Mac without certain representations and warranties or without additional cost.

33.     During the Relevant Period, Loan Prospector generated a score that estimated the risk of default for each loan. The scores, in turn, were grouped into six bands or "grades," which roughly corresponded to the level of anticipated risk: A+, A1, A2, A3, C1 or C2. These grades were visible to Freddie Mac but not to mortgage loan originators or the public. Loans falling into the first four grades (A+, A1, A2 and A3) were designated "Accept Loans." Loans falling into the bottom two grades (C1 and C2) were designated "Caution Loans."

34.     A loan designated as an Accept Loan permitted automated underwriting, reduced documentation and generally did not require originators to make special representations and warranties regarding the credit quality of the loan because Loan Prospector had already determined the loan was creditworthy.

35.     By contrast, Loan Prospector's designation of a loan as a Caution Loan meant that the system had identified concerns about the loan's creditworthiness. Originators were required

manually to underwrite Caution Loans, produce additional documentation regarding the borrower's creditworthiness, and make special representations and warranties regarding the credit quality of the loan. Caution Loans had multiple higher risk characteristics, such as high LTV ratios, borrowers with lower FICO scores, unusual property types or high debt-to-income ratios, and were recognized within Freddie Mac as loans that had a high risk of default relative to Accept Loans. Internally at Freddie Mac, Caution Loans were considered to be equivalent to subprime.

36.     On October 8, 1997, Freddie Mac publicly announced the roll-out of its "A-minus Program" at the Mortgage Bankers Association's annual meeting in New York. "A-minus" was a term commonly used in the marketplace to refer to subprime loans. The next day, the *American Banker* published an article reporting on Freddie Mac's announcement and observed that "Freddie Mac is diving into subprime lending, ending months of speculation over how deeply the agency would go into the burgeoning market." Under the A-minus Program, Caution Loans that received a score of C1 in Loan Prospector could be sold to Freddie Mac on the same terms as an Accept Loan with the payment of an additional fee by the seller. As noted by the *American Banker* article, the A-minus Program was publicly perceived as expanding Freddie Mac's exposure to subprime loans.

37.     Sales and marketing materials prepared for Single Family as part of the roll-out of the A-minus Program advised the Company's sales force that "Freddie Mac is expanding the range of loans it will purchase, including many loans in the A-minus sector of the market. Now lenders can use Loan Prospector to provide less costly, more efficient financing to borrowers with weaker credit." In describing the A-minus sector of the housing market, the sales and

marketing materials stated that "A-minus loans account for approximately 50 percent of subprime loans."

38.     In or about November 1998, in connection with the A-minus Program, Freddie Mac revised its Credit Policy Book as it related to the broader credit risk parameters and processes under which Freddie Mac was willing to guarantee loans in Single Family.  The memorandum authorizing these revisions described mortgages eligible for the A-minus Program as "[m]ortgages that generally comprise the first and second tier of subprime lender risk grades" and "mortgages generally includ[ing] 54% to 56% of the subprime market."  Mortgage loans that received a C1 rating in Loan Prospector were described as having a credit quality of "A-minus," and those that received a C2 rating in Loan Prospector were described as having a credit quality of "subprime."  Bisenius signed and approved the revisions to the Credit Policy Book.

39.     In or about 1999, at the request of Bisenius, Freddie Mac developed an econometric model called "Segmentor," which enhanced Loan Prospector's ability to identify subprime loans prior to Freddie Mac guaranteeing those loans.  The model scored mortgage loans on a variety of credit risk characteristics, such as debt ratio, FICOs, and time since most recent foreclosure, and generated a "subprime score."  If the Segmentor "subprime score" fell below certain thresholds or had certain characteristics such as a high debt-to-income ratio, the loan received an automatic rating of C1 or C2 in Loan Prospector.

40.     Loan Prospector developed and evolved over time, but, the internal view that Caution Loans (C1 and C2) were synonymous with subprime or were "subprime-like" did not change.

41.     Freddie Mac's exposure to Caution Loans up through the Relevant Period steadily rose.  As of the end of 2004, Freddie Mac guaranteed the principal and interest on Caution Loans

in the amount of approximately $70 billion.  From the first quarter of 2005 through the second quarter of 2008, Freddie Mac increased its total exposure to Caution Loans from approximately $73 billion to $233 billion, with the largest annual increase between the fourth quarter of 2006 (approximately $138 billion) and the fourth quarter of 2007 (approximately $216 billion).  While Caution Loans were internally referred to as subprime, they were not disclosed publicly as part of the Company's Single Family subprime exposure.

### *Freddie Mac Acquires Increasingly Risky Loans to Maintain Market Share*

42.    In or about the early 2000s, Freddie Mac and the Federal National Mortgage Association ("Fannie Mae") began to lose market share in mortgage loan securitizations to new competitors, including Wall Street banks.  Mortgage originations had shifted from traditional fixed-rate loans to higher risk loan products with features such as adjustable rates ("ARMs"), interest-only payments, and reduced documentation requirements.

43.    By 2005, the Freddie Mac and Fannie Mae combined share of the market for mortgage securitizations had fallen to approximately 42 percent from a high of nearly 60 percent in 2000.  Within that shrinking GSE share of the market, Freddie Mac also had been steadily losing market share to Fannie Mae.  Freddie Mac responded to this loss of market share by broadening its credit risk parameters to purchase and guarantee increasingly risky mortgages in its Single Family guarantee portfolio between approximately 2004 and 2007.

44.    For example, in or about late 2004, despite contrary advice from the Company's senior credit risk experts, Syron authorized Freddie Mac's continued purchases of a particularly risky type of mortgage commonly referred to in the industry as a "No Income, No Asset" loan or "NINA."  NINAs were widely considered to be particularly risky because they did not require any verification of a borrower's income or assets.  Freddie Mac's senior credit risk officers

14

advocated to Syron that the Company stop guaranteeing NINA mortgages, in part, because of the high risk of default associated with such mortgages within their first year and because of perceived reputation risk to the Company. Syron rejected the advice, in part due to his desire to improve Freddie Mac's market share.

45.    Another example of increased risk taking occurred in or about 2005, when the Company embarked on a business strategy called Touch More Loans. Touch More Loans was designed to gain back lost market share by granting exceptions to Freddie Mac's existing credit policy to permit the acquisition and guarantee of riskier loans that were being originated in the marketplace. Cook led the Touch More Loans strategy.

46.    Coinciding with the introduction of Touch More Loans, the Company embarked on two additional initiatives to expand market share:

a.    First, in February 2005, Freddie Mac introduced a new residential mortgage product called Home Possible, which was geared to low-to-moderate income borrowers (such as teachers, law enforcement personnel, healthcare workers and the military) and permitted lower down payments or higher loan-to-value ratios, among other higher credit risk characteristics, than had previously been allowed. Loans acquired through Home Possible were internally considered to be "subprime-like."

b.    Second, on August 17, 2005, Freddie Mac internally issued a policy statement authorizing increased guarantees of a Fannie Mae proprietary product called "Expanded Approval" (or "EA") loans. As of December 2004, Freddie Mac guaranteed the principal and interest on EA loans in the approximate amount of $69 million. From the first quarter of 2005 through the second quarter of 2008, Freddie Mac increased its total exposure to EA loans from approximately $1 billion to $11 billion (with the largest increase of

approximately $8 billion coming between the fourth quarter of 2006 and the fourth quarter of 2007).  EA loans were considered to have, at best, credit risk equivalent to A-minus loans and were internally described in this policy statement as (1) "appear[ing] to be subprime in nature[;]" and (2) "high risk . . . since performance compares to subprime products."  In fact, on August 20, 2007, in an email that was sent to Cook and others, Bisenius described EA loans as "clearly subprime."

47.    From 2005 forward, Freddie Mac also substantially increased its exposure to loans from a subprime lending division of Countrywide Financial Corporation ("Countrywide") known as Full Spectrum Lending.  Between 1999 and 2004, Freddie Mac acquired loans from Countrywide's Full Spectrum Lending division in the aggregate amount of approximately $279 million.  From 2005 through 2008, Freddie Mac acquired approximately $12 billion of Full Spectrum Lending loans (with the largest increase between 2006 (approximately $3 billion) and 2007 (approximately $6 billion)).

48.    The approximate aggregate amount (in billions of U.S. dollars), measured by unpaid principal balance, of C1, C2 and EA loans in Single Family at the end of the following periods was as follows:

| Single-Family Guarantee Portfolio | | | | | | | |
| Period | EA | C1 | C2 | Total C1 and C2 | Total C1, C2 and EA | Total Single-Family Guarantee Portfolio | % Total C1, C2 and EA of Total Single-Family Guarantee Portfolio |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 1Q05 | $1 | $39 | $35 | $74 | $75 | $1,220 | 6% |

| | Single-Family Guarantee Portfolio | | | | | | |
|---|---|---|---|---|---|---|---|
| Period | EA | C1 | C2 | Total C1 and C2 | Total C1, C2 and EA | Total Single-Family Guarantee Portfolio | % Total C1, C2 and EA of Total Single-Family Guarantee Portfolio |
| 2Q05 | $1 | $42 | $37 | $79 | $80 | $1,244 | 6% |
| 3Q05 | $1 | $47 | $39 | $86 | $87 | $1,274 | 7% |
| 4Q05 | $2 | $53 | $42 | $95 | $97 | $1,318 | 7% |
| 1Q06 | $2 | $60 | $47 | $107 | $109 | $1,360 | 8% |
| 2Q06 | $2 | $64 | $50 | $114 | $116 | $1,387 | 8% |
| 3Q06 | $2 | $71 | $54 | $125 | $127 | $1,428 | 9% |
| 4Q06 | $3 | $78 | $60 | $138 | $141 | $1,467 | 10% |
| 1Q07 | $4 | $89 | $67 | $156 | $160 | $1,528 | 10% |
| 2Q07 | $6 | $100 | $77 | $177 | $183 | $1,586 | 12% |
| 3Q07 | $8 | $110 | $88 | $198 | $206 | $1,642 | 13% |
| 4Q07 | $11 | $118 | $98 | $216 | $227 | $1,692 | 13% |
| 1Q08 | $11 | $123 | $104 | $227 | $238 | $1,739 | 14% |
| 2Q08 | $11 | $127 | $106 | $233 | $244 | $1,784 | 14% |

### *Freddie Mac's Acquisition and Guarantee Of*
### Loans From Other AUSs Increases its Subprime Exposure

49.     Beginning in or about 2004, in addition to purchasing and guaranteeing the payment of principal and interest on loans that had been underwritten using Loan Prospector, Freddie Mac increasingly purchased and guaranteed mortgage loans underwritten through other proprietary AUSs.   For example, Freddie Mac purchased and guaranteed mortgage loans underwritten using AUSs such as Fannie Mae's Desktop Underwriter and Countrywide's CLUES.

50.     To assess the relative risk of mortgages underwritten through other AUSs, Freddie Mac used an internal modeling system called LP Emulator to approximate how the loans would have scored under Loan Prospector.   LP Emulator used the same scoring metric as Loan Prospector – Accept Loans (A+, A1, A2 and A3) and Caution Loans (C1 and C2) – but, LP Emulator was run on a loan after Freddie Mac had agreed to guarantee the loan.   Using LP Emulator, Freddie Mac could identify a loan that would have been designated as a Caution Loan if underwritten through Loan Prospector, but had instead been guaranteed on terms equivalent to an Accept Loan after being underwritten through another AUS.   Loans falling into this category were deemed to have a "defect."   Beginning in 2004, Freddie Mac tracked the "defect rate" of loans acquired through other AUSs.

51.     In the second quarter of 2003, before Freddie Mac increased its purchases through AUSs other than Loan Prospector, Freddie Mac's aggregate defect rate was approximately 1 percent.   Freddie Mac's purchase and guarantee of mortgages underwritten through other AUSs increased to the point where it was acquiring fewer loans through Loan Prospector (approximately 27 percent) than through Fannie Mae's Desktop Underwriter (approximately 31 percent).   The defect rate rose dramatically, and in August 2007, the aggregate defect rate

18

reached a historical high of approximately 22 percent. Approximately 22 percent of the loans Freddie Mac purchased and guaranteed that were underwritten through other AUSs therefore met the Freddie Mac internal definition of subprime.

### *Defendants Were Aware of Subprime Exposure in Single Family*

52.   On May 25, 2006, Cook attended a meeting of the Board's Finance and Capital Deployment Committee. Prior to that meeting, she received a memorandum authored by the Company's then-Chief Enterprise Risk Officer, highlighting for her and the other attendees that "[t]he credit parameters of new single-family purchases continue to decline. In order to support our business strategies to increase customer focus, build market share and meet affordable goals, we continue to expand credit policies and increase purchases of higher-risk products."

53.   Six days later, on May 31, 2006, Syron and Cook attended a meeting of the Board's Mission, Sourcing and Technology Committee, where it was highlighted that the Touch More Loans strategy had resulted in significantly greater credit risk to the Company. Specifically, a presentation made by a senior credit risk officer stated that, pursuant to Touch More Loans, Freddie Mac was "expanding our appetite" for, among other things, risk layering of lower FICOs, higher LTV's, other AUSs, and other high-risk loans. To the extent it was not already clear to them prior to the meeting, Syron and Cook also were informed that the Company was loosening its underwriting standards through its implementation of the Touch More Loans strategy by, among other things, increasing exceptions to the Company's existing credit policy – exceptions that had almost tripled between 2004 and 2005, from 286 in 2004 to 770 in 2005.

54.   On November 30, 2006, Bisenius' staff informed him that loans sold to Freddie Mac through Fannie Mae's Desktop Underwriter were contributing disproportionately to the Company's increasing defect rate and included loans that were equivalent to subprime. Specifically, Bisenius' staff told him and others that loans from Fannie Mae's Desktop

Underwriter "have a much higher percent of defect loans, loans that are subprime-like, loans that have very low FICOs" in referring to loans that contributed to the increasing "defect rate" at the Company.

55.     On December 7, 2006, Syron and Cook attended a meeting of the Mission, Sourcing and Technology Committee of the Board of Directors.  Attached to a presentation prepared for that meeting was a glossary of terms, the purpose of which was to inform the Board of how management used certain terms.  The glossary defined "Subprime Mortgages" as follows:

> There is no longer a clear-cut distinction between prime and subprime mortgages as the mortgage market has evolved to provide for mortgage credit to a full range of borrowers with a variety of products and processes.  Subprime mortgages generally are mortgages that involve elevated credit risk.  Whereas prime loans are typically made to borrowers who have a strong credit history and can demonstrate a capacity to repay their loans, subprime loans are typically made to borrowers who have a blemished or weak credit history and/or a weaker capacity to repay.

Ultimately, during the Relevant Period, the Company's public subprime disclosures were inconsistent with how management characterized its use of the term "subprime" for its own Board members.

56.     Beginning on or about January 18, 2007, Freddie Mac's ERMC began to report on Freddie Mac's exposure to subprime loans.  Attendees of the January 18 ERMC meeting – including Syron and Cook – were told that "[l]oan level risk grades are blurred as capital retreats in [the] subprime market, increasing the likelihood that we are already purchasing subprime loans under existing acquisition programs."   Accordingly, this presentation reinforced to attendees of this meeting that it was likely that Freddie Mac already was purchasing loans with credit risk characteristics similar to loans originated by self-identified subprime originators, and that market participants would consider to be subprime loans.  The ERMC met monthly after this

and Syron and Cook generally attended ERMC meetings.  Going forward, the ERMC reports consistently contained this same warning.  Syron typically received the ERMC reports in advance of the meetings and generally reviewed them prior to the meetings.

57.    On February 6 and 7, 2007, Syron gathered his Senior Executive Team for a two-day offsite planning meeting in Florida to discuss Freddie Mac's strategic direction.  Cook attended as a member of the SET, as did Bisenius (who was invited even though he was not formally a member of the SET).  At least one presentation was devoted to Freddie Mac's role in the subprime market.  That presentation highlighted for attendees the following regarding Freddie Mac's exposure to subprime:

- Freddie Mac "already purchase[s] subprime-like loans . . . but with considerably lower fees[,]" which attendees generally understood meant that Freddie Mac was purchasing loans with credit risk and expected default rates similar to the loans originated by a small handful of institutions that self-identified as subprime originators.

- The "[w]orst 10% of [the Single Family] Flow Business" – which comprised approximately 70 percent of Single Family purchases in 2006 – were "subprime-like loans."

- Freddie Mac was purchasing greater percentages of "risk layer[ed]" loans, defined as loans consisting of total LTV greater than 90 percent and FICO scores less than 680, which was "leading to more 'Cautions'" and a higher "[d]efect rate."

- "'Caution' loans have greater default costs . . . resulting in higher expected losses[.]"

58.    On February 17, 2007, Syron received and responded to an email from Bisenius

regarding a new "Subprime Project."  Bisenius told Syron and others that an expanded role in the

subprime market only made sense if Freddie Mac was adequately compensated for the risk, and

reminded Syron and others that there were certain categories of loans, including "free cautions,"

that the Company already purchased and did not receive adequate compensation for the risk.

59.    On March 2 and 3, 2007, Syron, Cook and Bisenius attended a two-day Board of

Directors meeting, a significant portion of which was dedicated to the Company's strategic

direction in subprime.  Cook was one of the presenters at the Board meeting and she, along with

the then-Chief Operating Officer, presented similar information to the Board as contained in the

February 6 and 7 offsite meeting.  Specifically, Cook and the then-Chief Operating Officer led a

discussion at the meeting concerning a slide in which the "worst 10% of [Freddie Mac's] Flow

Business" was listed as an example of "subprime-like loans" the Company already purchased,

and in which they conveyed:

- "We already purchase subprime-like loans to help achieve our HUD goals . . .
  [b]ut we receive considerably lower fees than subprime loans would fetch in the
  market."

- "Some of our current purchases have subprime-like risk[.]"

- "[F]ixed-rate subprime doesn't look all that different than the bottom of our
  purchases, with returns five to six times as great, not universal for all subprime."

60.    In addition to receiving at least the SET and Board materials referred to above in

Paragraphs 57 and 59 which highlighted, among other things, that a material portion of the

Single Family business was "subprime-like," and monthly ERMC reports which repeatedly

warned of the increasing risk that Freddie Mac was buying subprime loans (and showed data

suggesting that the credit risk of the principal and interest of loans to be securitized by Freddie Mac was increasing to historic proportions), Syron also was aware at least as early as February 17, 2007 of Freddie Mac's efforts to develop a model subprime offering targeted at customers of self-identified subprime originators.

61.     By at least early April 2007, Bisenius transitioned into a new role at Freddie Mac, where he was placed in charge of developing a Model Subprime Offering that was later publicly known as a product called "Freddie Mac SafeStep Mortgages," to give subprime borrowers a more consumer-friendly mortgage option.

62.     Although the Model Subprime Offering purportedly had been developed as an alternative to subprime products, Freddie Mac personnel, including Syron, Cook and Bisenius, recognized that it actually competed with existing programs that Freddie Mac had internally recognized as "subprime," "otherwise subprime," or "subprime-like."

63.     On April 12, 2007, Bisenius proposed abolishing Freddie Mac's A-minus Program – which was long-recognized as subprime – "so as to not canabalize [sic] our [Model Subprime Offering]."

64.     By mid-April 2007, Bisenius also knew that the credit characteristics of loans to be guaranteed under the Model Subprime Offering were similar to those of other existing Freddie Mac programs in addition to the A-minus Program, such as Home Possible and Fannie Mae's EA program, which he was well aware internally were perceived as programs that exposed Freddie Mac to subprime or subprime-like loans – as he had used those same descriptions for those programs.

65.     Bisenius regularly briefed Cook on the Model Subprime Offering.   Cook requested these briefings to discuss the role of the Company's existing Single Family guarantee

programs relative to the Model Subprime Offering.  At a briefing on April 20, 2007, highlighted

that there were "alignment" issues between the Model Subprime Offering loans and Freddie

Mac's existing loan programs.

66.    On May 16, 2007, Bisenius sent an e-mail commenting on a set of

recommendations regarding certain of Freddie Mac's current offerings as related to the Model

Subprime Offering.  In the email, Bisenius observed that the recommendations did not "address

DU approves or Proprietary AUS approves that we think are subprime (ie., [sic] they would

score Caution in LP) and therefore might compete with our model offering."

67.    On June 7, 2007, Cook and Bisenius attended a meeting of the Board's Mission,

Sourcing and Technology Committee, where it was conveyed that:

- Certain higher risk loans sold to Freddie Mac through other AUSs were
  equivalent to subprime.

- Freddie Mac-securitized loans obtained through Fannie Mae's Desktop
  Underwriter had a "higher share of low FICO loans and subprime-like loans"
  relative to other AUS loans.

- Loans sold to Freddie Mac through Countrywide's CLUES were "particularly
  volatile" and, in particular, of those loans sourced through CLUES that were later
  scored by Freddie Mac's LP Emulator as "Caution," (called "defect loans" for
  their contributions to the "defect rate"), a high proportion of such loans were
  "subprime in nature."

68.    On or about June 11, 2007, Cook and others received an "Executive Summary"

sponsored by Bisenius, that stated that the Model Subprime Offering would compete with

existing loans the Company acquired and guaranteed such as "[Freddie Mac's] affordable

24

offerings like Home Possible and [Fannie Mae's] MyCommunityMortgage, as well as our LP

Loan Prospector A-minus offering and [Fannie Mae's] newly revamped EA program." The

Executive Summary also highlighted that "[s]ubprime mortgages are not considered unique in

the industry. An analysis of Freddie Mac's existing products indicates our current A-minus

offering has credit risk and product parameters (business terms) that match, and in some cases,

are broader than those outlined in the proposed model Subprime offering." Cook attended the

meeting of the New Products Committee where this Executive Summary was discussed.

69.     At the September 25, 2007 ERMC meeting, both Syron and Cook were told that

the defect rate of purchases, which had been steadily rising, had increased from approximately

13 percent at the end of June 2007, to 19 percent in July 2007, to approximately 22 percent in

August 2007. The presentation highlighted for Syron and Cook that principal drivers of the

defect rate were low FICOs and high LTVs. Syron and Cook were presented with similar facts

at the October 23, 2007 ERMC meeting.

70.     Additionally, on September 26, 2007, Cook received a memorandum describing

how the Model Subprime Offering would be positioned for marketing purposes. The

memorandum noted that the Model Subprime Offering was consistent with Freddie Mac's

"longer term corporate 'touch more loans' strategy to expand into adjacent markets" and that the

offering would replace Freddie Mac's A-minus loan program.

71.     On November 27, 2007, the ERMC distributed a packet of materials to Syron and

Cook, among others. Although no meeting took place, the materials further informed Syron and

Cook of the stresses on Single Family as a result of Freddie Mac's acquisition of riskier loans.

Specifically, the materials highlighted that the "2007 book performance is worse than in 2006,

both exhibiting much higher serious delinquency rates than other book years;" that expected

25

default costs for October 2007 "are 76% higher than in 2006;" and that the defect rate had risen to approximately 20 percent.

72.    On December 18, 2007, Syron and Cook attended an ERMC meeting, which highlighted for them the deterioration of credit quality for the largest portion of Freddie Mac's Single Family guarantee portfolio.  According to the report used at that meeting, the defect rate for the third quarter of 2007 had increased to approximately 20 percent, up from approximately 16 percent in the second quarter of 2007 and approximately 13 percent in the first quarter of 2007.  Similar facts were highlighted for Syron and Cook at meetings of the ERMC on January 23, 2008

73.    On January 23, 2008, Syron and Cook attended another ERMC meeting, during which they were told that the defect rate on the largest part of the business was at approximately 20 percent in November, still at historically high levels.  Syron and Cook also were told that EA loans accounted for approximately 19 percent of expected default costs in Single Family.  Similar trends were highlighted for Syron and Cook at ERMC meetings on February 19, 2008, March 25, 2008 and April 29, 2008

### *Syron, Cook and Bisenius Were Responsible for Freddie Mac's Disclosures*

74.    Syron, Cook and Bisenius each made, or aided and abetted Freddie Mac or each other in making, false and misleading credit risk disclosures regarding subprime loans in the Company's Single Family guarantee portfolio as a result of their authority over, or knowing and substantial assistance in, such disclosures.

75.    As CEO of Freddie Mac, Syron certified the Information Statement and Annual Report to Stockholders for the Fiscal Year Ended December 31, 2006 (the "2006 Information Statement"), the Financial Report for the Three and Six months Ended June 30, 2007 (the "2Q07 Information Statement Supplement"), the Financial Report for the Three and Nine Months Ended

September 30, 2007 (the "3Q07 Information Statement Supplement"), the Information Statement and Annual Report to Stockholders for the Fiscal Year Ended December 31, 2007 (the "2007 Information Statement"), the Financial Report for the Three Months Ended March 31, 2008 (the "1Q08 Information Statement Supplement"), and the Form 10-Q for the Quarterly Period Ended June 30, 2008 (the "2Q08 Form 10-Q"). The certifications stated, among other things:

- "Based on my knowledge, this [Report] does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this [Report.]"

- "Based on my knowledge, the consolidated financial statements, and other financial information included in this [Report], fairly present in all material respects the financial condition, results of operations and cash flows of Freddie Mac as of, and for, the periods presented in this [Report]."

76.     Cook sub-certified the 2006 Information Statement, the 2Q07 Information Statement Supplement, the 3Q07 Information Statement Supplement, the 2007 Information Statement, the 1Q08 Information Statement Supplement, and 2Q08 Form 10-Q. Bisenius sub-certified the 2006 Information Statement, the 2Q07 Information Statement Supplement and the 2Q08 Form 10-Q. Those sub-certifications stated, among other things:

- "Based upon my role and responsibilities, I have reviewed the appropriate sections of the [Report]."

- "I have consulted with such members of my staff and others whom I thought should be consulted in connection with my execution of this attestation."

- "Based upon my role and responsibilities, but limited in all respects to the matters that come to my attention in fulfilling my responsibilities as [CBO (Cook) or SVP for Credit Policy (Bisenius)], I hereby certify to the best of my knowledge and belief that:"

- "The [Report] does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, to not be misleading."

- "The financial statements and other financial information included in the [Report] fairly present, in all material respects, the financial condition and results of

operations, and cash flows of the Company as of and for the periods presented in the [Report]."

77.     Cook and Bisenius each sub-certified to the accuracy of Freddie Mac's subprime disclosures in those Information Statements and Information Statement Supplements described above in Paragraph 76 based upon their respective roles and responsibilities at the Company.

78.     As EVP for Investments and Capital Markets and CBO, during the Relevant Period, Cook specifically had responsibility over the Company's Single Family business, including the Company's subprime loan exposure as it related to the credit risks associated with that business.

79.     As SVP of Credit Policy and Portfolio Management and SVP of Single Family Credit Guarantee, during a portion of the Relevant Period, Bisenius had direct responsibility over the credit risks, including subprime loan exposure, associated with the Single Family business. During that portion of the Relevant Period that Bisenius was working on "special projects" for Cook, including the Model Subprime Offering, Bisenius continued to carry on certain responsibilities as the SVP for Credit Policy and Portfolio Management, and sub-certified to those Information Statements and Information Statement Supplements described above in Paragraph 76. In addition to sub-certifying these disclosures, Bisenius served on the Disclosure Committee that considered the 2Q08 Form 10-Q.

80.     Given their respective roles and responsibilities and the importance of the sub-certifications to the Company's disclosure process, Cook and Bisenius substantially assisted in the making of the Company's false and misleading statements by validating the accuracy of the Company's subprime disclosures, which they knew or were reckless in not knowing were false.

### *Freddie Mac's Subprime Disclosures*

81.    On June 28, 2006, in its Information Statement and Annual Report to Stockholders for the fiscal year end December 31, 2005 (the "2005 Information Statement"), Freddie Mac publicly quantified for the first time the exposure of its Single Family portfolio to subprime loans.  The Company represented that:  "At December 31, 2005 and 2004, we guaranteed $2.3 billion and $4.5 billion of securities backed by subprime mortgages which constituted less than one percent of our Total mortgage portfolio, respectively."

82.    The Company also noted that it participated in the subprime segment in two other ways:  (i) "our Retained portfolio makes investments in non-Freddie Mac mortgage-related securities that were originated in this market segment" and (ii) "we made investments through our Retained Portfolio in some of the structured securities we issue with underlying collateral that is subprime."

83.    During the Relevant Period, Freddie Mac continued to make public disclosure of its Single Family subprime exposure.  However, the disclosures during the Relevant Period were consistently materially false and misleading.

### *Year-End 2006*

84.    On March 23, 2007, in its 2006 Information Statement, Freddie Mac disclosed the following regarding it subprime exposure in Single Family:

> Participants in the mortgage market often characterize loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime.  There is no universally accepted definition of subprime.    The subprime segment of the mortgage market primarily serves borrowers with poorer credit payment histories and such loans typically have a mix of credit characteristics that indicate a higher likelihood of default and higher loss severities than prime loans.  Such characteristics might include a combination of high loan-to-value ratios, low FICO scores or originations using lower underwriting standards such as limited or no documentation of a borrower's income.  The

subprime market helps certain borrowers by increasing the availability of mortgage credit.

While we do not characterize the single-family loans underlying the PCs and Structured Securities in our credit guarantee portfolio as either prime or subprime, we believe that, based on lender-type, underwriting practice and product structure, the number of loans underlying these securities that are subprime is not significant. Also included in our credit guarantee portfolio are Structured Securities backed by non-agency mortgage-related securities where the underlying collateral was identified as being subprime by the original issuer. At December 31, 2006 and 2005, the Structured Securities backed by subprime mortgages constituted approximately 0.1 percent and 0.2 percent, respectively of our credit guarantee portfolio.

The 2006 Information Statement also disclosed that Freddie Mac held, at December 31, 2006 and 2005, in its Retained Portfolio – which is distinct from the Single Family guarantee portfolio – "approximately $124 billion and $139 billion, respectively, of non-agency mortgage-related securities backed by subprime loans."

85.     The statement in the 2006 Information Statement that Freddie Mac's subprime exposure in Single Family was "not significant" was materially false and misleading because it communicated the misleading impression that after considering a mix of credit risk characteristics to assess its exposure to subprime loans, Freddie Mac determined that its Single Family guarantee portfolio had no significant exposure.

86.     Contrary to its disclosure, at December 31, 2006, Freddie Mac's single-family credit guarantee portfolio consisted of approximately $141 billion of C1, C2 and EA loans – loans that Single Family internally described as "subprime," "otherwise subprime" or "subprime-like loans" – which represented approximately 10 percent of Freddie Mac's single-family credit guarantee portfolio.

87.     Syron certified, and Cook and Bisenius each signed sub-certifications, for the 2006 Information Statement even though they knew, or were reckless in not knowing, that the

disclosure regarding exposure to subprime loans contained in the 2006 Information Statement was materially false and misleading.

88.     The disclosures contained in Freddie Mac's 2006 Information Statement were incorporated by reference into, among other things, Freddie Mac's April 10, 2007 Offering Circular, pursuant to which Freddie Mac issued $500 million of 5.66 percent non-cumulative perpetual preferred stock.

### *Syron Makes a Materially False and Misleading Statement Regarding Freddie Mac's Exposure to Subprime Loans on an Earnings Conference Call*

89.     The same day that Freddie Mac published the 2006 Information Statement, the Company's senior executives held an earnings conference call.  Syron and others participated in the call.  On the call, Syron had the following question-and-answer exchange with a research analyst:

> Q:     "Seems like over the last couple of years that subprime market has really replaced the FHA product.  You and to some degree Fannie Mae both have abstained from those higher LTV products. . . ."
>
> A:     "Fortunately, at least speaking for ourselves as a GSE, we as you know weren't involved in underwriting much of that business any of that business directly.  Having said all of that ... [w]e are working fairly intensely right now on how we can develop products in the subprime space that [are] both shareholder and consumer friendly . . . we're doing it on a pretty accelerated basis."

90.     Syron's statement that, with respect to the subprime market, Freddie Mac was not "involved in underwriting much of that business any of that business directly" was materially false and misleading.  Furthermore, his answer reinforced the already misleading impression that Freddie Mac did not participate in the "subprime space," but was exploring ways to develop products for that market.

***Syron and Cook Make Materially False and Misleading Statements Regarding
<u>Single Family's Exposure to Subprime in Speeches at Investor Conferences</u>***

91.     Less than two months after the 2006 Information Statement was issued, Syron and Cook each spoke at separate investor conferences and reiterated the misleading assertion that Single Family's exposure to subprime loans was not significant.

92.     On May 14, 2007, Syron spoke in New York at the UBS Global Financial Services Conference (the "UBS Conference") and stated: "As we discussed in the past, at the end of 2006, Freddie had basically no subprime exposure in our guarantee business, and about $124 billion of AAA rated subprime exposure in our retained portfolio."

93.     Three days later, on May 17, 2007, Cook gave a speech at the Lehman Brothers 10th Annual Financial Services Conference (the "Lehman Conference") in London and stated: "As we discussed in the past, at the end of 2006, Freddie had basically no subprime exposure in our guarantee business, and about $124 billion of AAA rated subprime exposure in our retained portfolio."

94.     Each of Syron's statement at the UBS Conference quoted in Paragraph 92 and Cook's statement at the Lehman Conference quoted in Paragraph 93 was materially false and misleading because the statements reinforced the misleading impression that Freddie Mac had little or no exposure to subprime loans in its Single Family guarantee business and was not in the "subprime space."

95.     Prior to these speeches, Syron and Cook both knew or were reckless in not knowing that it was false and misleading to claim the Company "had basically no subprime exposure." The then-head of External Reporting and others at Freddie Mac recognized that this statement was inaccurate.

96.     Prior to Syron and Cook giving these speeches, Freddie Mac's then-head of External Reporting reviewed a draft of Syron's speech and warned Bisenius, among others, that it would be false to state that Freddie Mac has basically no exposure to subprime:

> We need to be careful how we word this. Certainly our portfolio includes loans that under some definitions would be considered subprime. . . . We should reconsider making as sweeping a statement as we have "basically no subprime exposure."

97.     Bisenius did not respond to the concern raised by the then-head of External Reporting or otherwise seek to correct the speeches before they were given. He reported to Cook at the time.

### *First and Second Quarters of 2007*

98.     On June 14, 2007, Freddie Mac published its financial report for the three months ended March 31, 2007 (the "1Q07 Information Statement Supplement"), which appended, among other things, a June 14 press release in which Syron suggested that Freddie Mac was just starting to become exposed to subprime: "I'm particularly proud that our company took a leadership role in the subprime mortgage market, announcing new underwriting standards and products and committing to purchase up to $20 billion mortgages to support subprime borrowers."

99.     Freddie Mac did not quantify its subprime exposure in its 1Q07 Information Statement Supplement but incorporated by reference the misleading subprime disclosure contained in its 2006 Information Statement.

100.    The disclosures contained in Freddie Mac's 2006 Information Statement and its 1Q07 Information Statement Supplement were incorporated by reference into, among other things, Freddie Mac's July 17, 2007 Offering Circular, pursuant to which Freddie Mac issued $500 million of 6.02 percent non-cumulative perpetual preferred stock.

101.   On August 30, 2007, Freddie Mac published its 2Q07 Information Statement Supplement, which purported to disclose Freddie Mac's total Single Family exposure to subprime:

> Participants in the mortgage market often characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. There is no universally accepted definition of subprime.  The subprime segment of the mortgage market primarily serves borrowers with poorer credit payment histories and such loans typically have a mix of credit characteristics that indicate a higher likelihood of default and higher loss severities than prime loans. Such characteristics might include a combination of high loan-to-value ratios, low credit scores or originations using lower underwriting standards such as limited or no documentation of a borrower's income.  The subprime market helps certain borrowers by broadening the availability of mortgage credit.
>
> We estimate that approximately $2 billion, or 0.1 percent, and $3 billion, or 0.2 percent, of loans underlying our single-family mortgage portfolio, at June 30, 2007 and December 31, 2006, respectively, were classified as subprime mortgage loans.

The 2Q07 Information Statement Supplement also disclosed that, at June 30, 2007 and December 31, 2006, Freddie Mac held in its Retained Portfolio – which is distinct from the Single Family guarantee portfolio – "approximately $119 billion and $124 billion, respectively, of non-agency mortgage-related securities backed by subprime loans."

102.   The statement in Freddie Mac's 2Q07 Information Statement Supplement concerning Single Family's exposure to subprime in it guarantee portfolio was materially false and misleading.  It communicated the misleading impression that, after considering a mix of credit risk characteristics to assess its exposure to subprime loans, Freddie Mac determined that its Single Family guarantee portfolio included only $2 billion, or 0.1 percent, of subprime loans as of June 30, 2007.

103.    Contrary to its disclosure, as of June 30, 2007, Freddie Mac's Single Family guarantee portfolio consisted of more than $182 billion of C1, C2 and EA loans – loans internally described as "subprime," "otherwise subprime" or "subprime-like loans" – which represented approximately 11 percent of the Single Family credit guarantee portfolio.

104.    In July 2007, in between the publication of Freddie Mac's 1Q07 and 2Q07 Information Statement Supplements, Cook was involved in developing the Company's definition of subprime for disclosure purposes.

105.    Syron certified and Cook and Bisenius each sub-certified the 2Q07 Information Statement Supplement even though they knew or were reckless in not knowing that the Statement was materially false and misleading.

106.    The disclosures contained in Freddie Mac's 2006 Information Statement and its 2Q07 Information Statement Supplements were incorporated by reference into, among other things, Freddie Mac's September 25, 2007 Offering Circular, pursuant to which Freddie Mac issued $500 million of 6.55 percent non-cumulative perpetual preferred stock.

### *Third Quarter of 2007*

107.    On November 20, 2007, Freddie Mac published its 3Q07 Information Statement Supplement, which purported to disclose Freddie Mac's total Single Family exposure to subprime:

> Participants in the mortgage market often characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. There is no universally accepted definition of subprime. The subprime segment of the mortgage market primarily serves borrowers with poorer credit payment histories and such loans typically have a mix of credit characteristics that indicate a higher likelihood of default and higher loss severities than prime loans. Such characteristics might include a combination of high loan-to-value ratios, low credit scores or originations using lower underwriting standards such as limited or no documentation of a

borrower's income. The subprime market helps certain borrowers by broadening the availability of mortgage credit.

We estimate that approximately $5 billion and $3 billion of loans underlying our Structured Transactions at September 30, 2007 and December 31, 2006, respectively, were classified as subprime mortgage loans.

The 3Q07 Information Statement Supplement also disclosed that, at September 30, 2007 and December 31, 2006, Freddie Mac held in its Retained Portfolio – which is distinct from the Single Family guarantee portfolio – "approximately $105 billion and $124 billion, respectively, of non-agency mortgage-related securities backed by subprime loans."

108.    The statement in Freddie Mac's 3Q07 Information Statement Supplement concerning Single Family's exposure to subprime in its guarantee portfolio was materially false and misleading. It communicated the misleading impression that, after considering a mix of credit risk characteristics to assess its exposure to subprime loans, Freddie Mac had determined that its Single Family guarantee portfolio included only $5 billion of subprime loans as of September 30, 2007.

109.    Contrary to its disclosure, Freddie Mac's Single Family credit guarantee portfolio had exposure to approximately $206 billion of C1, C2 and EA loans – loans internally described as "subprime," "otherwise subprime" or "subprime-like loans" – which represented approximately 13 percent of the Single Family credit guarantee portfolio as of September 30, 2007.

110.    Syron certified and Cook sub-certified the 3Q07 Information Statement Supplement even though they knew or were reckless in not knowing that the Statement was materially false and misleading.

111.    The disclosures contained in Freddie Mac's 2006 Information Statement and its 3Q07 Information Statement Supplements were incorporated by reference into, among other

things, Freddie Mac's November 29, 2007 Offering Circular, pursuant to which Freddie Mac

issued $6 billion of fixed-to-floating rate non-cumulative perpetual preferred stock.

### Syron Makes a False and Misleading Statement Regarding
### Single Family's Exposure to Subprime at an Investor Conference

112.    On December 11, 2007, Syron spoke at a Goldman Sachs & Co. Financial

Services Conference (the "GS Conference") in New York.  At the GS Conference, Syron

knowingly or recklessly made the false and misleading representation that Freddie Mac had not

guaranteed any subprime loans in its Single Family guarantee business.  He stated:

> Finally, we feel that our credit position in the current guarantee
> book, actually, is very near the best of the entire industry.  A very
> major reason for this is that we have very low exposures to alt A in
> risk-layered mortgage products in the guarantee business.  We
> didn't do any subprime business. . . .  In terms of our insight into
> the subprime stuff, we didn't buy any subprime loans.  I mean, we
> bought some securities, which we can go through, and we think
> we're fine in.  We bought them for goal purposes.  But we didn't
> buy in guarantee, essentially any subprime loans.  So we weren't in
> that business.

113.    Syron's statement was materially false and misleading because his statement

reinforced the misleading impression that Freddie Mac had little or no exposure to subprime

loans in its Single Family guarantee business.  Although Syron appears to have rationalized this

false and misleading statement based on the fact that Single Family did not typically acquire

loans from a small handful of institutions that self-identified as subprime originators, this

rationale was not publicly disclosed and not shared with the audience as the basis for his

sweeping public statement.  In fact, as set forth above, at the time of Syron's statement, the

Freddie Mac Single Family guarantee business consisted of approximately $206 billion of

exposure to loans that Freddie Mac internally recognized were "subprime," "otherwise

subprime" or "subprime-like."

### *Year-End 2007*

114.    On February 28, 2008, Freddie Mac published its 2007 Information Statement,

which purported to disclose Freddie Mac's total Single Family exposure to subprime:

> Participants in the mortgage market often characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. There is no universally accepted definition of subprime. The subprime segment of the mortgage market primarily serves borrowers with poorer credit payment histories and such loans typically have a mix of credit characteristics that indicate a higher likelihood of default and higher loss severities than prime loans. Such characteristics might include a combination of high LTV ratios, low credit scores or originations using lower underwriting standards such as limited or no documentation of a borrower's income. The subprime market helps certain borrowers by broadening the availability of mortgage credit.
>
> While we have not historically characterized the single-family loans underlying our PCs and Structured Securities as either prime or subprime, we do monitor the amount of loans we have guaranteed with characteristics that indicate a higher degree of credit risk. See "Mortgage Portfolio Characteristics — Higher Risk Combinations" for further information. We estimate that approximately $6 billion and $3 billion of loans underlying our Structured Transactions at December 31, 2007 and 2006, respectively, were classified as subprime mortgage loans.

The 2007 Information Statement Supplement also disclosed that, as of December 31, 2007 and

December 31, 2006, Freddie Mac held in its Retained Portfolio – which is distinct from the

Single Family guarantee portfolio – "approximately $110 billion and $122 billion, respectively,

of non-agency mortgage-related securities backed by subprime loans." Additionally, Freddie

Mac announced that, to date, it had made purchase commitments of $207 million of mortgages

on primary residence, single-family properties, pursuant to the commitment it announced in

April 2007 to purchase up to $20 billion in fixed-rate and hybrid ARM products and also

purchases of $43 billion of mortgages to borrowers that otherwise might have been limited to

subprime products.

115.    The statement in Freddie Mac's 2007 Information Statement concerning Single

Family's subprime exposure in its guarantee portfolio was materially false and misleading

because it communicated the misleading impression that, after considering a mix of credit risk

characteristics to assess its exposure to subprime loans, Freddie Mac had determined that its

Single Family guarantee portfolio included only $6 billion of exposure to subprime loans as of

December 31, 2007.

116.    Contrary to its disclosure, Freddie Mac was exposed in its Single Family

guarantee business to approximately $226 billion of C1, C2 and EA loans – loans internally

described as "subprime," "otherwise subprime" or "subprime-like loans" – which represented

approximately 13 percent of Freddie Mac's Single Family credit guarantee portfolio as of

December 31, 2007.

117.    Syron certified and Cook sub-certified the 2007 Information Statement even

though they knew or were reckless in not knowing that the Statement was materially false and

misleading.

### *First Quarter of 2008*

118.    On May 14, 2008, Freddie Mac published its 1Q08 Information Statement

Supplement, purported to assure investors that it monitors the subprime loans it guarantees and

purported to disclose Freddie Mac's exposure to subprime loans underlying Structured

Transactions:

> Participants in the mortgage market often characterize single-
> family loans based upon their overall credit quality at the time of
> origination, generally considering them to be prime or subprime.
> There is no universally accepted definition of subprime.   The
> subprime segment of the mortgage market primarily serves
> borrowers with poorer credit payment histories and such loans
> typically have a mix of credit characteristics that indicate a higher
> likelihood of default and higher loss severities than prime loans.

> Such characteristics might include a combination of high LTV ratios, low credit scores or originations using lower underwriting standards such as limited or no documentation of a borrower's income.   The subprime market helps certain borrowers by broadening the availability of mortgage credit.  While we have not historically characterized the single-family loans underlying our PCs and Structured Securities as either prime or subprime, we do monitor the amount of loans we have guaranteed with characteristics that indicate a higher degree of credit risk (see "Higher Risk Combinations" for further information).  In addition, we estimate that approximately $4 billion of security collateral underlying our Structured Transactions at both March 31, 2008 and December 31, 2007 were classified as subprime.

The 1Q08 Information Statement Supplement also disclosed that, as of March 31, 2008 and December 31, 2007, Freddie Mac held in its Retained Portfolio – which is distinct from the Single Family guarantee portfolio – "approximately $93 billion and $101 billion, respectively, of non-agency mortgage-related securities backed by subprime loans."

119.    The statement in Freddie Mac's 1Q08 Information Statement Supplement concerning Single Family's exposure to subprime in its guarantee portfolio was materially false and misleading because it communicated the misleading impression that, after considering a mix of credit risk characteristics to assess its exposure to subprime loans, Freddie Mac had determined that its total Single Family exposure to subprime loans was only $4 billion, or the amount of its Structured Transactions as of March 31, 2008.  In fact, at the time, Freddie Mac was exposed to approximately $239 billion of C1, C2 and EA loans – loans that were internally referred to as "subprime," "otherwise subprime" or "subprime-like loans – which represented approximately 14 percent of Freddie Mac's Single Family credit guarantee portfolio.

120.    Syron certified and Cook sub-certified the 1Q08 Information Statement Supplement even though they knew or were reckless in not knowing that the Statement was materially misleading.

### *Second Quarter of 2008*

121.    On August 6, 2008, Freddie Mac filed with the Commission its 2Q08 Form 10-Q,

which was the first periodic report it filed following its registration with the Commission.  The

2Q08 Form 10-Q disclosed the following regarding Freddie Mac's subprime exposure:

> Participants in the mortgage market often characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. There is no universally accepted definition of subprime. The subprime segment of the mortgage market primarily serves borrowers with poorer credit payment histories and such loans typically have a mix of credit characteristics that indicate a higher likelihood of default and higher loss severities than prime loans. Such characteristics might include a combination of high LTV ratios, low credit scores or originations using lower underwriting standards such as limited or no documentation of a borrower's income. The subprime market helps certain borrowers by broadening the availability of mortgage credit. While we have not historically characterized the single-family loans underlying our PCs and Structured Securities as either prime or subprime, we do monitor the amount of loans we have guaranteed with characteristics that indicate a higher degree of credit risk (see "Higher Risk Combinations" for further information). In addition, we estimate that approximately $6 billion of security collateral underlying our Structured Transactions at both June 30, 2008 and December 31, 2007 were classified as subprime.
>
> . . . .
>
> Although we do not categorize our single-family loans into prime or subprime, we recognize that certain of the mortgage loans in our retained portfolio exhibit higher risk characteristics. Total single-family loans include $1.3 billion at both June 30, 2008 and December 31, 2007, of loans with higher-risk characteristics, which we define as loans with original LTV ratios greater than 90% and borrower credit scores less than 620 at the time of loan origination.

The 2Q08 Form 10-Q also disclosed that, as of June 30, 2008 and December 31, 2007, Freddie

Mac held in its Retained Portfolio – which is distinct from the Single Family guarantee portfolio

– "approximately $86 billion and $101 billion, respectively, of non-agency mortgage-related securities backed by subprime loans."

122.     The statement in Freddie Mac's 2Q08 Form 10-Q concerning Single Family's exposure to subprime in its guarantee portfolio was materially false and misleading.   It communicated the misleading impression that, after considering a mix of credit risk characteristics to assess its exposure to subprime loans, Freddie Mac had determined that its Single Family exposure to subprime loans was only $6 billion, or the amount of its Structured Transactions, as of June 30, 2008.   In fact, at June 30, 2008, Freddie Mac's Single Family guarantee portfolio was exposed to approximately $244 billion of C1, C2 and EA loans – loans that were internally referred to as "subprime," "otherwise subprime" or "subprime-like loans – which represented approximately 14 percent of Freddie Mac's Single Family credit guarantee portfolio.

123.     Syron certified and Bisenius and Cook sub-certified to the 2Q08 Form 10-Q even though they knew or were reckless in not knowing that the Statement was materially false and misleading.

124.     The chart below summarizes (in billions of U.S. dollars) the approximate exposure to subprime loans in the Freddie Mac Single Family guarantee business, as disclosed by Freddie Mac, compared to the Freddie Mac exposure to Caution Loans (C1 and C2) and EA loans – loans that were internally described as "subprime," "otherwise subprime" or "subprime like" – during the same period:

| Period | Disclosed Subprime Exposure | % Disclosed Subprime Exposure of Total Single-Family Guarantee Portfolio | Total C1, C2 and EA | Total Single-Family Guarantee Portfolio | % Total C1, C2 and EA of Total Single-Family Guarantee Portfolio |
|---|---|---|---|---|---|
| 4Q06 | "Not Significant" | 0.1% | $141 | $1,467 | 10% |
| 1Q07 | N/A | 0.1% | $159 | $1,528 | 10% |
| 2Q07 | $2 | 0.1% | $182 | $1,586 | 11% |
| 3Q07 | $5 | N/A | $206 | $1,642 | 13% |
| 4Q07 | $6 | N/A | $226 | $1,692 | 13% |
| 1Q08 | $4 | N/A | $239 | $1,739 | 14% |
| 2Q08 | $6 | N/A | $244 | $1,784 | 14% |

## FIRST CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rules 10b-5(b)
### (Against Syron and Cook)

125.    Paragraphs 1 through 124 are realleged and incorporated by reference as if set forth fully herein.

126.    Syron and Cook, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or by use of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of Freddie Mac securities, knowingly or recklessly, made

untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

127.    By reason of the foregoing, Syron and Cook violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

### SECOND CLAIM FOR RELIEF

**Aiding and Abetting Violations of
Section 10(b) of the Exchange Act and Rules 10b-5(b)
(Against Syron, Cook and Bisenius)**

128.    Paragraphs 1 through 127 are realleged and incorporated by reference as if set forth fully herein.

129.    Freddie Mac, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or by use of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, knowingly or recklessly, made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

130.    By reason of the foregoing, Syron knowingly or recklessly provided substantial assistance to and thereby aided and abetted Freddie Mac in its violations of Exchange Act Section 10(b) and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)]; therefore, Syron is liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)].

131.    By reason of the foregoing, Cook knowingly or recklessly provided substantial assistance to Freddie Mac and/or Syron and thereby aided and abetted Freddie Mac and/or Syron in their violations of Exchange Act Section 10(b) and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)]; therefore, Cook is liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)].

132.   By reason of the foregoing, Bisenius knowingly or recklessly provided substantial assistance to Freddie Mac, Syron and/or Cook and thereby aided and abetted Freddie Mac, Syron and/or Cook in their violations of Exchange Act Section 10(b) and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)]; therefore, Bisenius is liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)].

133.   Unless restrained and enjoined, Syron, Cook and Bisenius will in the future aid and abet violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

### THIRD CLAIM FOR RELIEF

#### Violations of Sections 17(a)(2) of the Securities Act
#### (Against Syron and Cook)

134.   Paragraphs 1 through 133 are realleged and incorporated by reference as if set forth fully herein.

135.   Syron and Cook, directly or indirectly, in the offer and sale of Freddie Mac securities, by use of the means and instruments of transportation and communication in interstate commerce and by use of the mails, knowingly, recklessly, or negligently have obtained money or property by means of untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

136.   By reason the foregoing, Syron and Cook violated, and unless enjoined will again violate, Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## FOURTH CLAIM FOR RELIEF

### Violation of Exchange Act Rule 13a-14
### (Against Syron)

137.    Paragraphs 1 through 136 are realleged and incorporated by reference as if set forth fully herein.

138.    On August 6, 2008, Syron signed false certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 and Rule 13a-14 promulgated thereunder, that were included in Freddie Mac's Form 10-Q filed with the Commission on that date.   His certification falsely stated that:  he had reviewed each report; based upon his knowledge, the reports did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading; and based upon his knowledge, the financial statements and information contained in each report fairly present in all material respects the financial condition, results of operations and cash flows of the issuer.

139.    By reason of the foregoing, Syron violated, and unless restrained and enjoined will in the future violate, Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14] promulgated under Section 302 of the Sarbanes-Oxley Act of 2002.

## FIFTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of Section 13(a) of the
### Exchange Act and Rules 12b-20 and 13a-13
### (Against Syron, Cook and Bisenius)

140.    Paragraphs 1 through 139 are realleged and incorporated by reference as if set forth fully herein.

141.    Section 13(a) of the Exchange Act and Rule 13a-13 thereunder require issuers of registered securities to file with the Commission factually accurate quarterly reports.  Exchange

Act Rule 12b-20 provides that, in addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made, not misleading.

142.    Freddie Mac violated Exchange Act § 13(a) [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-13].

143.    By reason of the foregoing, Syron, Cook and Bisenius acted knowingly or recklessly provided substantial assistance to and thereby aided and abetted Freddie Mac's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20 and 13a-13 [17 C.F.R. §§ 240.12b-20 and 240.13a-13]; therefore, each is liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

(a)    Permanently restrain and enjoin defendants Syron and Cook from violating or aiding and abetting violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)], Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20 and 13a-13, and with respect to defendant Syron only, Exchange Act Rule 13a-14 [17 C.F.R. §§ 240.b-20, 240.13a-13, and 240.13a-14];

(b)    Permanently restrain and enjoin defendant Bisenius from aiding and abetting violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)], Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20 and 13a-13 [17 C.F.R. §§ 240.b-20 and 240.13a-13];

(c)      Order Syron, Cook and Bisenius to pay disgorgement, together with prejudgment interest;

(d)      Order Syron, Cook and Bisenius to pay penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

(e)      Permanently bar Syron, Cook and Bisenius, pursuant to Section 20(e) of the Securities Act [15 U.S.C. §77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from acting as an officer or director of any issuer that has a class of securities registered under Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]; and

(f)    Grant such other relief as this Court may deem necessary and proper.

Dated: December 14, 2011
       Washington, DC

Respectfully submitted,

_____
Suzanne J. Romajas
Kevin P. O'Rourke

<u>Of Counsel:</u>
Stephen L. Cohen
Charles E. Cain
Giles T. Cohen
David S. Karp

SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, DC 20549-5971
Tel: 202-551-4473 (Romajas)
Email (Romajas): RomajasS@sec.gov
Email (O'Rourke): ORourkeK@sec.gov

Counsel for Plaintiff