UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                     :

U.S. SECURITIES AND EXCHANGE     :       No. 1:11-CV-9201-RJS
COMMISSION,                        :
                                     :
                Plaintiff,     :      **ECF Case**
                                     :
               v.            :      **Oral Argument Scheduled**
                                     :      **August 20, 2012**
RICHARD F. SYRON, PATRICIA L. COOK and  :
DONALD J. BISENIUS,            :
                                     :
                 Defendants.    :
                                     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## JOINT MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS WITH PREJUDICE PLAINTIFF'S CIVIL ACTION COMPLAINT

SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC  20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711

*Attorneys for Defendant Richard F. Syron*

ZUCKERMAN SPAEDER LLP
1800 M Street NW, Suite 1000
Washington, DC  20036
Telephone:  (202) 778-1800
Facsimile: (202) 822-8106

*Attorneys for Defendant Patricia L. Cook*

PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

*Attorneys for Defendant Donald J. Bisenius*

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ..................................................................................1

BACKGROUND .......................................................................................................7

    A.    The Defendants. ...................................................................................7

    B.    Freddie Mac's Operations. ...................................................................7

        1.    Single Family Guarantee Portfolio. ...........................................8

        2.    Retained Portfolio. .................................................................11

    C.    Freddie Mac's Credit Risk Disclosures. .............................................11

        1.    The Disclosures at Issue in the Complaint.................................11

            a.    Quantitative Risk Disclosures.......................................12

            b.    Narrative Subprime Disclosures. ..................................14

            c.    Risk-Layering. .............................................................17

            d.    Warnings of Increased Credit Risk.................................18

        2.    Loan-Level Disclosures by Freddie Mac.................................19

    D.    The Certifications and Sub-Certifications at Issue. .............................20

    E.    The Housing Market Crash and Freddie Mac's Statements in Conservatorship. ................................................................................20

    F.    The SEC's Allegations........................................................................22

STANDARD OF REVIEW .......................................................................................24

ARGUMENT...........................................................................................................25

I.    THE COMPLAINT DOES NOT ADEQUATELY ALLEGE ANY ACTIONABLE MISREPRESENTATION OR OMISSION. ............................25

    A.    The Commission Has Failed to State a Legally Viable Claim that Freddie Mac's Disclosures Were False or Misleading. ........................26

        1.    Freddie Mac's Statements Did Not Purport to Define the Term "Subprime" for the Entire Single Family Portfolio.........................26

2.      Freddie Mac's Statements Did Not Purport to Describe the Entire Single Family Portfolio's Subprime Exposure. ...........28

3.      Freddie Mac Made Comprehensive Quantitative Disclosures Regarding Its Credit Risk.............................................32

    a.   Credit Scores.................................................33

    b.   LTV Ratios...................................................35

    c.   Risk Layering and Other Risk Disclosures...................35

4.      Freddie Mac Had No Duty to Disclose "Caution" or "EA" Loans As Subprime.............................................36

5.      Freddie Mac Accurately Disclosed Other "Subprime" Exposure. ....................................................37

B.    Mr. Syron's Public Statements Are Not Actionable.............................38

C.    Ms. Cook's Public Statement Is Not Actionable. .................................41

II.    THE FIRST AND SECOND CLAIMS MUST BE DISMISSED FOR FAILURE ADEQUATELY TO PLEAD SCIENTER. ....................................42

A.    The Commission Fails Adequately to Allege Facts Giving Rise to a Strong Inference of Scienter as to Mr. Syron....................................43

1.      The Commission Fails to Allege Facts to Show That Mr. Syron Had the Motive And Opportunity to Commit Fraud.....................43

2.      The Complaint Does Not Allege Facts That Constitute Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness. ...........................................45

    a.   The Single Family Portfolio Did Not Typically Acquire Loans From Subprime Channels.................................46

    b.   The Complaint Fails to Allege that Mr. Syron Knew or Should Have Known Facts Contradicting the Public Statements. ...............................................46

    c.   The Complaint's Allegations Regarding Freddie Mac's "Model Subprime Offering" Similarly Fail to Show Scienter. ...............................................49

B.    The Commission Fails Adequately to Allege Facts Giving Rise to a Strong Inference of Scienter as to Ms. Cook. ....................................50

ii

1.    The Complaint's Allegations Are Insufficient to Support a Strong Inference That Ms. Cook Had the Motive And Opportunity to Commit Fraud. ...................................................50

2.    The SEC Fails to Sufficiently Allege Facts Constituting Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness. ...................................................50

C.    Freddie Mac's Extensive Truthful Disclosures Negate any Inference of Scienter. ...................................................54

III.    THE AIDING AND ABETTING CLAIMS SHOULD BE DISMISSED. ...................55

A.    The Complaint Fails to State a Claim for Aiding and Abetting Liability Against Mr. Syron. ...................................................57

B.    The Complaint Fails to State a Claim for Aiding and Abetting Liability Against Ms. Cook and Mr. Bisenius. ...................................................58

1.    The Complaint's Aiding and Abetting Allegations. ...................................................59

a.    The Allegations Against Ms. Cook. ...................................................59

b.    The Allegations Against Mr. Bisenius. ...................................................59

2.    The SEC Fails Adequately to Allege That Ms. Cook and Mr. Bisenius Provided "Substantial Assistance." ...................................................61

a.    The SEC's "Sub-Certification" Theory Fails. ...................................................61

b.    The SEC's "Bystander" Liability Theory Fails. ...................................................64

3.    The SEC Fails Adequately to Allege That Mr. Bisenius Knew That the Company's Disclosures Were Misleading. ...................................................66

4.    The Complaint Fails Adequately to Allege That Ms. Cook Knew That the Company's Disclosures Were Misleading. ...................................................68

IV.    CLAIMS ONE, TWO, FOUR AND FIVE SHOULD BE DISMISSED BECAUSE THE EXCHANGE ACT DOES NOT APPLY TO FREDDIE MAC OR ITS OFFICERS. ...................................................69

A.    The Ordinary Meaning of the Exchange Act Exempts Freddie Mac and Its Officers From Its Provisions. ...................................................70

B.    Freddie Mac's Charter Confirms Congressional Intent to Exempt It From the Exchange Act. ...................................................72

      C.     Congress's Decision to Place Freddie Mac Under Section 17
f the Securities Act Confirms That Freddie Mac Is Not Subject
to the Anti-Fraud Provisions of the Exchange Act. ................................................73

V.     CLAIM THREE FAILS ADEQUATELY TO ALLEGE THAT
DEFENDANTS OBTAINED MONEY OR PROPERTY. ...............................................74

VI.    THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE. ..........................75

CONCLUSION ....................................................................................................................75

## **TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Acito v. Imcera Grp., Inc.*,
    47 F.3d 47 (2d Cir. 1995) ........................................................................................................43

*Armstrong v. McAlpin*,
    699 F.2d 79 (2d Cir. 1983)...............................................................................................55, 61

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).............................................................................................................24

*In re BearingPoint, Inc. Sec. Litig.*,
    525 F. Supp. 2d 759 (E.D. Va. 2007) ....................................................................................54

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...............................................................................................24, 58, 75

*In re Capstead Mortg. Corp. Sec. Litig.*,
    258 F. Supp. 2d 533 (N.D. Tex. 2003) ..................................................................................25

*Cent. Bank v. First Interstate Bank*,
    511 U.S. 164 (1994).............................................................................................................65

*Chill v. Gen. Elec. Co.*,
    101 F.3d 263 (2d Cir. 1996)................................................................................................45

*Colonial Bank & Trust Co. v. Am. Bankshares Corp.*,
    439 F. Supp. 797 (E.D. Wis. 1977)..................................................................................71, 72

*Decker v. Massey-Ferguson*,
    681 F.2d 111 (2d Cir. 1982)................................................................................................45

*DiFolco v. MSNBC Cable LLC*,
    622 F.3d 104 (2d Cir. 2010)................................................................................................24

*Dodds v. Cigna Sec., Inc.*,
    12 F.3d 346 (2d Cir. 1993)..................................................................................................41

*Dolphin & Bradbury, Inc. v. SEC*,
    512 F.3d 634 (D.C. Cir. 2008)............................................................................................43

*In re Dothill Sys. Corp. Sec. Litig.*,
    No. 06-cv-228, 2009 WL 734296 (S.D. Cal. Mar. 18, 2009).................................................54

*In re Downey Sec. Litig.*,
    No. CV 08-3261, 2009 WL 736802 (C.D. Cal. Mar. 18, 2009) .............................................44

*In re Fannie Mae 2008 Sec. Litig.*,
    742 F. Supp. 2d 382 (S.D.N.Y. 2010) .......................................................................................37

*Ferber v. Travelers Corp.*,
    785 F. Supp. 1101 (D. Conn. 1991) ...........................................................................................74

*Ferber v. Travelers Corp.*,
    802 F. Supp. 698 (D. Conn. 1992) .............................................................................................54

*In re First Marblehead Corp. Sec. Litig.*,
    639 F. Supp. 2d 145 (D. Mass. 2009) ........................................................................................25

*Fulton County Employees' Ret. Sys. v. MGIC Inv. Corp.*,
    No. 08-C-0458, 2010 WL 601364 (E.D. Wis. Feb. 19, 2010) ...................................................33

*Greenhouse v. MCG Capital Corp.*,
    392 F.3d 650 (4th Cir. 2004) .....................................................................................................25

*Heller v. Goldin Restructuring Fund, L.P.*,
    590 F. Supp. 2d 603 (S.D.N.Y. 2008) ......................................................................................44

*Howe v. Bank for Int'l Settlements*,
    194 F. Supp. 2d 6 (D. Mass. 2002) ...........................................................................................71

*IIT v. Cornfeld*,
    619 F.2d 909 (2d Cir. 1980) .......................................................................................................65

*Joffee v. Lehman Bros. Inc.*,
    209 F. App'x 80 (2d Cir. 2006) ..........................................................................................25, 36

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001) .......................................................................................................45

*Kidder Peabody & Co. v. Unigestion Int'l Ltd.*,
    903 F. Supp. 479 (S.D.N.Y. 1995) ...........................................................................................73

*Klein v. General Nutrition Cos.*,
    186 F.3d 338 (3d Cir. 1999) .......................................................................................................25

*Kapps v. Torch Offshore, Inc.*,
    379 F.3d 207 (5th Cir. 2004) .....................................................................................................25

*Kuriakose v. Fed. Home Loan Mortg. Corp.*,
    No. 08-7281, 2011 WL 1158028 (S.D.N.Y. Mar. 30, 2011) ...................................................33

*Landgraf v. USI Film Prods.*,
  511 U.S. 244 (1994)........................................................................................56

*Ley v. Visteon Corp.*,
  543 F.3d 801 (6th Cir. 2008) ........................................................................25

*Maldonado v. Dominguez*,
  137 F.3d 1 (1st Cir. 1998)..............................................................................44

*Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*,
  576 F.3d 172 (4th Cir. 2009) ........................................................................54

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
  272 F. Supp. 2d 243 (S.D.N.Y. 2003)..........................................................25

*In re Morgan Stanley Info. Fund Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010)..........................................................................25

*Morgan v. Prudential Grp., Inc.*,
  81 F.R.D. 418 (S.D.N.Y. 1979) ....................................................................58

*Nolte v. Capital One Fin. Corp.*,
  390 F.3d 311 (4th Cir. 2004) ........................................................................29

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)......................................................43, 45, 46, 50

*OKC Corp. v. Williams*,
  461 F. Supp. 540 (N.D. Tex. 1978) ..............................................................71

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
  98 F.3d 2 (2d Cir. 1996).........................................................25, 38, 41, 75

*In re Refco, Inc. Sec. Litig.*,
  503 F. Supp. 2d 611 (S.D.N.Y. 2007)..........................................................44

*Rolf v. Blyth, Eastman Dillon & Co.*, Inc.,
  570 F.2d 38, 47 (2d Cir. 1978)......................................................................43

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004).....................................................................24, 25

*Ruotolo v. City of New York*,
  514 F.3d 184 (2d Cir. 2008)..........................................................................75

*In re Salomon Analyst Level 3 Litig.*,
  373 F. Supp. 2d 248 (S.D.N.Y. 2005)..........................................................27

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Co.*,
  75 F.3d 801 (2d Cir. 1996)...............................................................................44, 45

*Schindler Elevator Corp. v. U.S. ex rel. Kirk*,
  131 S. Ct. 1885 (2011) ...........................................................................................70

*In re Sec. Capital Assurance Ltd. Sec. Litig.*,
  729 F. Supp. 2d 569 (S.D.N.Y. 2010)....................................................................44

*SEC v. Apuzzo*,
  758 F. Supp. 2d 136 (D. Conn. 2010) ..............................................................61, 63

*SEC v. Baxter*,
  No. C-05-03843 RMW, 2007 WL 2013958 (N.D. Cal. July 11, 2007) ................58

*SEC v. Black*,
  No. 04-c-7377, 2008 WL 4394891 (N.D. Ill. Sept. 24, 2008) .............................41

*SEC v. Cedric Kushner Promotions, Inc.*,
  417 F. Supp. 2d 326 (S.D.N.Y. 2006)........................................................56, 57, 61

*SEC v. Daifotis*,
  No. 11-00137, 2011 WL 2183314 (N.D. Cal. June 6, 2011) .................................74

*SEC v. Espuelas*,
  698 F. Supp. 2d 415 (S.D.N.Y. 2010)........................................................... *passim*

*SEC v. Forman*,
  No 07-1151, 2010 WL 2367372 (D. Mass. June 9, 2010)....................................75

*SEC v. Glantz*,
  No. 94-5737, 1995 WL 562180 (S.D.N.Y. Sept. 20, 1995) ...........................74, 75

*SEC v. Kelly*,
  765 F. Supp. 2d 301 (S.D.N.Y. 2011)....................................................................56

*SEC v. KPMG LLP*,
  412 F. Supp. 2d 349 (S.D.N.Y. 2006)....................................................................56

*SEC v. Monarch Funding Corp.*,
  192 F.3d 295 (2d Cir. 1999)...................................................................................24

*SEC v. Mozilo*,
  No. 09-cv-3994, 2009 WL 1549287 (C.D. Cal. June 4, 2009).......................28, 33

*SEC v. Mozilo*,
  No. 09-cv-3994, 2010 WL 3656068 (C.D. Cal. Sept. 16, 2010) ...........................41

*SEC v. Pasternak,*
    561 F. Supp. 2d 459 (D.N.J. 2008) ...................................................................61

*SEC v. Patel,*
    No. 07-cv-39-SM, 2009 WL 3151143 (D.N.H. Sept. 30, 2009) ............................63

*SEC v. Power,*
    525 F. Supp. 2d 415 (S.D.N.Y. 2007)..................................................................61

*SEC v. Stanard,*
    No. 06 Civ. 7736, 2009 WL 196023 (S.D.N.Y. Jan. 27, 2009)............................56

*SEC v. Tecumseh Holdings Corp.,*
    No. 03 Civ. 5490, 2009 WL 4975263 (S.D.N.Y. Dec. 22, 2009).........................61

*SEC v. Treadway,*
    430 F. Supp. 2d 293 (S.D.N.Y. 2006)............................................................57, 61

*SEC v. Woodruff,*
    778 F. Supp. 2d 1073 (D. Colo. 2011)...........................................................61, 62

*Shields v. Citytrust Bancorp, Inc.,*
    25 F.3d 1124 (2d Cir. 1994)..........................................................................44, 45

*In re Sportsline.com Sec. Litig.,*
    366 F. Supp. 2d 1159 (S.D. Fla. 2004) ...............................................................43

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007)....................................................................................7, 24

*U.S. v. Martinez-Santos,*
    184 F.3d 196 (2d Cir. 1999)...............................................................................70

*In re Wachovia Equity Sec. Litig.,*
    753 F. Supp.2d 326 (S.D.N.Y. 2011)...................................................................29

*In re Worlds of Wonder Sec. Litig.,*
    35 F.3d 1407 (9th Cir. 1994) ..............................................................................54

*Xiao Ji Chen v. U.S. Dep't of Justice,*
    471 F.3d 315 (2d Cir. 2006)...............................................................................73

### STATUTES AND RULES

12 U.S.C. § 282....................................................................................................72

12 U.S.C. § 287....................................................................................................72

12 U.S.C. § 302....................................................................................................72

12 U.S.C. § 304 ..................................................................................................72

12 U.S.C. § 341 ..................................................................................................72

12 U.S.C. § 1451 .............................................................................................8, 71

12 U.S.C. § 1452 ...........................................................................................70, 71

12 U.S.C. § 1455 ..................................................................................................73

12 U.S.C. § 1811 ..................................................................................................72

15 U.S.C. § 77c(a)(2) ...........................................................................................73

15 U.S.C. § 77q(a)(2) ................................................................................24, 74, 75

15 U.S.C. § 78c(c) ........................................................................................ *passim*

15 U.S.C. § 78j(b) ......................................................................23, 24, 55, 72

15 U.S.C. § 78m(a) ................................................................24, 55, 56, 72

15 U.S.C. § 78t(e) .................................................................................................72

24 C.F.R. § 81.12 ...................................................................................................8

Dodd-Frank Wall Street Reform Act,
    Pub. L. No. 111-203, 124 Stat. 1367 (2010) ................................................56

Fed. R. Civ. P. 9(b) ....................................................................24, 42, 45, 58

Fed. R. Civ. P. 12(b)(6)...................................................................................7, 42

Federal Housing Enterprises Financial Safety and Soundness Act of 1992,
    Pub. L. No. 102-550, 106 Stat. 3672 (1992) .....................................7, 70, 71

Financial Institutions Reform, Recovery and Enforcement Act of 1989,
    Pub. L. No. 101-73, 103 Stat. 183 (1989) ....................................................70

Housing and Economic Recovery Act of 2008,
    Pub. L. No. 111-289, 122 Stat. 2654 (2008)................................................71

Pub. L. No. 91-351, 84 Stat. 452 (1970) ...........................................................70

## OTHER AUTHORITIES

Dep't of Housing & Urban Development,
    Subprime and Manufactured Home Lender List, Data Sets ..........................15

Fin. Crisis Inquiry Comm'n, *Final Report of the National Commission on the*
   *Causes of the Financial and Economic Crisis in the United States* (2011).......................20, 21

Freddie Mac, Loan-Level Disclosure,
   Variable Names & Descriptions (Mar. 1, 2006)....................................................................19

Freddie Mac, Loan-Level Disclosure,
   Variable Names & Descriptions (April 2008) ......................................................................19

H.R. Rep. No. 73-1383 (1934).................................................................................................73

Interagency Guidance on Nontraditional Mortgage Product Risks,
   71 Fed. Reg. 58,609 (Oct. 4, 2006)..................................................................................13, 15

*In re Lisa B. Premo*, SEC Order Instituting Administrative Cease-And-
   Desist Proceedings (Jan. 17, 2012) ..................................................................................28, 33

OCC Bulletin 2001-6, Expanded Guidance for Subprime Lending Programs
   (Jan. 31, 2001)........................................................................................................................14

S. Rep. No. 73-792 (1934) ........................................................................................................73

Statement on Subprime Mortgage Lending,
   72 Fed. Reg. 37,569 (July 10, 2007).......................................................................13, 14, 15, 29

*Transparency as an Alternative to Risk Retention: Hearing before the H.R.*
   *Comm. on Oversight & Gov't Reform Subcommittee on TARP, Financial*
   *Servs. & Bailouts of Public and Private Programs*, 112th Cong. (May 11, 2011) .................19

*Webster's New International Dictionary* (2d ed. 1934)................................................................70

Defendants Richard F. Syron, Patricia L. Cook and Donald J. Bisenius respectfully submit this Memorandum of Law in Support of their Motion to Dismiss with Prejudice the Complaint filed by the Securities and Exchange Commission ("Commission" or "SEC") pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6).

## PRELIMINARY STATEMENT

This case is a misguided attempt to punish three respected, skilled and dedicated former officers of the Federal Home Loan Mortgage Corporation ("Freddie Mac" or the "Company") for a crisis in the housing market they did not cause. In an effort to scapegoat Defendants, the Complaint mischaracterizes statements about the Company's so-called "subprime" holdings, alleging they were fraudulent when they were neither false nor misleading. Specifically, the Complaint alleges that a single paragraph included in the extensive periodic reports issued by Freddie Mac and a few sentences contained within lengthy public remarks made by Mr. Syron and Ms. Cook conveyed a "misleading impression" about the Company's exposure to "subprime" mortgages underlying its Single Family guarantee portfolio ("Single Family portfolio").

The SEC's basic theory is implausible. Far from hiding credit risk in its trillion-dollar-plus Single Family portfolio, as the SEC alleges, Freddie Mac expressly told investors that there is "no universally accepted definition of subprime" and that the Company's disclosures did *not* classify the mortgages underlying the vast majority of the portfolio as either "prime" or "subprime." Because the term "subprime" could and did have different meanings to different people, Freddie Mac chose not to apply that ambiguous label in its disclosure documents and instead provided tables of comprehensive data regarding the mortgages' credit characteristics.

These loan characteristic tables provided transparency to investors, in accordance with guidance on subprime lending developed by federal regulators—including the Office of the Comptroller of the Currency, the Federal Reserve and the Federal Deposit Insurance Corporation ("FDIC").  This regulatory guidance—repeatedly referenced by the Company in the filings at issue here—explained that "the term 'subprime' is not consistently defined in the marketplace or among individual institutions," and noted that using mortgage credit characteristics to describe credit risk provided clarity lacking in the label "subprime."   Accordingly, Freddie Mac's disclosures told investors the percentages of loans underlying the Single Family portfolio that stood at various levels of borrower credit scores or loan-to-value ("LTV") ratios.  Freddie Mac also disclosed the percentages in the portfolio of various types of non-traditional loans that market participants sometimes associated with "subprime" lending.  These disclosures appear in the very documents about which the Commission complains—and within just a few pages of the statements it claims misled investors.

Freddie Mac's ample quantitative disclosures enabled any investor to analyze the extent of risk in the Single Family portfolio.  By way of illustration, during the Relevant Period (March 2007 to August 2008), any reader of Freddie Mac's reports could see at a glance the percentage of the loans underlying the Single Family portfolio that had been made to borrowers with credit scores below 660—one metric identified by federal banking regulators, the SEC itself and some market participants as an indicator of a "subprime" mortgage.  The Company's 2007 Information Statement showed that at least 13% of the loans underlying its entire Single Family portfolio, and 17% of the mortgages it purchased over the past year, fell below the 660 credit score threshold. These disclosures render wholly implausible the Complaint's allegation that the Company concealed the fact that 10-14% of the Single Family portfolio allegedly was "subprime."

Notwithstanding these accurate disclosures, the Complaint claims that Freddie Mac and its executives intentionally misled investors by giving the impression that the Company had concluded that the Single Family portfolio's exposure to "subprime" loans was "not significant" or "basically no[ne]."  According to the SEC, all of the Defendants knew that such statements were false because loans amounting to 10-14% of the Single Family portfolio were referred to in internal Freddie Mac communications as "subprime," "otherwise subprime" or "subprime-like."

These arguments ignore the plain language of the disclosures and wrench statements out of context.  Statements that exposure to "subprime" loans was "not significant" or "basically no[ne]" referred to purchases of loans from self-described "subprime" mortgage originators. These statements were true:  As the Complaint concedes, Freddie Mac's Single Family portfolio "did not typically acquire loans from a small handful of institutions that self-identified as subprime originators."

Further, it is unremarkable that Freddie Mac stated that a small amount of securities underlying its Structured Transactions had been identified by the *issuer* as backed by "subprime" loans.  These statements clearly referred only to securities that were found in the Company's relatively small holdings of Structured Transactions, and not to the entire Single Family portfolio, where the Company refused to use the label "subprime."  No reasonable investor would have misread the Company's disclosures about Structured Transactions in the bizarre manner presented in the Complaint.

The Complaint's allegation that Freddie Mac should have publicly labeled loans that received "Caution" rankings from Freddie Mac's proprietary automated underwriting program ("Loan Prospector") as "subprime" makes no sense.  The Complaint correctly asserts that loans received "Caution" grades based on their credit risk characteristics.  But Freddie Mac published

the data on credit risk characteristics—specifically including borrower credit scores and loan-to-value ratios—for its entire Single Family portfolio.  Freddie Mac disclosed the data underlying the "Caution" rating—the very information the Complaint suggests that investors lacked.  Boiled down to its essence, the Complaint rests on the incoherent proposition that Freddie Mac should have used an imprecise term to characterize a portion of its Single Family portfolio, instead of providing the more precise and detailed credit risk characteristics that it did disclose.

Freddie Mac had no duty to disclose its internal underwriting rankings to investors.  The fact that internal communications by some employees may have occasionally called "Caution" loans "subprime," "subprime-like" or "otherwise subprime" is not relevant.  The Commission cannot establish that these internal, colloquial comments were appropriate for Freddie Mac's public filings, much less necessary to make the Company's comprehensive credit risk disclosures not misleading.

In addition, the Complaint should be dismissed because it fails to allege facts that give rise to a "strong inference" of fraudulent intent.  The Complaint does not adequately allege that any Defendant had a motive to mislead investors.  It does not allege that any Defendant sold stock during the Relevant Period (Mr. Syron, for example, saw his holdings drop $24 million in value), and the allegation that Defendants benefitted from their executive compensation fails, as a matter of law, to adequately plead motive.  The Complaint's claims of primary liability hinge instead on showing "conscious misbehavior or recklessness."  Yet, the Complaint's scattershot allegations of unconnected documents and meetings fail to include any facts that would have put Defendants on notice that the Company's statements could have misled investors about its subprime exposure.

The Complaint also alleges that each Defendant aided and abetted some or all of the alleged misrepresentations.  These claims fail as a matter of law for several reasons.  First, the Complaint does not adequately establish a primary violation.   Second, the Complaint's allegations do not support a plausible inference that any Defendant actually knew that any of Freddie Mac's disclosures were misleading.   To the extent the SEC relies on a theory of recklessness, these claims should be dismissed because the courts in this Circuit have repeatedly held that the SEC's burden is to plead "actual knowledge," and it has failed to do so.  Third, the Complaint does not adequately allege that any Defendant "substantially assisted" a violation of law.  The Complaint focuses on Mr. Syron's certification and Ms. Cook's and Mr. Bisenius's "sub-certifications," which stated that, to the best of their knowledge, the disclosure documents in question were not misleading.   These certifications and sub-certifications were broad and general, directed at the entire disclosure rather than any specific part, and do not mention "subprime" loans.  No case of which we are aware has held that such "certifications" or "sub-certifications," standing alone, suffice to state a claim of aiding and abetting, and the courts have uniformly held that mere participation in a company's internal disclosure review process—even participation amounting to approval of alleged misstatements—does not constitute "substantial assistance."  Because there is no allegation that Defendants drafted, edited or even commented on statements about "subprime" exposure as part of Freddie Mac's disclosure review process, the Complaint's aiding and abetting claims fail.

The Complaint suffers from other defects, as well.  Claim Three, which alleges that Mr. Syron and Ms. Cook violated Section 17(a)(2) of the Securities Act of 1933 ("Securities Act"), should be dismissed because the Complaint does not allege that they "obtained money or property" by means of any actionable misrepresentation or omission.  The mere fact that their

5

compensation increased with the Company's overall performance does not suffice.  And the Court need not even reach the four claims in the Complaint arising under the Securities Exchange Act of 1934 ("Exchange Act") and its regulations because Section 3(c) of the Exchange Act makes clear that its provisions do not apply to Freddie Mac and its officers.

*          *          *

Since September 2008, Freddie Mac has been under the conservatorship of a new regulator, the Federal Housing Finance Agency ("FHFA"); closely supervised by the U.S. Department of the Treasury; subject to increased congressional oversight; and run by new management.  Moreover, in December 2011, the Company entered into a non-prosecution agreement with the SEC under which it owes continuing obligations to the SEC.  Despite these developments, the Company has continued to issue disclosures concerning its "subprime" exposure that are consistent with the statements the Complaint alleges were misleading.  To this day, the Company has never stated that its "Caution" loans are "subprime."  Indeed, in March 2012, months after the Complaint was filed, Freddie Mac filed a Form 10-K that contains statements about "subprime" mortgages that are strikingly similar to the disclosures alleged to be misleading here.  The Company continues to state: "we have not historically characterized the loans in our single-family credit guarantee portfolio as either prime or subprime."

In sum, the Complaint seeks to sanction Freddie Mac's executives for not making "subprime" disclosures that Freddie Mac's current management—closely regulated and supervised by FHFA and the SEC—still do not make today.  This is an ill-conceived attempt to cast blame on Defendants for losses that resulted from an unprecedented deterioration in the housing market that virtually no one expected—including the Commission and other federal regulators.  This flawed Complaint should be dismissed, with prejudice.

6

## BACKGROUND[1]

### A.     The Defendants.

Mr. Syron was the Chairman of the Board of Directors and CEO of Freddie Mac from late 2003 to September 2008.  Compl. ¶ 15.  In that role, he oversaw all segments of Freddie Mac and a total mortgage portfolio that reached $2.2 trillion.  *Id.* ¶ 16; Freddie Mac, Form 10-Q at 77, tbl. 49 (Aug. 6, 2008) ("2Q08 Form 10-Q"), Ex. 7.[2]

Ms. Cook served as Executive Vice President of Investments and Capital Markets and Chief Business Officer of Freddie Mac during the Relevant Period.  Compl. ¶ 19.  In that role, Ms. Cook oversaw both Freddie Mac's Single Family guarantee portfolio and its retained portfolio.  Ms. Cook also served on Freddie Mac's Senior Executive Team.  *Id.* ¶ 20.

Mr. Bisenius worked at Freddie Mac for nearly 20 years, from 1992 until April 2011.  *Id.* ¶ 24.  During the Relevant Period, he served as a senior vice president under Ms. Cook.  *Id.* ¶ 25.  For most of that time (March 2007 to April 2008), he worked on "special projects" for the Company.  *Id.* ¶ 26.  Apparently in recognition of that role, the SEC claims that Mr. Bisenius aided and abetted the publication of only three of the six Freddie Mac disclosures alleged to be misleading.  *Id.* ¶ 76.

### B.     Freddie Mac's Operations.

Freddie Mac was chartered by Congress to perform the "important public missions" of providing liquidity and stability to the residential mortgage market.  Federal Housing Enterprises Financial Safety and Soundness Act of 1992, Pub. L. No. 102-550, § 1302(1), 106 Stat. 3672,

---

[1]  Pursuant to Fed. R. Civ. P. 12(b)(6), this background relies on the Complaint's allegations, documents incorporated therein, and documents that are subject to judicial notice.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

[2]  Unless otherwise noted, all exhibits in support of Defendants' Motion are attached to the accompanying Declaration of Daniel J. Beller.  Where necessary, excerpts of documents are provided in accordance with the Court's Individual Practices.

3941 (1992); Compl. ¶ 9.   The Company accomplishes these missions through two main activities.   First, the Company purchases, securitizes, guarantees and then sells mortgage-related securities (the "guarantee portfolio").   The guarantee portfolio backs "single-family" and "multifamily" mortgages.[3]   Second, the Company invests in mortgage-related securities (the "retained portfolio").   Compl. ¶ 10.

Congress has mandated that Freddie Mac support lending to low- and moderate-income families.   12 U.S.C. § 1451 Note.   From 2005 through the period in question, the U.S. Department of Housing and Urban Development ("HUD") steadily increased the portion of loans to low- and moderate-income families that the Company was required to purchase, up from 50% before 2005 to 56% by 2008.   *See* Freddie Mac, 2005 Information Statement and Annual Report to Stockholders, at 6 (June 28, 2006); 24 C.F.R. § 81.12(c).   As the Company made clear, to meet these goals, it had to "relax some of [its] underwriting criteria . . . and may make additional investments in higher-risk mortgage loan products that are more likely to serve the borrowers targeted by HUD's goals and subgoals.   Efforts to meet the goals and subgoals could further increase our credit losses."   2007 IS at 8 (Ex. 5); *see, e.g.*, Freddie Mac, 2006 Information Statement and Annual Report to Stockholders, at 6-7 (Mar. 23, 2007) ("2006 IS"), Ex. 2.

1.   Single Family Guarantee Portfolio.

The Complaint focuses on the Single Family guarantee portfolio.   Compl. ¶ 11.   In the Single Family business, Freddie Mac issues securities, known as Participation Certificates ("PCs"), that are backed by bundles of residential mortgages the Company purchases from

---

[3]   "Single-family mortgages are secured by one- to four-family properties"; "[m]ultifamily mortgages are secured by properties with five or more residential rental units."   Freddie Mac, 2007 Information Statement and Annual Report to Stockholders, at 2 (Feb. 28, 2008) ("2007 IS"), Ex. 5.

mortgage originators.  *Id.* ¶ 12.  Freddie Mac guarantees the payment of principal and interest on the mortgages that underlie its PCs in exchange for guarantee fees paid by the originators.  *Id.*

A small portion of the Single Family portfolio is made up of what Freddie Mac refers to as Structured Securities.  These are securities that Freddie Mac issues that represent beneficial interests in pools of PCs and certain other types of mortgage-related assets.  *See, e.g.*, 2007 IS at 4–5 (Ex. 5).

A portion of the Structured Securities are known as Structured Transactions.  In a Structured Transaction, Freddie Mac purchases senior interests in a trust that holds mortgage-related collateral, and then issues guaranteed Structured Securities backed by those senior interests.  2007 IS at 5 (Ex. 5); 2006 IS at 68-69 (Ex. 2).  The collateral in these trusts typically is "non-agency mortgage-backed securities," which means they are issued not by government-sponsored enterprises ("GSEs") such as Freddie Mac or the Federal National Mortgage Association ("Fannie Mae"), but by private issuers, such as Wall Street investment banks.  2007 IS at 5 (Ex. 5); 2006 IS at 68-69 (Ex. 2).  During the Relevant Period, the Structured Transactions amounted to approximately $20.4 billion to $29.4 billion, or 1% to 2%, of the Single Family portfolio.  *See, e.g.*, 2006 IS at 68 (Ex. 2); 2Q08 Form 10-Q at 76, tbl. 48 (Ex. 7).  As Freddie Mac's annual Information Statements disclosed, "Structured Transactions generally have underlying mortgage loans with higher risk characteristics."  *Id.*

As part of its mortgage acquisition process, Freddie Mac uses a proprietary automated underwriting system called Loan Prospector.  Compl. ¶ 31; 2007 IS at 90 (Ex. 5).  Loan Prospector generates scores that determine the terms on which Freddie Mac will purchase mortgages.  Compl. ¶ 32.  Freddie Mac groups the scores into grades that correspond with the anticipated risk of default, based on factors such as credit scores and LTV ratios.  *Id.* ¶¶ 33, 35;

2007 IS at 90–91 (Ex. 5) (listing "indicators of mortgage default risk").  Loans qualifying for the first four grades (A+, A1, A2 and A3) are designated as "Accept Loans," and can be sold to Freddie Mac using automated underwriting, with reduced documentation and without special representations and warranties regarding their credit quality.   Compl. ¶¶ 33–34.   Loans qualifying for the bottom two grades (C1 and C2) receive a "Caution" designation, which requires the originator to manually underwrite the loan, produce additional documentation regarding the borrower's creditworthiness and make special representations and warranties.  *Id.* ¶¶ 33, 35.  Freddie Mac also sometimes acquires loans processed by Fannie Mae, including loans known as "Expanded Approval" ("EA") loans.  *Id.* ¶ 46b.  According to the Complaint, Freddie Mac believed EA loans had credit risks that, at best, equaled a C1 loan.  *Id.* ¶¶ 46b, 38.

In its public disclosures, Freddie Mac described its use of Loan Prospector to manage credit risk.  2007 IS at 90-91 (Ex. 5).  Although Freddie Mac did not disclose Loan Prospector scores to investors, Compl. ¶ 33, the Company did provide detailed information regarding risk factors for its Single Family portfolio (such as credit scores and LTV ratios).[4]

From the end of 2005 to the second quarter of 2008, Freddie Mac's Single Family portfolio nearly doubled from $974 billion to $1.8 trillion.  2007 IS at 73 (Ex. 5); Compl. ¶ 11. During that same period, Freddie Mac's holdings of C1, C2 and EA loans increased from $97 billion to $244 billion.  Compl. ¶ 48.  The SEC alleges that Freddie Mac should have publicly identified C1, C2 and EA loans as "subprime."  *See id.*  ¶¶ 86, 103, 109, 116, 119, 122, 124.

---

[4]   *E.g.*, 2006 IS at 70 (Ex. 2); Freddie Mac, Financial Report for the Three and Six Months Ended June 30, 2007, at 32 (Aug. 30, 2007) ("2Q07 ISS"), Ex. 3; Freddie Mac, Financial Report for the Three and Nine Months Ended September 30, 2007, at 31 (Nov. 20, 2007) ("3Q07 ISS"), Ex. 4; 2007 IS at 96 (Ex. 5); Freddie Mac, Financial Report for the Three Months Ended March 31, 2008, at 40 (May 14, 2008) ("1Q08 ISS"), Ex. 6.

2.      Retained Portfolio.

Freddie Mac's retained portfolio consists of investments that Freddie Mac makes and holds.  As the Company consistently disclosed, its retained portfolio includes purchases of mortgages and mortgage-related securities "with less attractive investment returns and with incremental risk in order to achieve our affordable housing goals."  *See, e.g.*, 2007 IS at 6 (Ex. 5).  Many of the retained portfolio investments were Freddie Mac's own PCs or securities issued by other GSEs.   The retained portfolio also contained "[n]on-agency mortgage-related securities."  2007 IS at 56, tbl. 22 (Ex. 5).  From the end of 2005 to the second quarter of 2008, Freddie Mac's total retained portfolio grew from $710 billion to $792 billion.  *See* 2Q08 Form 10-Q at 77, tbl. 49 (Ex. 7).  Of that $792 billion, about one-quarter ($213 billion) consisted of non-agency mortgage related securities.  *See id.*

**C.      Freddie Mac's Credit Risk Disclosures.**

The disclosures in question resulted from a rigorous, transparent approval process that involved primary drafting by the Finance department and then multiple steps of review by a Disclosure Committee, Freddie Mac's legal department, outside counsel, outside auditors, senior executives (including those from Risk Management and Internal Audit) and the Audit Committee.

1.      The Disclosures at Issue in the Complaint.

In each of its financial reports, the Company included a section titled "Mortgage Credit Risk."  *E.g.*, 2007 IS at 90-106 (Ex. 5); 2006 IS at 66-78 (Ex. 2).  This section explained that credit risk is influenced by "the credit profile of the borrower on the mortgage, the features of the mortgage itself, the type of property securing the mortgage and the general economy."  2006 IS at 66 (Ex. 2).  Each section then provided both quantitative information about Freddie Mac's

mortgage portfolios, which was presented in a standard tabular format in each report, and also a narrative discussion, which varied in each report.  *E.g.*, *id.* at 70-71.

                a.          Quantitative Risk Disclosures.

       Chief among Freddie Mac's quantitative disclosures of mortgage credit risk was a table titled "Characteristics of Single-Family Mortgage Portfolio."  2006 IS at 70 (Ex. 2); 2Q07 ISS at 32 (Ex. 3); 3Q07 ISS at 31 (Ex. 4); 2007 IS at 96 (Ex. 5); 1Q08 ISS at 40 (Ex. 6); 2Q08 Form 10-Q at 59 (Ex. 7).  This table identified what the Company believed to be the most important predictors of default—borrower credit scores, loan-to-value ratios, loan purpose and property characteristics.  *E.g.*, 2007 IS at 96 (Ex. 5).  The table detailed, for the past three years, what percentage of the Company's entire Single Family portfolio included loans at various levels of those risk factors.  *Id.*  For certain factors, the table listed this information both as a percentage of the entire Single Family portfolio and as a percentage of annual purchases for the portfolio.  *Id.* For example, the Company disclosed that, at the end of 2007, at least 13% of the entire Single Family portfolio included loans made to borrowers with credit scores under 660.  *Id.*  Of purchases made in calendar year 2007, 17% included loans made to borrowers with those credit scores.  *Id.*  Federal regulators, some market participants and even the SEC itself have relied on the credit score threshold of 660 to identify mortgages that are likely to feature "subprime" risk. *See infra* Section I.A.3.a.  Reproduced below is an illustrative table from the Company's 2007 Information Statement:

Table 46 — Characteristics of Single-Family Mortgage Portfolio[1]

| | Purchases During the Year Ended December 31, | | | Portfolio at December 31, | | |
|---|---|---|---|---|---|---|
| | 2007 | 2006 | 2005 | 2007 | 2006 | 2005 |
| **Original LTV Ratio Range[2]** | | | | | | |
| Less than 60% | 18% | 19% | 21% | 22% | 24% | 25% |
| Above 60% to 70% | 14 | 14 | 16 | 16 | 16 | 17 |
| Above 70% to 80% | 49 | 54 | 50 | 47 | 46 | 44 |
| Above 80% to 90% | 8 | 7 | 7 | 8 | 7 | 8 |
| Above 90% to 100% | 11 | 6 | 6 | 7 | 7 | 6 |
| Above 100% | — | | | — | — | |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| Weighted average original ratio | 74% | 73% | 71% | 71% | 70% | 70% |
| **Estimated Current LTV Ratio Range[3]** | | | | | | |
| Less than 60% | | | | 41% | 52% | 56% |
| Above 60% to 70% | | | | 15 | 18 | 18 |
| Above 70% to 80% | | | | 19 | 20 | 18 |
| Above 80% to 90% | | | | 15 | 8 | 6 |
| Above 90% to 100% | | | | 7 | 2 | 2 |
| Above 100% | | | | 3 | — | |
| Total | | | | 100% | 100% | 100% |
| Weighted average estimated current LTV ratio | | | | 63% | 57% | 56% |
| **Credit Score[4]** | | | | | | |
| 740 and above | 42% | 42% | 44% | 45% | 45% | 45% |
| 700 to 739 | 22 | 24 | 23 | 23 | 23 | 23 |
| 660 to 699 | 19 | 19 | 19 | 18 | 18 | 18 |
| 620 to 659 | 11 | 10 | 10 | 9 | 9 | 9 |
| Less than 620 | 6 | 5 | 4 | 4 | 4 | 4 |
| Not available | — | — | — | 1 | 1 | 1 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| Weighted average credit score | 718 | 720 | 722 | 723 | 725 | 725 |

Additional quantitative disclosures presented investors with detailed pictures of the Company's credit risk. One table categorized the total portfolio by loan type, showing the percentage of the portfolio consisting of traditional loan products, such as 30-year fixed-rate mortgages, as well as the percentage of non-traditional loans, such as adjustable-rate mortgages ("ARMs") and interest-only loans. *E.g.*, 2006 IS at 68 (Ex. 2); 2Q07 ISS at 33 (Ex. 3); 3Q07 ISS at 32 (Ex. 4); *see also* 2007 IS at 75 (Ex. 5) (disclosing this information in absolute dollar amounts). As Freddie Mac's disclosures made clear, as federal regulatory guidance discussed and as market participants well knew, certain types of non-traditional loans are sometimes associated with subprime lending. *E.g.*, 2006 IS at 68 (Ex. 2); 2007 IS at 92-93 (Ex. 5); *see also* Interagency Guidance on Nontraditional Mortgage Product Risks, 71 Fed. Reg. 58,609, 58,613 (Oct. 4, 2006) ("Interagency Guidance"); Statement on Subprime Mortgage Lending, 72 Fed. Reg. 37,569, 37,569 (July 10, 2007) ("Subprime Statement"). Other tables detailed the delinquency rates of loans by origination year and loan type. *E.g.*, 2006 IS at 74–75 (Ex. 2);

13

2007 IS at 101–102 (Ex. 5).  The SEC does not dispute the accuracy of any of these quantitative

disclosures.

b. Narrative Subprime Disclosures.

Freddie Mac's narrative discussions of credit risk included a subsection addressed to

"Subprime Loans."  *E.g.*, 2007 IS at 93-94 (Ex. 5); 2006 IS at 69 (Ex. 2).  The reports stated that

"[p]articipants in the mortgage market often characterize single-family loans based upon their

overall credit quality at the time of origination, generally considering them to be prime or

subprime."  Compl. ¶¶ 101, 107, 114, 118, 121.  The reports went on to say, however, that

"*[t]here is no universally accepted definition of subprime.*"  *Id.* ¶¶ 84, 101, 107, 114, 118, 121

(emphasis added).  And the reports consistently stated that Freddie Mac did not "characterize the

single-family loans underlying the PCs and Structured Securities in our credit guarantee portfolio

as either prime or subprime."  *Id.* ¶¶  84, 114, 118, 121.

Freddie Mac's statement that "[t]here is no universally accepted definition of subprime"

echoed pronouncements by government regulators.  According to the Subprime Statement,

issued in June 2007 by five federal banking regulators—the Office of the Comptroller of the

Currency ("OCC"), the FDIC, the Federal Reserve, the Office of Thrift Supervision and the

National Credit Union Administration—"the term 'subprime' is not consistently defined in the

marketplace or among individual institutions."  Subprime Statement, 72 Fed. Reg. at 37,570.

That statement referred back to a 2001 policy statement issued by four of the same five federal

agencies that expressly declined to provide a definition of "subprime," and instead provided a

range of credit risk characteristics typically associated with "subprime" borrowers.  OCC

Bulletin 200-6-1, Expanded Guidance for Subprime Lending Programs, at 2-3 (Jan. 31, 2001)

("Expanded Guidance").  One of the characteristics typically associated with "subprime"

14

borrowers, according to the Expanded Guidance, is a credit (or FICO) score of less than 660. *Id*.[5]

Another definition of "subprime" loans is according to lender type; that is, loans originated by lenders that have been identified as subprime.  HUD maintains a list of such institutions.[6]  Yet another definition focuses on underwriting practices.  For example, lending to borrowers with "limited or no documentation of income" is an underwriting practice indicative of subprime lending.  Subprime Statement, 72 Fed. Reg. at 37,572; *see* 2006 IS at 69 (Ex. 2); 2007 IS at 93-94 (Ex. 5).  Further, certain types of non-traditional loans are indicative of subprime lending, including ARMs with low initial payments based on a fixed introductory rate that expires after a short period, and loan products that have substantial prepayment penalties. *See* Interagency Guidance, 71 Fed. Reg. at 58,613; Subprime Statement, 72 Fed. Reg. at 37,572. In short, "subprime" was, and continues to be, an imprecise term without a universally accepted definition.

In the disclosures at issue in this case, Freddie Mac repeatedly referred to the Subprime Statement, as well as to the related Interagency Guidance concerning non-traditional mortgage products. *E.g.*, 2006 IS at 8 (Ex. 2); 2Q07 ISS at 7 (Ex. 3); 3Q07 ISS at 8 (Ex. 4); 2007 IS at 11-12 (Ex. 5).  The Company also stated:  "OFHEO [Freddie Mac's regulator] has directed us to adopt practices consistent with the risk management, underwriting and consumer protection principles of the Interagency Guidance and the Subprime Statement."  2007 IS at 12 (Ex. 5).

---

[5]   Other factors include, for example, two or more 30-day delinquencies in the last 12 months and a judgment, foreclosure, repossession or charge-off in the prior 24 months.

[6]   HUD, Subprime and Manufactured Home Lender List, Data Sets, *available at* http://www.huduser.org/portal/datasets/manu/subprime_2006 _distributed.xls.

Although Freddie Mac specifically disclaimed any attempt to use the term "subprime" as a synonym for "risky loans" in describing credit risk, the Company did use the term "subprime" in limited contexts to characterize certain lenders and their underwriting practices. In particular, the Company recognized that there were mortgage origination channels where the lenders themselves historically had been identified, and self-identified, as "subprime" lenders. The Company typically did not contract with these lenders or purchase mortgages from them directly, as the SEC expressly acknowledges in the Complaint. Compl. ¶ 113. It was in this context that the Company's 2006 Information Statement disclosed that "based on lender-type, underwriting practice and product structure, the number of loans underlying these securities that are subprime is not significant." *Id.* ¶¶ 84.

In addition, when the Company purchased mortgages from third parties that the third party had labeled as "subprime," the Company disclosed that information. This is evident in the Company's description of its subprime exposure in its guarantee and retained portfolios:

> While we do not characterize the single-family loans underlying the PCs and Structured Securities in our credit guarantee portfolio as either prime or subprime, we believe that, based on lender-type, underwriting practice and product structure, the number of loans underlying these securities that are subprime is not significant. Also included in our credit guarantee portfolio are *Structured Securities backed by non-agency mortgage-related securities where the underlying collateral was identified as being subprime by the original issuer.* At December 31, 2006 and 2005, the Structured Securities backed by subprime mortgages constituted approximately 0.1 percent and 0.2 percent, respectively of our credit guarantee portfolio.

> With respect to our Retained portfolio, we do not believe that any meaningful amount of the agency securities we hold is backed by subprime mortgages. However, at December 31, 2006 and 2005, we held approximately $124 billion and $139 billion, respectively, of *non-agency mortgage-related securities backed by subprime loans.* These securities include significant credit

> enhancement based on their structure and more than 99.9 percent
> of these securities were rated AAA at December 31, 2006.

2006 IS at 69 (Ex. 2) (emphasis added); *see also* 2007 IS at 94 (Ex. 5) (similar description of guarantee and retained portfolios).

As this disclosure explains, in its Single Family portfolio, Freddie Mac held a small amount of non-agency securities that had been identified *by the issuer* as backed by "subprime" loans. Compl. ¶ 84. The Company had guaranteed these securities in connection with certain "Structured Securities backed by non-agency mortgage related securities"—that is, Structured Transactions.[7] *See* 2006 IS at 68-69 (Ex. 2). Beginning in the 2006 Information Statement and in every disclosure in the Relevant Period thereafter, the Company disclosed the extent to which third parties had characterized the loans underlying Structured Transactions as "subprime." Compl. ¶¶ 101, 107, 114, 118, 121.

Likewise, in its retained portfolio, Freddie Mac held some mortgage-related securities originated by private issuers such as Wall Street investment banks. *See, e.g.*, 2006 IS at 4 (Ex. 2). Where the issuer had self-described the underlying collateral as "subprime," Freddie Mac included the issuer's characterization of the loans in its disclosures and described such securities as "non-agency mortgage-related securities backed by subprime loans." *See* Compl. ¶¶ 84, 101, 107, 114, 118, 121. Freddie Mac valued these securities between $86 billion and $124 billion during the Relevant Period.

c.      Risk-Layering.

In the second-quarter of 2007, to further enhance transparency, Freddie Mac began disclosing risk layering information—that is, analysis of multiple risk factors. *See* 2007 2Q ISS

---

[7]   This is the one instance that Freddie Mac used the definition of Structured Transactions rather than the term itself. *See supra* Background Section B.

at 33 (Ex. 5) (describing mortgages with both "high LTV ratios" and borrowers having "lower [borrower] credit scores").   For example, in the 2007 Information Statement, Freddie Mac explained that mortgages that had both higher LTV ratios and lower borrower credit scores were more likely to default:

> As of December 31, 2007, approximately 1% of single-family mortgage loans we have guaranteed were made to borrowers with credit scores below 620 and had original LTV ratios above 90% at the time of mortgage origination. In addition, as of December 31, 2007, 4% of Alt-A and interest-only single-family loans we have guaranteed have been made to borrowers with credit scores below 620 at mortgage origination. These combinations of loans represent categories that have inherently greater credit risk, but reflect our efforts to meet increasingly demanding affordable housing goals.

2007 IS at 97 (Ex. 5).

### d.     Warnings of Increased Credit Risk.

The Company's disclosures during the Relevant Period also made clear that Freddie Mac's credit risk was increasing due to an "expansion of credit terms under which loans are underwritten and an increase in our purchases of variable-rate and non-traditional mortgage products that have higher inherent credit risk than traditional fixed-rate mortgage products." 2006 IS at 74 (Ex. 2); *see id.* at 68-69 ("To improve our ability to fulfill our mission, we have increased our participation in nontraditional mortgage market products. . . . We expect each of these [nontraditional] products to default more often than traditional products . . . ."). The Company's 2007 Information Statement repeated these points:  "The proportion of higher risk mortgage loans that were originated in the market during the last several years increased significantly."  2007 IS at 52-53 (Ex. 5) (describing and quantifying increased securitization of "non-traditional mortgage products, such as interest-only loans and loans originated with less documentation in the last two years").

2.      Loan-Level Disclosures by Freddie Mac.

During the Relevant Period the Company publicly disclosed "loan-level" data for each of the loans it purchased.  Freddie Mac began disclosing this loan-level information in the fourth quarter of 2005 "for all newly issued fixed-rate and adjustable rate mortgage (ARM) PC securities" on a monthly basis.  Freddie Mac Press Release, Freddie Mac to Expand Disclosure on PC Securities (Aug. 10, 2005), Ex. 16.  The Company's regulator deemed this a "major development" in improved disclosure—one that Fannie Mae did not match until just recently. *See Transparency as an Alternative to Risk Retention: Hearing before the H.R. Comm. on Oversight & Gov't Reform Subcommittee on TARP, Fin. Servs. & Bailouts of Public and Private Programs*, 112th Cong. 11 (May 11, 2011) (statement of Edward DeMarco, Acting Director, Federal Housing Finance Agency).  By the first quarter of 2006, Freddie Mac was disclosing 39 loan-level attributes for each PC, including credit score, loan-to-value ratio, occupancy status, originator name, servicer name and loan amount.[8]  And by the end of the Relevant Period, Freddie Mac was disclosing 48 loan-level attributes for each adjustable-rate mortgage and 34 loan-level attributes for each fixed-rate mortgage.[9]  Such disclosures, coupled with the introduction of risk layering in Freddie Mac's public financial statements, demonstrate a trend toward increasingly comprehensive and nuanced disclosures by the Company concerning the credit risk of its Single Family portfolio.

---

[8]   Freddie Mac, Loan-Level Disclosure, Variable Names & Descriptions (Mar. 1, 2006), *available at* http://web.archive.org/web/20060507061617/http://www.freddiemac.com/mbs/docs/fs_lld.pdf.

[9]   Freddie Mac, Loan-Level Disclosure, Variable Names & Descriptions (April 2008), *available at* http://web.archive.org/web/20080909201212/http://www.freddiemac.com/mbs/docs/fs_lld.pdf.

19

### D.     The Certifications and Sub-Certifications at Issue.

Freddie Mac's CEO is required to certify the Company's financial statements.  In turn, certain Company employees are required by Freddie Mac to provide "sub-certifications" in connection with the financial statements.  The Complaint alleges that Mr. Syron certified, and that Ms. Cook sub-certified, all of the alleged misleading Freddie Mac disclosures.  Compl. ¶¶ 75-76.  The Complaint also alleges that Mr. Bisenius sub-certified three of them.  *Id.* ¶¶ 76.

Freddie Mac's sub-certifications were two-page forms that required employees to state that, to the best of their knowledge, and based on the matters that came to their attention based on their roles and responsibilities, the disclosure documents they were given to review were not misleading.  *See, e.g.*, Donald Bisenius, Attestation and Certification Regarding the Q2 2008 Interim Consolidated Financial Information Package (Aug. 4, 2008) (Ex. 9).  These forms were broadly worded, and directed at the entire disclosure.[10]  They do not mention "subprime."

### E.     The Housing Market Crash and Freddie Mac's Statements in Conservatorship.

Home prices across the country declined precipitously between 2006 and 2008.  2Q08 Form 10-Q at 2 (Ex. 7); *see* Fin. Crisis Inquiry Comm'n ("FCIC"), *Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States* 214–15 (2011) ("FCIC Report").  As home prices plummeted, borrower defaults increased and the severity of Freddie Mac's credit losses in its guarantee business also increased.  2Q08 Form 10-Q at 5-6  (Ex. 7) (Single Family portfolio reported a net loss of $1.8 billion in the six months

---

[10]    For example, the sub-certification required Ms. Cook and Mr. Bisenius to affirm:  "The information in the Report, including the financial statements, and other financial information included in the Report, fairly presents in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in the Report."  *E.g.*, Donald Bisenius, Attestation and Certification Regarding the Q2 2008 Interim Consolidated Financial Information Package (Aug. 4, 2008) (Ex. 9).

ending June 30, 2008).  Because Freddie Mac typically did not buy from "subprime" origination channels, however, its delinquency rates were substantially lower than those of other financial institutions that securitized mortgages from "subprime" lenders.  FCIC Report at xxvi (data "for a subset of borrowers with similar credit scores—scores below 660—show that by the end of 2008, GSE mortgages were far less likely to be seriously delinquent than were non-GSE securitized mortgages: 6.2% versus 28.3%"); *see id.* at 218–19.  Freddie Mac incurred substantial losses simply because it was engaged in a monoline insurance business—*i.e.*, guaranteeing repayment of mortgages—during an unprecedented downturn.

On September 6, 2008, FHFA placed the Company into conservatorship and installed new management.  Since that time, Freddie Mac has "operate[d] under the direction of FHFA," and is "also subject to certain constraints . . . imposed by [the U.S.] Treasury."  Freddie Mac, Form 10-K at 1 (Mar. 9, 2012) ("2011 Form 10-K"), Ex. 8.[11]  Freddie Mac also has faced intense scrutiny from Congress and the news media.  The investigation that led to the Complaint began in September 2008, and was resolved for the Company in December 2011, when Freddie Mac entered a non-prosecution agreement with the SEC concerning the disclosures at issue here.

Nevertheless, at no time has Freddie Mac ever disclosed in its public reports the amounts or percentages of loans underlying its Single Family portfolio that fall into the EA, C1 or C2 categories.  In fact, the Company has continued to file Form 10-Ks and Form 10-Qs with the Commission that describe "subprime" exposure in a manner that tracks the disclosures the

---

[11]   FHFA has wide-ranging power over Freddie Mac.  2011 Form 10-K at 1 (Ex. 8) ("As our Conservator, FHFA succeeded to all rights, titles, powers and privileges of Freddie Mac, and of any stockholder, officer or director thereof, with respect to the company and its assets.  FHFA, as Conservator, has directed and will continue to direct certain of our business activities and strategies.  FHFA has delegated certain authority to our Board of Directors to oversee, and to management to conduct, day-to-day operations. The directors serve on behalf of, and exercise authority as directed by, the Conservator.").

Complaint alleges are fraudulent.  Specifically, when discussing the Single Family portfolio in its public filings, Freddie Mac consistently asserts, in substance, that:

- there is no universally accepted definition of subprime;

- the Company has not historically characterized the loans underlying the Single Family portfolio as either prime or subprime; and

- only a few billion dollars' worth of loans underlying Structured Transactions have been classified or identified as subprime.

For example, in its 2011 Form 10-K, filed with the SEC on March 9, 2012—nearly three months after the Complaint was filed—Freddie Mac stated:

> While we have classified certain loans as subprime or Alt-A for purposes of the discussion below and elsewhere in this Form 10-K, there is no universally accepted definition of subprime or Alt-A . . . .  Participants in the mortgage market may characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. While we have not historically characterized the loans in our single-family credit guarantee portfolio as either prime or subprime, we do monitor the amount of loans we have guaranteed with characteristics that indicate a higher degree of credit risk. . . . In addition, we estimate that approximately $2.3 billion and $2.5 billion of security collateral underlying our Other Guarantee Transactions[12] at December 31, 2011 and December 31, 2010, respectively, were identified as subprime based on information provided to use when we entered into these transactions.

2011 Form 10-K at 147 (Ex. 8); *see also id*. at 374 (glossary definition of "Subprime").  These statements—made while Freddie Mac is under federal government conservatorship—are virtually identical to those the Complaint alleges were misleading to investors.

## F.    The SEC's Allegations.

On December 16, 2011, after reviewing millions of documents and conducting scores of depositions and interviews during its three-year investigation, the SEC filed this action.  The

---

[12]   The term "Other Guarantee Transactions" has replaced "Structured Transactions" in Freddie Mac's financial statements.

Commission alleges that, during the Relevant Period, statements by Freddie Mac and its executives mischaracterized the Company's exposure to "subprime" mortgages.  According to the Complaint, during "a period of heightened investor interest" in "subprime loans," Freddie Mac gave the misleading impression that it had "little or no exposure to subprime loans in its Single Family" portfolio, and that the portfolio's exposure was between "$2 billion and $6 billion, or between 0.1 percent and 0.2 percent."  Compl. ¶¶ 2-3, 84-85, 91, 101, 124.  The Complaint also alleges that Mr. Syron and Ms. Cook misled investors by stating that Freddie Mac "had basically no subprime exposure" in its guarantee business.  *Id.* ¶¶ 4, 91-97, 112-13. (The Complaint does not allege that Mr. Bisenius made any misleading statements.)

According to the Complaint, Defendants allegedly knew that such statements were false because internal Freddie Mac documents referred to loans designated as "Caution" (C1 or C2) or as EA as "subprime," "otherwise subprime" or "subprime-like," *id.* ¶¶ 3, 28, 31-41, and Freddie Mac's exposure to "subprime" or "subprime-like" loans was discussed in Company meetings, *id.* ¶¶ 16, 20, 59, 62, 67.  Had the Company revealed its internal view of "subprime," the Complaint alleges, it would have disclosed publicly that 10-14% of its Single Family portfolio was actually exposed to "subprime."  *Id.* ¶¶ 35, 40, 41, 46, 48; *see id.* ¶ 3 (alleging subprime exposure grew from $141 billion to $244 billion).

The Complaint asserts five claims against Defendants.  First, the Commission alleges that Mr. Syron and Ms. Cook violated Section 10(b) and Rule 10b-5 of the Exchange Act by making supposedly misleading statements.  *Id.* ¶¶ 125-27.  Second, the SEC asserts a claim against all three Defendants for aiding and abetting Freddie Mac's violations of Section 10(b) and Rule 10b-5 of the Exchange Act, based on Defendants' involvement in Freddie Mac's financial disclosure process.  *Id.* ¶¶ 128-33.  Third, the SEC alleges that Mr. Syron and Ms. Cook obtained

23

money or property in connection with their allegedly misleading statements in violation of Section 17(a)(2) of the Securities Act.  *Id.* ¶¶ 134-36.  Fourth, the Complaint asserts a claim against Mr. Syron for a violation of Exchange Act Rule 13a-14, arising from Mr. Syron's signing an allegedly false certification with respect to a Form 10-Q filed with the Commission on August 6, 2008.  *Id.* ¶¶ 137-39.  Fifth, the SEC alleges that all three Defendants aided and abetted allegedly misleading statements in violation of Section 13(a) and Rules 12b-20 and 13a-13 of the Exchange Act.  *Id.* ¶¶ 140-43.  As demonstrated below, the Complaint should be dismissed with prejudice.

## STANDARD OF REVIEW

To survive dismissal, a complaint must plead facts sufficient "to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The court may consider not only the complaint's allegations but also any documents relied upon by the complaint and "matters of which a court may take judicial notice."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010).  Dismissal is required when the allegations fail to exclude "more likely explanations" than those alleged in the complaint.  *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009).  "In alleging fraud . . . a party must state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).[13]

---

[13]  The Complaint alleges violations of sections 10(b) and 13(a) of the Exchange Act and section 17(a) of the Securities Act.  Rule 9(b) applies to each violation.  *See, e.g.*, *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004).  To state a claim under each of these provisions, the SEC must allege a material misrepresentation.  *See SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999).

**ARGUMENT**

**I.    THE COMPLAINT DOES NOT ADEQUATELY ALLEGE ANY ACTIONABLE MISREPRESENTATION OR OMISSION.**

In assessing whether a misrepresentation or omission is actionable, the "defendants' representations" must be "taken together and in context." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010) (citing *Rombach*, 355 F.3d at 172 n.7); *see, e.g.*, *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996) ("prospectuses must be read 'as a whole'"). Such claims fail when the defendant has actually "disclosed that which the Complaint alleges it concealed." *In re First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 163 (D. Mass. 2009); *see, e.g.*, *Olkey*, 98 F.3d at 9 (affirming dismissal because "plaintiffs' claims are contradicted by the disclosure of risk made on the face of each prospectus").[14]   There is no shortage of cases where courts have dismissed complaints that fail, as a matter of law, to allege an actionable misrepresentation or omission. *E.g.*, *Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 657 (4th Cir. 2004) (dismissing complaint alleging that an executive's education was a material fact and that "management integrity" is always material); *Klein v. Gen. Nutrition Cos., Inc.*, 186 F.3d 338, 342-43 (3d Cir. 1999) (dismissing complaint alleging failure to disclose information that was public knowledge); *In re Merrill Lynch & Co., Inc. Research Reports Sec.*

---

[14]   *See also, e.g.*, *Joffee v. Lehman Bros. Inc.*, 209 F. App'x 80, 81 (2d Cir. 2006) (affirming dismissal where "all of the facts which plaintiffs allege were concealed were, in fact, revealed in various public filings"); *Ley v. Visteon Corp.*, 543 F.3d 801, 807-08 (6th Cir. 2008) (affirming dismissal of securities fraud claims based on alleged non-disclosure of material information where defendant's disclosures were "rife" and "replete" with the allegedly omitted information); *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 211-12 (5th Cir. 2004) (affirming dismissal of claims that a statement was misleading because the statement was factually correct and true "when read in the context of the prospectus as a whole"); *In re Capstead Mortg. Corp. Sec. Litig.*, 258 F. Supp. 2d 533, 555 (N.D. Tex. 2003) (dismissing claims after "review[ing] the relevant public filings and determin[ing] that they adequately warned investors of exactly the risks Plaintiffs contend were not disclosed").

*Litig.*, 272 F. Supp. 2d 243, 250-53, 261 (S.D.N.Y. 2003) (dismissing complaint because "the information allegedly withheld from the shareholders was a matter of public knowledge").

**A.     The Commission Has Failed to State a Legally Viable Claim that Freddie Mac's Disclosures Were False or Misleading.**

The Complaint alleges that a single paragraph in Freddie Mac's lengthy disclosures misleadingly understated the extent of "subprime" holdings in the Single Family portfolio. Compl. ¶¶ 84-122.  But the only thing misleading here is the Complaint.  The disclosures make clear that because there is no universally accepted definition of a "subprime" loan, Freddie Mac declined to characterize the loans in the Single Family portfolio as "prime" or "subprime."  The statements targeted by the Complaint clearly refer *not* to the entire Single Family portfolio, but instead to Structured Transactions backed by collateral that the original issuer classified as "subprime."  Rather than labeling loans as "prime" or "subprime," the Company's disclosure documents provided detailed tables with credit characteristics for the entire Single Family portfolio, allowing investors to see the actual percentage of loans with various risk profiles.

1.     Freddie Mac's Statements Did Not Purport to Define the Term "Subprime" for the Entire Single Family Portfolio.

The Complaint implies that Freddie Mac had two different and inconsistent definitions of "subprime"—a public definition and an internal one.  This theory is based on a misreading of both Freddie Mac's filings and the internal Company documents referenced in the Complaint.

Freddie Mac's public statements are—on their face—not definitions of "subprime."  For example, after expressly stating that there is "no universally accepted definition of subprime," Freddie Mac's 2006 Information Statement described some typical features of subprime loans, including who that market *primarily serves*, what characteristics such loans *typically have*, and what credit characteristics such loans *might include*.  Compl. ¶ 84.  This illustrative and

impressionistic characterization is not a "definition" that any reasonable reader would believe is subject to quantification.

Nor did the Company have a uniform internal definition of subprime. On some occasions, Freddie Mac employees used different terms—"subprime," "subprime like" and "otherwise subprime"—to refer to the same categories of loans. Compl. ¶¶ 46(b), 57, 59, 62, 67, 89, 112. And, although certain documents referenced in the Complaint referred to "Caution" or EA loans as "subprime," others state that the Company was not operating in the subprime space. *See, e.g.*, Freddie Mac's Strategic Landscape and Options, Senior Executive Team ("SET") Offsite Meeting Presentation at 2, 5–10, 26 (Feb. 6–7, 2007) (Ex. 15) ("*Outside our franchise*, the nonprime mortgage market has grown dramatically . . .") (emphasis added). In short, even within the Company there was no universally accepted definition of the term "subprime."

That the Complaint identifies some statements describing the C1, C2 and EA tranches of the Single Family portfolio as "subprime" is of no legal significance. Miscellaneous *employees' internal* use of terms such as "subprime," "subprime like" and "otherwise subprime" cannot render the *Company's external* disclosures misleading from any objective standpoint. Indeed, the Complaint does not plausibly allege that the view that such loans were "subprime" was Freddie Mac's "true institutional opinion (if such a concept is even meaningful)." *In re Salomon Analyst Level 3 Litig.,* 373 F. Supp. 2d 248, 252 (S.D.N.Y. 2005) (where financial models within an investment bank differed, plaintiffs could not pick one and establish that it represented the bank's true view). The SEC cannot properly base its fraud claims on the fact that certain employees expressed views about "subprime" internally that differed from the Company's public disclosures.

It is telling that *nowhere* in the Complaint does the SEC offer its own definition of what constitutes a "subprime" loan, although the Commission has not hesitated to do so when it suited its purposes in other cases.  *See SEC v. Mozilo*, No. 09-cv-03994, 2009 WL 1549287, Compl. ¶ 21 (C.D. Cal. June 4, 2009) (complaint alleges that "[w]hile guidance issued by the banking regulators referenced a credit score ('FICO score') at 660 or below as being an indicator of a subprime loan, some within the banking industry drew the distinction at a score of 620 or below"); *In re Lisa B. Premo*, SEC Order Instituting Administrative and Cease-And-Desist Proceedings, ¶ 6 (Jan. 17, 2012) ("The CDO was primarily backed by subprime residential mortgage-backed securities, *meaning* that the CDO was ultimately backed by mortgages issued to borrowers who were not considered to be prime credit risks (*e.g.*, borrowers who credit scores were below approximately 650).") (emphasis added).  In this case, Freddie Mac accurately disclosed the percentage of all loans in its Single Family portfolio that were below the threshold benchmarks of "subprime" embraced by the SEC in other cases.  These detailed disclosures should be more than sufficient to satisfy the SEC, and more important, the Court, in this case.

   2.   Freddie Mac's Statements Did Not Purport to Describe the Entire Single Family Portfolio's Subprime Exposure.

The Complaint alleges that Freddie Mac misleadingly suggested that the Single Family portfolio's *entire* exposure to "subprime" loans was between $2 billion and $6 billion, or 0.1% and 0.2%.  Compl. ¶ 3.  This reading contradicts the plain language of the disclosures.

First, in the Credit Risk sections, Freddie Mac explained that "[t]here is no universally accepted definition of subprime" and that the Company "*d[oes] not characterize* the single-family loans . . . in our credit guarantee portfolio as either prime or subprime."  Compl. ¶ 84 (emphasis added); *see also id.* ¶¶ 114, 118, 121.  As discussed above, there is no consensus about the meaning of the term "subprime," and federal regulatory guidance cited in Freddie Mac's

disclosures emphasized that the term was "not consistently defined in the marketplace."[15]   For

that precise reason, the Company's risk disclosures focused on objective factors that "indicate a

higher likelihood of default"—such as "high loan-to-value ratios" and "low credit scores," *e.g.,*

Compl. ¶¶ 84, 101—and then provided investors with tables breaking down the Single Family

portfolio according to those risk factors.  *E.g.*, 2006 IS at 70 (Ex. 2); 2Q07 ISS at 32 (Ex. 3).

Second, regarding Structured Transactions, the Company used the subprime label only

where the original issuer had used that label.  As the 2006 Information Statement stated: the

Single Family portfolio "[a]lso included . . . Structured Securities backed by non-agency

mortgage-related securities [*i.e.*, Structured Transactions] where the *underlying collateral was*

*identified as being subprime by the original issuer*."  2006 IS at 69 (Ex. 2) (emphasis added).

Those Structured Transactions where the original issuer classified the collateral as "subprime"

"constituted approximately 0.1 percent and 0.2 percent" of the Single Family portfolio.  *Id.*;

Compl. ¶ 84.

Virtually all of the disclosures make this same distinction, referring to Freddie Mac's

small category of Structured Transactions.[16]   The 2007 Information Statement, after again

---

[15]   Subprime Statement, 72 Fed. Reg. at 37,570.  Courts have reached similar conclusions.  *See e.g.*, *Nolte v. Capital One Fin. Corp.*, 390 F.3d 311, 317 (4th Cir. 2004) ("'there is no standard industry-wide approach to the definition[] of . . . subprime'"); *cf. In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 359 (S.D.N.Y. 2011) (Sullivan, J.) (warning against pleadings that "look backward in time and apply the 'subprime' label to any loan that defaulted during the mortgage crisis").

[16]   The only exception is the second-quarter 2007 ISS, which references the loans underlying "our single-family mortgage portfolio" rather than the loans underlying Structured Transactions.  Compl. ¶ 101.  This disclosure must be read in conjunction with the 2006 Information Statement, which accurately describes the distinction.  *See* Compl. ¶ 84 (quoting 2006 IS); *see* 2Q07 ISS, at cover (Ex. 3) ("All available supplements, including this Information Statement Supplement, should be read together with our 2006 Information Statement.").  In any event, this less precise language, which probably was a drafting error, was fixed in the next quarterly report.  *See* Compl. ¶ 107.

disclaiming use of the "prime or subprime" characterization for its own "PCs and Structured Securities," states:   "We estimate that approximately $6 billion and $3 billion of *loans underlying our Structured Transactions* at December 31, 2007 and 2006, respectively, were *classified* as subprime mortgage loans."   Compl. ¶ 114 (emphasis added); *see also id.* ¶¶ 107 (same), 118 (same), 121 (same).  The SEC misreads the plain language of the disclosures when it asserts that the statements regarding "subprime" loans underlying the Structured Transactions were conveying the amount of "subprime" loans in the entire Single Family portfolio.

Third, the broader context reinforces this difference between Freddie Mac's disclosures for PCs, Structured Securities and Structured Transactions.  Every disclosure at issue explicitly defines "Structured Transactions" as distinct from PCs and as a subset of Structured Securities.[17] Further, every disclosure at issue contains a table that provides the product distribution of Freddie Mac's "total mortgage portfolio."[18]  These tables provide a separate, specific line for "Structured Securities backed by non-Freddie Mac mortgage-related securities" or "Structured Transactions," which are minuscule in value compared to the "PCs and Structured Securities." *See e.g.*, 2007 IS, at 75, tbl. 39  (Ex. 5) (Total Guaranteed PCs and Structured Securities are $1.738 trillion, whereas Structured Transactions are $20.223 billion).  Reproduced below is an illustrative table from the Company's 2007 Information Statement:

---

[17]   2006 IS at 68 (Ex. 2); Freddie Mac, Financial Report for the Three Months Ended March 31, 2007 at 28 (Jun. 14, 2007) ("1Q07 ISS"); 2Q07 ISS at 33 (Ex. 3); 3Q07 ISS at 32 (Ex. 4); 2007 IS at 5 (Ex. 5); 1Q08 ISS at 72 (Ex. 6); 2Q08 Form 10-Q at 60 (Ex. 7).

[18]   2006 IS at 68, tbl. 37 (Ex. 2); 1Q07 ISS at 29, tbl. 23; 2Q07 ISS at 33, tbl. 23 (Ex. 3); 3Q07 ISS at 32, tbl. 23 (Ex. 4); 2007 IS at 77, tbl. 39 (Ex. 5); 1Q08 ISS at 60, tbl. 44 (Ex. 6); 2Q08 Form 10-Q at 76, tbl. 48 (Ex. 7).

**Table 39 — Guaranteed PCs and Structured Securities[(1)(2)]**

|  | December 31, | | |
|---|---|---|---|
|  | 2007 | 2006 | 2005 |
|  | | (in millions) | |
| Single-family: | | | |
| Conventional: | | | |
| 30-year fixed rate[(3)] | $1,091,212 | $ 882,398 | $ 741,913 |
| 20-year fixed-rate | 72,225 | 66,777 | 67,937 |
| 15-year fixed rate | 272,490 | 290,314 | 321,176 |
| ARMs/adjustable-rate | 91,219 | 100,808 | 106,644 |
| Option ARMs | 1,853 | 2,808 | 3,830 |
| Interest-only[(4)] | 159,028 | 76,114 | 25,697 |
| Balloon/resets | 17,242 | 21,551 | 26,321 |
| FHA/VA | 1,283 | 1,398 | 849 |
| Rural Housing Service and other federally guaranteed loans | 132 | 138 | 154 |
| *Total single-family* | 1,706,684 | 1,442,306 | 1,294,521 |
| Multifamily: | | | |
| Conventional and other | 10,658 | 8,415 | 14,503 |
| *Total multifamily* | 10,658 | 8,415 | 14,503 |
| Structured Securities backed by non-Freddie Mac mortgage-related securities: | | | |
| Ginnie Mae Certificates[(5)] | 1,268 | 1,510 | 2,021 |
| Structured Transactions[(6)] | 20,223 | 24,792 | 24,479 |
| *Total Structured Securities backed by non-Freddie Mac mortgage-related securities* | 21,491 | 26,302 | 26,500 |
| Total guaranteed PCs and Structured Securities | $1,738,833 | $1,477,023 | $1,335,524 |

Finally, the Complaint's heavy emphasis on one "subprime" statement in the 2006 Information Statement is badly misplaced. There, Freddie Mac stated: "While we do not characterize the single-family loans underlying the PCs and Structured Securities in our credit guarantee portfolio as either prime or subprime, we believe that, based on *lender-type, underwriting practice and product structure*, the number of loans underlying these securities that are subprime is not significant." Compl. ¶ 84 (emphasis added). The Commission asserts that this statement gave the "misleading impression *that after considering a mix of credit risk characteristics* to assess its exposure to subprime loans, Freddie Mac determined that its Single Family guarantee portfolio had no significant exposure." *Id.* ¶ 85 (emphasis added). This allegation is again inconsistent with the disclosure's plain language.

The Company's statement plainly did not refer to "a mix of credit characteristics" of the *loans* but rather to the characteristics of the loans' *issuers*. "Lender-type" refers to self-described subprime originators. The Complaint acknowledges that the "Single Family [portfolio] did not typically acquire loans from a small handful of institutions that self-identified as subprime originators." *Id.* ¶ 113. "Underwriting practices" for such self-identified subprime lenders frequently included requiring borrowers to provide little or no documentation. *See e.g.*, 2006 IS

31

at 69 (Ex. 2) ("The subprime segment of the mortgage market primarily serves borrowers with poorer credit payment histories and such loans typically have . . . . limited or no documentation . . . ."). The underwriting guidelines for the Single Family portfolio generally did not permit Freddie Mac to purchase such loans. *See e.g.*, 2006 IS at 68 (Ex. 2) ("[W]e have adopted a set of limits on our purchases and holdings of . . . . mortgages originated with limited or no underwriting documentation."). Finally, "product structure" refers to non-traditional products with product features typically associated with subprime lenders, such as pre-payment penalties or certain types of ARMs. *See, e.g.*, 2007 IS at 92 (Ex. 5) ("[W]e have adopted a set of limits on our purchases and holdings of certain types of non-traditional mortgage products . . . includ[ing] option ARMs and loans with high LTV ratios . . . ."). The SEC finds fault here only by ignoring the actual words of the disclosure—"lender-type, underwriting practice and product structure"—and substituting the words "credit risk characteristics" of the loans.

In sum, when Freddie Mac guaranteed securities with collateral that an original, third-party issuer had labeled as "subprime" (*i.e.*, Structured Transactions), the Company conveyed that information to investors. For the remainder of the loans in the Single Family portfolio, the Company chose to identify risk characteristics for those loans rather than use a vague label such as "subprime." Thus, when Freddie Mac stated (as in the 2006 Information Statement) that it did not have "significant exposure" to loans issued by self-described "subprime" lenders, it was making a true statement—as the Complaint itself concedes. *See* Compl. ¶ 113.

        3.     Freddie Mac Made Comprehensive Quantitative Disclosures Regarding Its Credit Risk.

The SEC's theory that Freddie Mac misled investors is belied by the Company's disclosures of the substantial, and growing, credit risk in its guarantee portfolio. 2006 IS at 70 (Ex. 2); 2Q07 ISS at 32 (Ex. 3); 3Q07 ISS at 31 (Ex. 4); 2007 IS at 96 (Ex. 5); 1Q08 ISS at 40

(Ex. 6); 2Q08 Form 10-Q at 59 (Ex. 7).  These disclosures, often made within a page or two of

the Company's narrative discussions (which included the challenged "subprime" disclosure),

refute any suggestion that a reasonable investor could have concluded that only 0.1% to 0.2% of

the entire guarantee portfolio was comprised of risky loans.  *See Fulton County Employees' Ret.*

*Sys. v. MGIC Inv. Corp.*, No. 08-C-0458, 2010 WL 601364, at *7-8 (E.D. Wis. Feb. 18, 2010)

(finding defendant's disclosures neither false nor misleading because "to the extent that investors

considered MGIC's [vague] statement . . . important, they could have evaluated that statement in

light of the more detailed information made available in the same report").

a.      Credit Scores.

In every single disclosure at issue in this case, the Company provided charts listing the

percentages of Single Family portfolio loans that fell into various credit score ranges, including

those loans made to borrowers who had credit scores below 660 and below 620.  2006 IS at 70

(Ex. 2); 2Q07 ISS at 32 (Ex. 3); 3Q07 ISS at 31 (Ex. 4); 2007 IS at 96 (Ex. 5); 1Q08 ISS at 40

(Ex. 6); 2Q08 Form 10-Q at 59 (Ex. 7).  These tables show what tranches of the Single Family

portfolio were particularly risky, based on credit scores, and the extent to which those tranches

were growing year over year.  Such disclosures are particularly significant because, although the

term "subprime" has no universal meaning, as discussed above, many market participants, and

even the SEC, have used credit scores to identify "subprime" loans.  *See Kuriakose v. Fed. Home*

*Loan Mortg. Corp.*, No. 08-7281, 2011 WL 1158028, at *2 (S.D.N.Y. Mar. 30, 2011) ("It is

generally accepted that 'subprime' refers to a borrower with a FICO score lower than 660."); *see*

*also Mozilo*, 2009 WL 1549287, Compl., *supra* Section I.A.1; *In re Lisa B. Premo*, SEC Order

Instituting Administrative and Cease-And-Desist Proceedings, *supra* Section I.A.1.

The Complaint depends on the untenable assumption that a reasonable investor could

have been tricked into believing that Freddie Mac had few "subprime" (meaning "risky") loans

33

despite the fact that at least 13% of the Single Family portfolio guaranteed loans to borrowers with FICO scores below 660.  *See* 2007 IS at 96, tbl. 46 (Ex. 5) (9% with FICO scores between 620 and 659, plus 4% with FICO scores less than 620 and 1% with FICO score unavailable). The disclosure documents also show a growing exposure to loans with borrower FICO scores below 660 purchased during the years 2005, 2006 and 2007—14%, 15% and 17%, respectively. *See id.*  Any reasonable investor concerned about credit risk would have known that borrower FICO scores below 660 were, at the very least, a relevant factor to consider.

The chart below takes the table presented on page 43 of the Complaint[19] and adds a column at the far right that shows the percentage of loans in the Single Family segment with borrower FICO scores below 660 disclosed by Freddie Mac.  It disproves the SEC's contention that Freddie Mac hid its exposure to risky loans.

| Period | Disclosed Subprime Exposure | % Disclosed Subprime Exposure of Total Single-Family Guarantee Portfolio | Total C1, C2 and EA | Total Single-Family Guarantee Portfolio | %Total C1, C2 and EA of Total Single-Family Guarantee Portfolio | % Loans Disclosed with FICO Scores < 660 (Ending Balance) |
|---|---|---|---|---|---|---|
| 4Q06 | "Not Significant" | 0.1% | $141 | $1,467 | 10% | 13% |
| 1Q07 | N/A | 0.1% | $159 | $1,528 | 10% | 13% |
| 2Q07 | $2 | 0.1% | $182 | $1,586 | 11% | 13% |
| 3Q07 | $5 | N/A | $206 | $1,642 | 13% | 13% |
| 4Q07 | $6 | N/A | $226 | $1,692 | 13% | 13% |
| 1Q08 | $4 | N/A | $239 | $1,739 | 14% | 13% |
| 2Q08 | $6 | N/A | $244 | $1,784 | 14% | 13% |

---

[19]  The values that the SEC provides in the column labeled "Total Single-Family Guarantee Portfolio" are inconsistent with the values that Freddie Mac disclosed in its periodic filings. The correct values are as follows (in billions): 4Q06, $1,442 (2006 IS at 68) (Ex. 2); 1Q07, $1,504 (1Q07 ISS at 29); 2Q07, $1,563 (2Q07 ISS at 33) (Ex. 3); 3Q07, $1,634 (3Q07 ISS at 32) (Ex. 4); 4Q07, $1,706 (2007 IS at 75) (Ex. 5); 1Q08, $1,750 (1Q08 ISS at 60) (Ex. 6); 2Q08, $1,782 (2Q08 Form 10-Q at 76) (Ex. 7).

Any investor looking at Freddie Mac's disclosures could easily multiply the percentage of loans made to borrowers with FICO scores under 660 against the total Single Family portfolio balance to see that such loans rose from $191 billion to $232 billion. These amounts dwarf the $3 to $6 billion of "loans underlying [the] Structured Transactions," 2007 IS at 94, and dispel any possible misconception that the $3 to $6 billion was intended to quantify some undefined measure of "subprime" loans for the entire Single Family portfolio.

b.      LTV Ratios.

Freddie Mac also disclosed information about both a loan's original LTV ratio and its current, estimated LTV. 2006 IS at 70 (Ex. 2); 2Q07 ISS at 32 (Ex. 3); 3Q07 ISS at 31 (Ex. 4); 2007 IS at 96 (Ex. 5); 1Q08 ISS at 40 (Ex. 6); 2Q08 Form 10-Q at 59 (Ex. 7). The latter measurement accounts for declines in home prices after origination. For example, the 2007 data showed that the percentage of the portfolio with current LTV ratios above 90% had increased from 2% to 10%, and that 3% of loans were "underwater"—*i.e.*, had an LTV above 100%. 2007 IS at 96 (Ex. 5). These tables also disclosed that by the end of 2007, 7% of the Single Family portfolio—approximately $95 billion—consisted of loans that, at *origination*, had an LTV ratio above 90% (which is another important factor in credit risk). *Id.*; *see id.* at 96-97. Again, no reasonable investor reading this disclosure could believe that Freddie Mac's exposure to risky loans was limited to the $3 to $6 billion of subprime "loans underlying our Structured Transactions."

c.      Risk Layering and Other Risk Disclosures.

Other examples of Freddie Mac's transparency further undermine the Complaint's plausibility. *See supra* at 17-19. Freddie Mac voluntarily began disclosing loan-level information about its Single Family portfolio as early as 2005, long before Fannie Mae did. *See*

*id.*  Further, Freddie Mac began providing risk-layering information, such as describing loans that had both higher LTV ratios and lower borrower credit scores.  *E.g.*, 2007 IS at 97.

The Company provided other extensive risk disclosures as well.  Freddie Mac identified the risks associated with a decline in housing prices and in the general economy.  *See, e.g.*, 2006 IS at 14, 71 (Ex. 2); 3Q07 ISS at 18-19, 39 (Ex. 3).  Freddie Mac discussed risks associated with meeting federal housing goals.  *See, e.g.*, 2006 IS at 13 (Ex. 2).  The Company explained the risks of alternative mortgage products.  *See, e.g.*, 2006 IS at 24, 69-71 (Ex. 2).  And Freddie Mac expressly warned that "[w]e are exposed to increased credit risk related to subprime and Alt-A mortgage loans that back our non-agency mortgage-related securities investments."  2007 IS at 14 (Ex. 5).

<blockquote>4.  Freddie Mac Had No Duty to Disclose "Caution" or "EA" Loans As Subprime.</blockquote>

The Complaint asserts that the Company violated the law by failing to disclose the precise percentages of C1, C2 and EA loans, and that those loans should have been disclosed as "subprime" due to their credit characteristics.  Compl. ¶¶ 3, 38, 124.  But this argument defies common sense in light of the Company's extremely detailed disclosure of the risk factors that caused loans to be categorized as C1, C2 and EA in the first place.  *See* Compl. ¶ 35.  Because "the facts which plaintiffs allege were concealed were, in fact, revealed," the claim fails.  *Joffee*, 209 F. App'x at 81; *see*, *e.g.*, *Ley*, 543 F.3d at 807–08.

Finally, it is of great significance that even today—with the Company under conservatorship and intense scrutiny from the SEC, FHFA and Congress—the Complaint does not and cannot allege that the Company discloses or classifies its C1, C2 and EA loans as subprime.  The SEC cannot premise its claim on a failure to make such a disclosure when the Company's conservator, FHFA, has not only declined to order any revised disclosure regarding

"subprime," but has, in fact, *continued to permit* Freddie Mac to engage in the same conduct about which the SEC complains.  *See In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 408 (S.D.N.Y. 2010) ("Plaintiffs['] allegations as to violations of GAAP and GAAS must be dismissed . . . . [Defendant] operated in a heavily regulated environment, and even after entering conservatorship, no restatements of [Defendant]'s financials have been ordered.").

5.     Freddie Mac Accurately Disclosed Other "Subprime" Exposure.

The Commission's theory that Freddie Mac misrepresented its Single Family exposure to subprime further strains credulity given Freddie Mac's undisputedly true disclosures about other subprime exposure.  The Commission does not dispute that Freddie Mac accurately disclosed the hundreds of billions of dollars of subprime investments in its retained portfolio, in the same "Subprime" section of the disclosure.  *See* Compl. ¶¶ 82, 84, 92, 93, 101, 107, 114.  Freddie Mac also disclosed the Company's expansion into product types associated with subprime loans, such as interest-only and option ARM loans.  *See* 2006 IS at 68–69 (Ex. 2); *see also* 2007 IS at 14 (Ex. 5) ("If delinquency and loss rates on subprime and Alt-A mortgages continue to increase, or there is a further decline in home prices, we could experience reduced yields or losses on our investments in non-agency mortgage-related securities backed by subprime or Alt-A loans.").  It is not plausible that the Company would accurately disclose its subprime position and associated risks in its retained portfolio if it was somehow attempting to mislead the market regarding credit risk in the Single Family portfolio.

The Information Statements also included an announcement that, to support its mission, beginning in April 2007, Freddie Mac would purchase "up to $20 billion in fixed rate and hybrid ARM products that will provide lenders with more choices to offer subprime borrowers."  2Q07 ISS at 34 (Ex. 3).  Freddie Mac later disclosed the dollar amount of the mortgages it purchased

37

pursuant to that commitment.  *See id.*, 3Q07 ISS at 33 (Ex. 4); 2007 IS at 94 (Ex. 5).  Again, it

would be absurd for the Company to proclaim its intent to purchase up to $20 billion in mortgage

products directed specifically at subprime borrowers at the same time the Company was trying to

hide its exposure to subprime.  Because the Complaint fails adequately to allege any actionable

misstatement or omission in Freddie Mac's disclosures, the claims fail.

      **B.**     **Mr. Syron's Public Statements Are Not Actionable.**

The Commission also challenges four statements in which Mr. Syron used the word

"subprime."  Each of these statements was consistent with the Company's formal and public

disclosures and, viewed in context, was not misleading.

First, the Complaint addresses Mr. Syron's statement on a March 23, 2007 earnings call

that accompanied the 2006 Information Statement.  Compl. ¶ 89.  Viewing the statement in

context as the Court must, *Olkey*, 98 F.3d at 9, Mr. Syron was responding to a question from a

Lehman Brothers analyst who commented that the "subprime market has really replaced the

FHA product" and asked Mr. Syron:

> Seems like over the last couple of years that subprime market has
> really replaced the FHA [*i.e.*, prime] product. You . . . have
> abstained from those higher LTV products.  Is there any product
> mix that you could see coming back in the marketplace that will
> replace the subprime product with the regulatory issues and
> congressional issues they're facing to keep the affordable housing
> market liquid and continue to provide capital to that marketplace?
> So the question would be, do you foresee FHA product com[ing]
> back, regaining market share? And do you have a product
> alternative, perhaps, in conjunction with the mortgage insurers that
> you could make higher profile in the coming quarters?

Ex. 12, Transcript, FRE-Q4 2006 Freddie Mac Earnings Conference Call, Thomson

StreetEvents, at 5 (Mar. 23, 2007).[20]

---

[20]  The analyst's remark, distinguishing between prime (FHA) and subprime, underscores the
market's awareness of the fact that, "based on lender-type, underwriting practice and product

Mr. Syron responded that "as you know, [we] weren't involved in underwriting much of that [subprime] business [or] any of that business directly." *Id.* Far from hiding subprime exposure, he went on to say that the Company might potentially increase its credit risk because it was considering "develop[ing] products in the subprime space that are both shareholder and consumer friendly . . . we're doing it on a pretty accelerated basis." *Id.* Taken in context, Mr. Syron's response echoed the Company's contemporaneous 2006 Information Statement, which stated that "based" on "lender-type, underwriting practice and product structure"—and not on creditworthiness of the borrower or the "riskiness" of the loan—the number of "subprime" loans underlying Freddie Mac's PCs was not significant. *See* Compl. ¶ 84. Thus, for the reasons the 2006 Information Statement is not actionable, neither is Mr. Syron's statement. His statement truthfully reported that the Company was not purchasing loans from traditional subprime channels but was considering developing new products that would reach prospective borrowers who would otherwise be relegated to those subprime channels. *See* 2Q07 ISS at 34-35 (Ex. 3); 3Q07 ISS at 33-34 (Ex. 4); 2007 IS at 94-95 (Ex. 5).

The second and third statements are similar: On May 14, 2007, when discussing the 2006 Information Statement at a UBS-sponsored investor conference, Mr. Syron stated that Freddie Mac "had basically no subprime exposure." Compl. ¶ 92; Transcript, Speech of Richard Syron, UBS 2007 Global Fin. Servs. Conf. (May 14, 2007) (Ex. 11). And, on December 11, 2007, at a Goldman Sachs conference, Mr. Syron stated likewise: "We didn't do any subprime business. . . . I mean, we bought some securities, which we can go through, and we think we're fine in. We bought them for goal purposes. But we didn't buy in guarantee, essentially any

---

structure," Freddie Mac was really not in the "subprime" market and that the "number of loans underlying [Freddie Mac's Guarantee Portfolio] that are subprime is not significant," Compl. ¶ 84.

subprime loans.  So we weren't in that business."  *Id.* ¶ 112; Transcript, Freddie Mac at Goldman Sachs Fin. Servs. Conf. (Dec. 11, 2007) (Ex. 10).   These statements, too, were completely consistent with what the Company disclosed in its 2006 IS and with reality.  *See id.* ¶ 84.  The Company was not "in the business" of purchasing or guaranteeing loans originated by traditional subprime channels, but it did disclose securities in which the issuer characterized the underlying mortgages as subprime.  *See id.* ¶ 113.  No one could read or hear these few sentences—in the context of the Company's expansive disclosures—and believe that Mr. Syron was stating that Freddie Mac "didn't buy any subprime"—meaning risky—"loans."

Finally, a June 14, 2007 press release issued along with Freddie Mac's First Quarter 2007 Information Statement Supplement quoted Mr. Syron's comments on a proposed initiative to purchase up to $20 billion of "subprime" mortgages:  "I'm particularly proud that our company took a leadership role in the subprime mortgage market, announcing new underwriting standards and products and committing to purchase up to $20 billion mortgages to support subprime borrowers."  *Id.* ¶ 98.  As the statement makes clear, the proposal under consideration is to *change* underwriting standards in order to enter a *new* market and allow the Company to purchase loans from subprime origination channels.  Because Freddie Mac typically did not purchase loans from traditional subprime channels, Compl. ¶ 113, these statements were also true and paralleled the Company's public disclosures, *see* 2Q07 ISS at 33-34 (Ex. 3); 3Q07 ISS at 32-33 (Ex. 4); 2007 IS at 94-95 (Ex. 5).

Indeed, these statements are also consistent with many of the internal documents incorporated in the Complaint.  *See* Freddie Mac's Strategic Landscape and Options, SET Offsite Meeting Presentation at 2, 5–10, 26 (Feb. 6–7, 2007) ("*Outside our franchise*, the nonprime mortgage market has grown dramatically . . . .") (Ex. 15) (emphasis added); Freddie Mac's

Business Strategy, Board of Directors Meeting, at 44-45, 70 (Mar. 2–3, 2007) (Ex. 14) (discussing subprime as an "adjacent market" and "market[] we have missed" and that "[o]ur involvement to date has been buying AAA tranches of others' securitizations").

In any event, even if Mr. Syron's statements were somehow inconsistent with the Company's periodic reports, those oral statements would not be misleading in the context of the Company's written disclosures.  *See Olkey*, 98 F.3d at 9 (defendant's representations at road shows were immaterial since they were contradicted by language in the prospectuses); *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 351 (2d Cir. 1993) ("Nor can a plaintiff rely on misleading oral statements . . . when the offering materials contradict the oral assurances."), *cert. denied*, 114 S. Ct. 1401, 128 L. Ed. 2d 74 (1994).[21]

### C.    Ms. Cook's Public Statement Is Not Actionable.

The sole alleged basis for the claims against Ms. Cook as a primary violator is a remark that she made during a May 17, 2007, speech at the Lehman Brothers 10th Annual Financial Services Conference in London (the "London Conference").  During that speech, Ms. Cook allegedly repeated the statement made by Mr. Syron three days earlier:  "[a]s we have discussed in the past, at the end of 2006, Freddie had basically no subprime exposure in our guarantee business, and about $124 billion of AAA rated subprime exposure in our retained portfolio." Compl. ¶ 93.  Ms. Cook's alleged statement was not limited to the "guarantee business"; she also reprised the disclosure from the 2006 Information Statement quantifying the amount of subprime-backed securities in the retained portfolio as of December 31, 2006.  *Id.* ¶ 84.

---

[21]   Claim Four alleging that Mr. Syron falsely certified in violation of SEC Rule 13a-14(a) fails, like the other claims, for lack of any actionable misrepresentation or omission.  In addition, SEC Rule 13a-14(a) does not support a separate cause of action.  *SEC v. Mozilo*, No. 09-cv-3994, 2010 WL 3656068, at *21 (C.D. Cal. Sept. 16, 2010); *SEC v. Black*, No. 04-c-7377, 2008 WL 4394891, at *16 (N.D. Ill. Sept. 24, 2008).

The Complaint alleges that Ms. Cook's statement "reiterated," *id.* ¶ 91, and "reinforced the misleading impression that Freddie Mac had little or no exposure to subprime loans in its Single Family guarantee business," *id.* ¶ 94, thereby acknowledging that Ms. Cook was referring to Freddie Mac's 2006 Information Statement.   For the same reasons that the "subprime" statement in the 2006 Information Statement did not contain an actionable misrepresentation or omission, *see supra* Section I.A, alleging that Ms. Cook "reiterated" that statement is insufficient to state a claim for primary liability against Ms. Cook.

The Company's "subprime" statement in the 2006 Information Statement provided that "based on lender-type, underwriting practice and product structure, the number of loans underlying [the PCs and Structured Securities in the Single Family portfolio] that are subprime is not significant."  Compl. ¶ 84.   All three qualifiers—lender-type, underwriting practice and product structure—reflect a loan's origination channel.  *See supra* at 16.   Fairly read, this statement, and what Ms. Cook reiterated, informed investors that Freddie Mac had very few loans in its Single Family portfolio that had been acquired from subprime originators, a fact that the SEC concedes.  *See* Compl. ¶ 113.   Instead of adequately alleging an actionable misrepresentation, the Complaint pleads that Ms. Cook made a true statement.

## II.   THE FIRST AND SECOND CLAIMS MUST BE DISMISSED FOR FAILURE ADEQUATELY TO PLEAD SCIENTER.

In addition to the pleading requirements of Rule 12(b)(6), a complaint alleging securities fraud must satisfy the heightened pleading requirements of Rule 9(b) by alleging "facts that give rise to a strong inference of fraudulent intent."  *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000).  A "strong inference" of fraudulent intent may be established either by: (a) alleging "facts to show that defendants had both motive and opportunity to commit fraud," or (b) by alleging "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."

*SEC v. Espuelas*, 698 F. Supp. 2d 415, 426–27 (S.D.N.Y. 2010) (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)).  To show "motive and opportunity," a plaintiff must "'allege that defendants benefited in some concrete and personal way from the purported fraud.'"  *Novak*, 216 F.3d at 307–08.  Conscious misbehavior is likened to "deliberate illegal behavior," while reckless conduct is "'at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that danger was either known to the defendant or so obvious that the defendant must have been aware of it.'"  *Id.* at 308 (ellipsis in original) (quoting *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38, 47 (2d Cir. 1978)).  In other words, the danger that the statement could mislead must be so obvious that the actor must have been aware of it and consciously disregarded it.  *Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634, 639 (D.C. Cir. 2008).  The Complaint does not meet this high burden with regard to either Mr. Syron or Ms. Cook.

### A. The Commission Fails Adequately to Allege Facts Giving Rise to a Strong Inference of Scienter as to Mr. Syron.

#### 1. The Commission Fails to Allege Facts to Show That Mr. Syron Had the Motive And Opportunity to Commit Fraud.

The Commission does not allege that Mr. Syron sold any Freddie Mac stock during the Relevant Period.  Public filings confirm that, in fact, Mr. Syron did not sell any stock during the Relevant Period.  *See* Declaration of Frank Volpe (Apr. 30, 2012) ("Volpe Decl."), Ex. A (Mr. Syron's SEC Form 4s).[22]  Instead, Mr. Syron held his stock even as Freddie Mac's share price sank from a Relevant Period high of $68.11 down to $6.49 at the Relevant Period's close.  *See*

---

[22]   Mr. Syron forfeited shares periodically during the Relevant Period.  *See* Volpe Decl., Ex. A. Forfeitures are not "sales" and do not show scienter.  *See, e.g.*, *In re Sportsline.com Sec. Litig.*, 366 F. Supp. 2d 1159, 1173 (S.D. Fla. 2004).  Forfeitures represent shares retained by the Company automatically to cover taxes owed with the lapse of stock restrictions.  Volpe Decl., Ex. A at 3.

*id.* ¶ 6; *id.*, Ex. A at 14-15.  Indeed, the value of Mr. Syron's position—including shares held absolutely and shares contingent upon vesting—dropped over $24 million from its Relevant Period high.  *See id.* ¶¶ 3-5.

This Court has recognized that the absence of stock sales belies any inference of scienter. *See In re Sec. Capital Assurance Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 594 (S.D.N.Y. 2010); *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Co.*, 75 F.3d 801, 814 (2d Cir. 1996).  Where, as here, a defendant suffers enormous losses, courts find it implausible that such a defendant intended to defraud.  *See, e.g., Acito*, 47 F.3d at 54 ("fact that [defendants] did not sell their shares during the relevant class period undermines plaintiffs' claim").[23]

Unable to point to any stock transactions that give rise to a strong inference of scienter, the SEC appears to allege that the Mr. Syron received an "improper benefit" through his employment compensation.  Compl. ¶ 15 (Mr. Syron's compensation grew "in part" tied to the "Touch More Loans" initiative . . . and to quarterly financial reporting).  But this allegation fails to plead scienter.  In case after case, this Court has held that "the mere desire to increase officer compensation"—a motive common to all corporate executives and consistent with innocent conduct—"does not give rise to a 'strong inference' of fraudulent intent."  *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 645 (S.D.N.Y. 2007); *see, e.g., Espuelas*, 698 F. Supp. 2d at 427 ("[A] plaintiff must do more than merely charge a 'motive [ ] possessed by virtually all corporate insiders.'") (quoting *Novak*, 216 F.3d at 307); *see also Acito*, 47 F.3d at 54; *Heller v. Goldin*

---

[23]  *See also, e.g., Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) (finding that plaintiffs did not adequately allege motive where "[t]here [was] no claim here that false statements were made in an effort to sell off shares"); *Maldonado v. Dominguez*, 137 F.3d 1, 12 n.9 (1st Cir. 1998) (noting that any inference of scienter was undermined by defendants' loss of $1.5 million); *In re Downey Sec. Litig.*, No. CV 08-3261, 2009 WL 736802, at *14 (C.D. Cal. Mar. 18, 2009) (finding that losses suffered by defendants due to their failure to sell any stock "negates any inference of scienter").

*Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 621 (S.D.N.Y. 2008).  These cases make clear that generalized corporate motives—like the one alleged in the Complaint—are not concrete enough to allow an inference of scienter.  *San Leandro*, 75 F.3d at 808; *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996).

2.      The Complaint Does Not Allege Facts That Constitute Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness.

The Complaint also fails to give rise to a strong inference of "conscious misbehavior or recklessness."  *Espuelas*, 698 F. Supp. 2d at 426; *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001).  The Complaint alleges no fact or document in which Mr. Syron displayed awareness that any statement about subprime was inaccurate.  The Complaint rests entirely on circumstantial allegations.  The strength of such allegations must be "correspondingly greater" where, as here, Defendants lack a motive for wrongdoing.  *Kalnit*, 264 F.3d at 142.  Allegations of "fraud by hindsight" are insufficient, and "conclusory allegations—that Defendants 'knew but concealed' some things, or 'knew or were reckless in not knowing' other things—do not satisfy the requirements of Rule 9(b)" because "'such allegations are so 'broad and conclusory as to be meaningless.'"  *Shields*, 25 F.3d at 1129 (quoting *Decker v. Massey-Ferguson*, 681 F.2d 111, 119-20 (2d Cir. 1982)).

The Complaint does not allege a single fact that suggests Mr. Syron was on notice that Freddie Mac somehow misrepresented its exposure to risk by not disclosing as subprime the value of loans categorized internally as Caution or EA.  *See* Compl. ¶ 48.  The Complaint describes no documents or discussions in which Mr. Syron is put on notice that disclosures about risk or about "subprime" loans were inaccurate.  Instead, the Complaint cites a series of inapposite documents, none of which can support an inference that Mr. Syron should have been

45

aware that the statements about subprime would "obvious[ly]" be misleading. *Novak*, 216 F.3d at 308.

> a.    The Single Family Portfolio Did Not Typically Acquire Loans
>        From Subprime Channels.

Mr. Syron's statements were based upon his accurate understanding that Freddie Mac's Single Family portfolio did not typically acquire loans from self-identified subprime originators. Compl. ¶ 113.   Mr. Syron's statements are entirely consistent with the only disclosure the Company ever made with respect to overall "subprime" exposure in the guarantee portfolio. Compl. ¶ 84 ("[B]ased on lender-type, underwriting practice and product structure, the number of loans underlying [our PCs and Structured Securities] that are subprime is not significant.").

The Complaint points to the fact that certain employees within Freddie Mac colloquially referred to Caution and EA loans as "subprime" or "subprime-like" in internal documents and emails.  *E.g.*, Compl. ¶ 46.  But in the absence of any universal definition of "subprime," the occasional and colloquial use of the term by Company employees does not permit the inference that Mr. Syron knew or must have known his statements were false.

> b.    The Complaint Fails to Allege that Mr. Syron Knew or Should
>        Have Known Facts Contradicting the Public Statements.

The Complaint does not allege—as it must—that Mr. Syron knew or was reckless in not knowing particularized facts that *actually contradicted* a specific statement.  *See Espuelas*, 698 F. Supp. 2d at 427.  Instead, the Complaint catalogues facts that are either irrelevant or simply not contrary to the Company's disclosures or to Mr. Syron's statements.

At the outset, the Complaint details a number of documents that have no bearing on whether Mr. Syron's statements and the Company's disclosures around *subprime* were accurate. For example, the Complaint cites documents relating to the Company's 2004 decision to purchase no-income, no-asset ("NINA") loans.   Compl. ¶ 44.   But NINA loans are not

characterized by credit risk; they are characterized by the level of documentation required.  Thus, this 2004 advice about an extremely narrow segment of the mortgage market is in no way relevant to Mr. Syron's scienter regarding credit risk and "subprime" disclosures in 2007.  For the same reason, all documents regarding business decisions in 2004 and 2005 that have nothing to do with subprime ("Touch More Loans," Home Possible, purchasing Fannie Mae's EA loans) cannot give rise to an inference that Mr. Syron knew, or was reckless in not knowing, that credit risk disclosures in the Relevant Period were false or misleading.[24]  Compl. ¶¶ 45–47.

The Complaint's allegations about underwriting categories also fall short.  There is no allegation that Mr. Syron was even aware that Freddie Mac's internal automated underwriting systems used the categories EA, C1 or C2.  *See* Compl. ¶¶ 31-41, 46.  Further, the Complaint does not allege that Mr. Syron would know or understand that these categories correlated somehow with a definition of subprime.  The allegations about *other* automated underwriting systems (*e.g.*, Fannie Mae's underwriting system) are even thinner.  *Id.* ¶¶ 49-54.  There is no allegation that Mr. Syron saw documents relating to them, nor that he was aware of the alleged relationship between "defect" and "caution loans," let alone that such loans were "subprime." *Id.* ¶¶ 49–54.

The Complaint's reliance on ERMC dashboards is similarly misplaced.  *See* Compl. ¶ 69. Everyone at the Company understood the relationship between low credit scores/high LTV ratios and defect rates.  That is why those risk factors were disclosed.  But that simple fact would not put Mr. Syron on notice of a problem with the Company's use of the term "subprime."  In the

---

[24]  In addition, it is not alleged that Mr. Syron was aware of any of the following: that "[l]oans acquired through Home Possible were internally considered to be 'subprime-like'"; that others at Freddie Mac referred to EA loans as "subprime in nature" or "clearly subprime"; or, that the Company acquired "Full Spectrum Lending" loans.  Compl. ¶¶ 46–47.

same way, the fact that mortgages acquired in 2007 performed worse than those acquired in 2006 says nothing about the whether the Company's credit risk disclosures were inadequate or whether the Company's use of the term subprime was misleading.  *Id.* ¶¶ 71–73.

Many of the documents cited in the Complaint for the purpose of alleging scienter actually corroborate the accuracy of the Company's disclosures.  For example, although the SEC cherry picks a few sentences from presentation slides used during an off-site meeting of the Senior Executive Team[25] to explore future business strategies, slides 51 and 52 of the presentation state that the Company currently does not "like" "subprime" fixed-rate mortgages, and that although Freddie has a "strong presence . . . in the markets it targets (mainly prime [fixed-rate mortgages]) . . . [,]" it is absent from "much of the rest"—*i.e.*, the non-prime or "subprime" market.  The presentation suggests that the Company, in the next three to five years, *consider* "expand[ing] into the nonprime market?"  Compl. ¶ 57; Ex. 15 at 1–2.  *See also id.* at 44, 51–52.  The presentation given to the Board of Directors and cited in the Complaint similarly discusses subprime as an "adjacent market" and "market[] we have missed."  Compl. ¶ 59; Ex. 14 at 44–45, 70.  Thus, these documents corroborate Mr. Syron's accurate and reasonable statements that Freddie Mac did not "do subprime," as well as the Company's disclosures.

The Complaint's allegations that some employees used the word "subprime" to refer to risky loans cannot fill the gap regarding Mr. Syron's scienter.  Indeed, even if Mr. Syron knew

---

[25] The very use of the phrase "subprime-*like*" in both the SET and Board of Director's presentations is telling.  Compl. ¶¶ 57, 59 (emphasis added).  If the slides' author meant to convey that Freddie Mac was indeed purchasing "subprime" loans from subprime originators, the use of the word "like" would be superfluous.  Its use shows the loans were not subprime.  The Complaint admits as much when it states that "subprime-like" means "*similar to* the loans originated by a small handful of institutions that self-identified as subprime originators."  Compl. ¶ 57 (emphasis added).  This is just as true of the phrases "equivalent to subprime" or "subprime in nature."  *See* Compl. ¶ 67.

48

about such usage, that would not put Mr. Syron on notice that the Company's financial disclosures—which were crafted and scrutinized by Freddie Mac's senior executives, attorneys, accountants and regulators—were false or misleading.

          c.      The Complaint's Allegations Regarding Freddie Mac's "Model Subprime Offering" Similarly Fail to Show Scienter.

The Commission points to a series of documents regarding Freddie Mac's "Model Subprime Offering" to support its assertion that Mr. Syron acted with a fraudulent intent. Compl. ¶¶ 60–70. Specifically, the Commission alleges that Mr. Syron should have understood that existing disclosures were misleading because the Company concluded that the terms of the proposed model offering would not expand the types of loans (in terms of credit risk) beyond what the Company was already acquiring. *See, e.g.*, *id.* ¶ 68.

These allegations fail. First, that the Company considered expanding its credit risk to reach the "subprime" market in the *future* says nothing about whether its disclosures of credit risk (or "subprime" holdings) to date were inadequate. The Company had, in fact, extensively disclosed its existing credit risk. Consequently, all that these documents prove is that, after extensive study and modeling, the Company was not willing to expand credit risk any further. Second, the "subprime" label on the proposed model offering—and the fact that the study was undertaken with the goal of reaching borrowers who would otherwise be relegated to the subprime market—does nothing to alert Mr. Syron to the quality and accuracy of existing disclosures. Finally, there is no allegation that Mr. Syron had any involvement in discussions about the offering, or that Mr. Syron even received the referenced documents, including those that describe existing loans "we think are subprime" or are "equivalent to subprime." Compl. ¶ 61, 63–68. Nothing in the study of the model subprime offering gives rise to an inference of scienter on the part of Mr. Syron.

**B.     The Commission Fails Adequately to Allege Facts Giving Rise to a Strong Inference of Scienter as to Ms. Cook.**

1.     The Complaint's Allegations Are Insufficient to Support a Strong Inference That Ms. Cook Had the Motive And Opportunity to Commit Fraud.

To adequately allege that Ms. Cook had the motive and opportunity to commit fraud, the Complaint must show that Ms. Cook benefitted in a "concrete and personal way" from the purported fraud.  *Novak*, 216 F.3d at 311.  The only allegation in the Complaint that could possibly be construed as an allegation that Ms. Cook received a concrete and personal benefit is the assertion that Ms. Cook's compensation was tied "in part" to the "Touch More Loans strategy" and to "quarterly financial reporting."  Compl. ¶¶ 19, 21.  Courts, however, have consistently rejected scienter allegations based on generalized motives such as increased compensation.  *See supra* Section II.A.1 (citing cases).  Furthermore, the Complaint does not (because it cannot) allege a link, as it must, between Ms. Cook's compensation and her purportedly false or misleading statement.  Accordingly, the Complaint fails adequately to allege motive and opportunity.

2.     The SEC Fails to Sufficiently Allege Facts Constituting Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness.

The SEC's theory that Ms. Cook's public statement was false or misleading rests entirely on allegations that loans designated C1, C2 and EA by the automated underwriting systems were referred to internally as "subprime" and "subprime-like" and therefore should have been disclosed to the public as "subprime."  As is the case with Mr. Syron, the Complaint does not allege that Ms. Cook ever heard the terms C1, C2 or EA, that she referred to C1, C2 or EA loans as "subprime" or "subprime-like," or that she knew or was reckless in not knowing that some employees colloquially used those terms to describe those loans.  Nor does the Complaint allege

50

that Ms. Cook knew or was reckless in not knowing that this internal risk-grading system might have correlated with some definition of subprime.

The crux of the Complaint's allegations that Ms. Cook acted with the requisite scienter when she spoke at the London Conference is that, in the year prior to that speech, Ms. Cook attended a handful of meetings at which credit risk was discussed.[26]  *See* Compl. ¶¶ 52-53, 55-57, 59, 62, 65.  According to the Complaint's own allegations, at none of these meetings was it discussed (or even mentioned) that the Company had exposure to "subprime" loans in its Single Family portfolio.  These included meetings of the Board's Finance and Capital Deployment Committee, *id.* ¶¶ 52, the Board's Mission, Sourcing and Technology Committee ("MST Committee"), *id.* ¶¶ 53, 55, the ERMC, *id.* ¶ 56, the SET, *id.* ¶ 57, and the Board of Directors, *id.* ¶ 59.  As we demonstrate below, however, these allegations negate an inference of scienter and effectively plead the SEC out of court.

The Complaint alleges that Ms. Cook presented at a March 2-3, 2007, Board of Directors meeting that was "dedicated to the Company's strategic direction in subprime." Compl. ¶ 59.  In her alleged presentation, Ms. Cook explained to the Board of Directors that Freddie Mac "already purchased subprime-like loans" to meet its HUD goals and that "subprime-like loans" made up the worst 10% of the Company's "Flow Business."  *Id.* Allegedly guided by Ms. Cook, the Board of Directors was evaluating whether Freddie Mac should enter the subprime market, a clear indication that the Company was not already in that market.  *See* Ex. 14 at 44–45, 70 (slides refer to the subprime market as an "adjacent market"

---

[26]  The Complaint also contains allegations describing historical information and past business initiatives, including the Company's "A-minus Program."  *See* Compl. ¶¶ 36-38.  These allegations are wholly irrelevant to the question of Ms. Cook's intent because they pre-date both her arrival at Freddie Mac and the Relevant Period by years.

and a "market[] we have missed").  The statements in this presentation reveal that Ms. Cook distinguished between loans with credit characteristics that made them "subprime-like" and loans that were generated by subprime originators using certain underwriting standards and product terms that made them "subprime."  She believed that Freddie Mac already had purchased "subprime-like" loans but not "subprime" loans, and that the Company had not yet entered, but was considering entering, the subprime market.

The February 6-7, 2007, SET meeting preceded the March 2007 Board of Directors meeting and included  "similar information" to the Board of Directors presentation given by Ms. Cook.  *See* Compl. ¶¶ 57, 59.  The SET presentation, which Ms. Cook attended, discussed the "subprime-like" loans that Freddie Mac was already purchasing.  *Id.*  As with the Board of Directors presentation, this presentation stated that the Company did not "like" "subprime" fixed-rate mortgages and that although the Company had a "strong presence . . . in the markets it targets (mainly prime [fixed-rate mortgages] . . . [,]" it was absent from "much of the rest," implying the subprime market.  Ex. 15 at 51-52.  The presentation also asked whether the Company, in the next three to five years, should *consider* "expand[ing] into the nonprime market?"  *Id.*

These two presentations, which occurred at the highest levels of the Company, reveal that, as of May 17, 2007, Ms. Cook knew that Freddie Mac had purchased subprime-like loans, and that it was considering expanding into the subprime market but had not yet done so.  The SEC's attempt to conflate "subprime-like" with "subprime" has no basis in law or fact.  *See supra* footnote 25.  More importantly, the SEC cannot plead around what those alleged meetings reveal about Ms. Cook's state of mind:  that she did not conflate "subprime-like" with

"subprime."  She therefore believed that her May 17 statement was true:  that Freddie Mac had almost no subprime exposure in its Single Family guarantee portfolio.

The Complaint's reference to other presentations that Ms. Cook viewed and meetings she attended further contradict the conclusory allegation that she acted with the requisite scienter. For example, a presentation delivered at the May 31, 2006 meeting of the MST Committee indicated that the Company was "expanding [its] appetite" for "high-risk loans" and "increasing exceptions to the Company's existing credit policy."[27]  Compl. ¶ 53.  The presentation did not mention "subprime" loans.  At another MST Committee meeting six months later, a presentation prepared for that meeting attached a glossary that defined "Subprime Mortgages."  *Id.* ¶ 55.  But not only is there no allegation that the definition of "Subprime Mortgages" was discussed at the meeting, there is no allegation that attendees discussed whether the Company had loans in the Single Family portfolio that met that definition.  *Id.*  None of the allegations as to these meetings contradict the distinction that Ms. Cook is alleged to have drawn by March 2007 between "subprime-like" and "subprime" loans.

The Complaint also alleges that Ms. Cook was present at an ERMC meeting on January 18, 2007, during which she may have seen a presentation that stated that there was an "increasing . . . likelihood that [the Company was] already purchasing subprime loans under existing acquisition programs."  Compl. ¶ 56.  Given the allegations in the Complaint regarding what Ms. Cook actually said at the Board of Directors meeting—over one month after this ERMC meeting—that negate scienter, this single allegation is insufficient to show conscious

---

[27]   The SEC also alleges that, prior to a May 25, 2006 meeting of the Board's Finance and Capital Deployment Committee, Ms. Cook received a memorandum stating that Freddie Mac had continued to expand its credit policies and "increase purchases of higher-risk products." Compl. ¶ 52.  However, there is no allegation that Ms. Cook actually read the memorandum, and no allegation that the Company's purchase of "higher-risk products"—much less its alleged exposure to "subprime" loans—was ever discussed at the meeting.

misbehavior or recklessness.  This allegation does not concern something that Ms. Cook herself said, nor does it establish that Ms. Cook knew that there were "subprime" loans in the Single Family portfolio or that she was reckless in not knowing of the existence of such loans when she made her statement on May 17, 2007.

### C.     Freddie Mac's Extensive Truthful Disclosures Negate any Inference of Scienter.

Freddie Mac's truthful disclosures of the increasing risk of its Single Family portfolio prevent any inference that Mr. Syron and Ms. Cook acted with a culpable state of mind.  *See supra* Sections I.A.3, I.A.5.  "[T]ruthful disclosures of negative information militate[] against a finding that [defendants] acted with a culpable state of mind."  *In re BearingPoint, Inc. Sec. Litig.*, 525 F. Supp. 2d 759, 769 (E.D. Va. 2007) (internal quotation marks and citation omitted), *aff'd in part, rev'd in part on other grounds by Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172 (4th Cir. 2009).  Where public filings thoroughly disclose the relevant risks facing a company, courts have held that an inference of scienter has been negated.  *See, e.g.*, *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1425 (9th Cir. 1994) ("[T]he detailed risk disclosure in the Debenture Prospectus negates an inference of scienter."); *In re Dothill Sys. Corp. Sec. Litig.*, No. 06-cv-228, 2009 WL 734296, at *9 (S.D. Cal. Mar. 18, 2009) (following *Worlds of Wonder* in granting motion to dismiss); *Ferber v. Travelers Corp.*, 802 F. Supp. 698, 714 (D. Conn. 1992) ("[D]efendants' provision of adverse information to [the public by way of disclosures] negates an inference that [they] acted with an inten[t] to defraud") (internal quotation marks & citation omitted).  As detailed above, the level of disclosure by Freddie Mac about the credit characteristics of its guarantee portfolio and the associated risks is incompatible with any effort to mislead or lull investors.  Likewise, it simply is not plausible that Freddie Mac would intentionally understate its subprime exposure in the Single Family portfolio and then

present (as it did) in the immediately following passage an accurate disclosure of subprime exposure in its retained portfolio.

As the Complaint effectively concedes, quarter after quarter during the Relevant Period, Freddie Mac accurately disclosed the amount of subprime collateral underlying the securities in its retained portfolio.  *See* Compl. ¶¶ 84, 101, 107, 114, 118, 121.  The same can be said of the allegedly actionable statements made by Mr. Syron and Ms. Cook in May 2007, which referred to information in the 2006 Information Statement.  Both Mr. Syron and Ms. Cook stated:  "[a]s we have discussed in the past, at the end of 2006, Freddie had basically no subprime exposure in our guarantee business, and about $124 billion of AAA rated subprime exposure in our retained portfolio."  *Id.* ¶¶ 92-93.  The fact that Mr. Syron and Ms. Cook uttered truthful statements about the amount of subprime in the retained portfolio, within a breath of their allegedly false statements about subprime, further negates scienter.  It is implausible that Mr. Syron and Ms. Cook would disclose accurately Freddie Mac's subprime exposure of $124 billion in one part of the business, and simultaneously obfuscate $141 billion of subprime in another part of the business.

## III.    THE AIDING AND ABETTING CLAIMS SHOULD BE DISMISSED.

Claims Two and Five allege that Mr. Syron, Ms. Cook and Mr. Bisenius aided and abetted Freddie Mac's violations of Exchange Act Sections 10(b) and 13(a), and Rules 10b-5(b), 12b-20 and 13a-13.  To state a claim, the SEC must allege adequately:  (1) a primary violation of securities laws; (2) that Defendants had "knowledge of the violation"; and (3) that Defendants "substantially assisted in the primary wrongdoing."  *Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir. 1983).  These aiding and abetting claims necessarily fail.

First, as shown above, the SEC has not alleged adequately a primary violation.[28]  *See supra* Sections I-II.

Second, the SEC has not adequately pled that Defendants actually knew of any primary violation.  Although the SEC attempts to cure this defect by alleging "reckless[ness]," Compl. ¶ 4, courts in the Second Circuit have repeatedly held that mere "recklessness" does not give rise to aiding and abetting liability.  *Espuelas*, 579 F. Supp. 2d at 484 ("[T]he allegations against Kampfner . . . raise a strong inference that Kampfner was reckless. . . . The fact that actual knowledge is the standard for aiding and abetting, however, compels the Court to dismiss . . . ."); *SEC v. Cedric Kushner Promotions, Inc.*, 417 F. Supp. 2d 326, 334 (S.D.N.Y. 2006) ("recklessness . . . is no longer sufficient"); *see also SEC v. Stanard*, No. 06 Civ. 7736, 2009 WL 196023, at *31 (S.D.N.Y. Jan. 27, 2009); *SEC v. KPMG LLP*, 412 F. Supp. 2d 349, 382-84 (S.D.N.Y. 2006).  The Complaint here fails to allege "actual knowledge."  *SEC v. Kelly*, 765 F. Supp. 2d 301, 322 (S.D.N.Y. 2011).[29]

---

[28]   At the very least, Claim Five should be dismissed with regard to any financial statements filed before July 18, 2008.  Claim Five alleges that Defendants aided and abetted Freddie Mac's violations of Exchange Act Section 13(a), which requires SEC registrants to file accurate quarterly reports.  Freddie Mac was not an SEC registrant until July 18, 2008 when it voluntarily registered under the Exchange Act.  Compl. ¶ 9.  Before that date, Freddie Mac could not have violated Section 13(a), and Defendants could not have aided or abetted any such violation.  The SEC apparently recognizes this, because it limits Claim Four's allegation of false certifications to Mr. Syron's certification of the Company's August 6, 2008 Form 10-Q, and no prior disclosures.  *See* Compl. ¶ 138.

[29]   Although the Dodd-Frank Act, enacted in 2010, altered the intent requirement for aiding and abetting liability to provide that recklessness is sufficient to state a claim, the Act, by its own terms, does not apply retroactively.  Pub. L. No. 111-203 § 4, 124 Stat. 1367, 1390 (2010) ("Except as otherwise specifically provided in this Act or the amendments made by this Act, this Act and such amendments shall take effect 1 day after the date of enactment of this Act."); *see also Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994) (if a statute affects a party's substantive rights, it will not apply retroactively "absent clear congressional intent favoring such a result").  All of the relevant disclosures in this case occurred well before the enactment of the Dodd-Frank Act.

Third, the SEC has not adequately alleged that Defendants "substantially assisted" any primary violation.  The "substantial assistance" element requires sufficient allegations that Defendants "affirmatively assist[ed], help[ed] conceal, or by virtue of failing to act when required to do so, enable[d] the fraud to proceed." *Espuelas*, 698 F. Supp. 2d at 433; *see, e.g.*, *Cedric Kushner*, 417 F. Supp. 2d at 335–36.  The SEC must also plead that a Defendant's actions were the "proximate cause" of the primary violation; mere "review and approval" or "awareness and approval" of an alleged primary violation is "insufficient to make out a claim for substantial assistance." *SEC v. Treadway*, 430 F. Supp. 2d 293, 339 (S.D.N.Y. 2006).  The SEC's allegations fail to demonstrate substantial assistance as to any Defendant.

### A.   The Complaint Fails to State a Claim for Aiding and Abetting Liability Against Mr. Syron.

The aiding and abetting allegations against Mr. Syron are not plausible and must be dismissed.  The SEC has not adequately alleged that there is any primary violation.  *See supra* Sections I-II.  And the SEC's failure adequately to allege scienter means that the SEC has failed *a fortiori* to allege "actual knowledge" of a violation, which is an even stricter standard that cannot be satisfied by a showing of recklessness.  *See supra* Section II.

Moreover, the Complaint does not allege that Mr. Syron substantially assisted in a primary violation.  The Complaint alleges only that Mr. Syron had "ultimate authority over," Compl. ¶ 4, and "certified" the relevant disclosures, *id.* ¶ 75.  There are no allegations that he participated in the drafting of subprime disclosures or any other portion of the disclosures, revised the disclosures or that he directed that the disclosures be drafted or altered in any particular way.  There are no allegations that he acted outside of, or tried to modify, the normal disclosure process, which entailed rigorous, transparent and multi-layered reviews by others charged with ensuring the disclosures' accuracy.  In cases where courts have found "substantial

assistance," the behavior alleged was far more significant and pled with greater specificity than the innocuous and vague behavior alleged here. *See, e.g.*, *SEC v. Baxter*¸ No. C-05-03843 RMW, 2007 WL 2013958, at *9 (N.D. Cal. July 11, 2007) (acknowledging that while "not a strong showing," the alleged behavior of a Chief Financial Officer survived a motion to dismiss because the defendant allegedly participated in "drafting the false and misleading disclosures[,]" "review[ing] the financial statements," "direct[ing] the reclassification" of balances for the purpose of concealment, and "sign[ing] the management representation letters").

The conclusory and vague allegations leveled against Mr. Syron cannot satisfy the standard set forth in Rule 9(b), as they lack any detail to make a plausible claim that he "affirmatively assist[ed]," "conceal[ed]," or otherwise "fail[ed] to act when required to do so." *Espuelas*, 698 F. Supp. 2d at 433. *See Morgan v. Prudential Grp., Inc.*, 81 F.R.D. 418, 425 (S.D.N.Y. 1979) ("unadorned allegation that a defendant 'participated' in the preparation of false and misleading . . . documents is at most a conclusory allegation" that does not satisfy Rule 9(b)). The Complaint therefore fails to raise the allegation of "substantial assistance" "above the speculative level." *Twombly*, 127 S. Ct. at 1965.

### B. The Complaint Fails to State a Claim for Aiding and Abetting Liability Against Ms. Cook and Mr. Bisenius.

The SEC's claims against Ms. Cook and Mr. Bisenius on an aiding and abetting theory likewise fail. Not only does the Complaint fail adequately to plead a primary violation, it fails adequately to plead that Defendants either (1) substantially assisted a violation, or (2) actually knew of a violation. To show just how threadbare the SEC's allegations are, we first summarize the Complaint's aiding and abetting allegations against these Defendants.

1.      The Complaint's Aiding and Abetting Allegations.

a.      The Allegations Against Ms. Cook.

The Complaint does not allege—nor could it—that Ms. Cook was involved in creating or drafting Freddie Mac's disclosures regarding its exposure to "subprime."  Moreover, by alleging that "the Disclosure Committee consulted [Ms.] Cook at least once regarding the Company's public disclosures concerning subprime," Compl. ¶ 22, the Complaint concedes that Ms. Cook neither sat on the Disclosure Committee nor reviewed the Company's subprime disclosures.

Unable to allege a more substantial role for Ms. Cook in creating the disclosures, the Complaint tries to support its aiding and abetting claims by alleging that Ms. Cook signed certain "sub-certifications" in connection with each of the financial reports at issue.  Compl. ¶ 76.  As discussed below, these allegations are insufficient.

In addition, the Complaint alleges that, for the same reasons that Ms. Cook acted with the requisite scienter during her speech at the London Conference, she also had actual knowledge that the Company's "subprime" disclosures were false and misleading.  Compl. ¶¶ 52-53, 55-57, 59, 62, 65, 67-73.  The Complaint does not allege, however, that anyone communicated reservations about the accuracy of the disclosures, or of her May 17, 2007 statement, to Ms. Cook.  Nor does the Complaint allege that Ms. Cook learned of any new information after May 17, 2007 that shows she had "actual knowledge" of a primary violation.

b.      The Allegations Against Mr. Bisenius.

The Complaint is devoid of any allegations that Mr. Bisenius was involved in the process of creating Freddie Mac's "subprime" disclosures, much less that he bears any responsibility for them.  The Complaint nowhere alleges that Mr. Bisenius drafted, edited or even commented on any of the purportedly misleading statements regarding Freddie Mac's exposure to "subprime."  The Complaint attempts to meet the "substantial assistance" standard merely by alleging that Mr.

Bisenius "sub-certified the 2006 Information Statement, the 2Q07 Information Statement Supplement . . . and the 2Q08 Form 10-Q," and that he received an email expressing concerns about prepared speeches for Mr. Syron and Ms. Cook but "fail[ed] to correct statements in their prepared speeches that he knew misstated the Company's subprime exposure."  Compl. ¶¶ 4, 76. The Complaint does not claim that Mr. Bisenius committed any other acts that contributed to the making of the alleged misleading statements.  As discussed below, none of the Complaint's allegations amount to "substantial assistance" sufficient to assert a viable aiding and abetting claim under the securities laws.

The SEC also attempts—but fails—to show that Mr. Bisenius knew that Freddie Mac's "subprime" disclosures were misleading.  The Complaint notes in passing that he sat on the Disclosure Committee that reviewed Freddie Mac's financial disclosures in 2008, but includes no allegations about what Mr. Bisenius may have done, said or even heard as a member of that Committee.[30]  The Complaint also alleges that Mr. Bisenius was knowledgeable about Freddie Mac's Single Family portfolio due to his management responsibilities and his role as developer of a "Model Subprime Offering" for the Company.  *Id.* ¶¶ 26, 61-68.  In addition, the SEC quotes a 2005 email in which Mr. Bisenius described "Expanded Approval" loans as "clearly subprime."  *Id.* ¶ 46.  But the Complaint's allegations about Mr. Bisenius's knowledge do not suggest that he had any concerns about the Company's public disclosures, or that anyone communicated to him that the disclosures were false, and thus do not support a plausible inference that he had "actual knowledge" of any primary violation.

---

[30]   Mr. Bisenius was not a member of the Disclosure Committee before 2008, and the Complaint does not allege otherwise.

2.      The SEC Fails Adequately to Allege That Ms. Cook and Mr. Bisenius Provided "Substantial Assistance."

a.      The SEC's "Sub-Certification" Theory Fails.

As discussed above, the SEC's primary allegation of substantial assistance is that, as part of the Company's internal disclosure controls process, Ms. Cook and Mr. Bisenius signed "sub-certifications" stating that they had reviewed the sections relevant to their roles and responsibilities at the Company and found no false or misleading information.  The law is well-settled, however, that such participation in a disclosure review process does not constitute substantial assistance rendering an employee liable as an aider and abettor.  Courts have repeatedly held that "review and approval" or "mere awareness and approval" of an alleged violation is "insufficient to make out a claim for substantial assistance."  *See, e.g.*, *Treadway*, 430 F. Supp. 2d at 339 ("approval of the primary violation is insufficient to make out a claim for substantial assistance") (citing *Armstrong*, 699 F.2d at 92).[31]

Only recently, the SEC tried and failed to establish aiding and abetting liability based on even more significant involvement in the disclosure process than that alleged here.  *See SEC v. Woodruff*, 778 F. Supp. 2d 1073 (D. Colo. 2011).  In *Woodruff*, the SEC argued that Afshin Mohebbi, the former COO of Qwest Communication International, Inc. ("Qwest"), aided and abetted "misrepresentations and omissions . . . in Qwest's written earnings releases and in statements by officials in investor conference calls . . . because he 'was involved in the preparation' of press releases and 'information used in conference calls.'"  *Id.* at 1092.  On

---

[31]      *See also, e.g.*, *SEC v. Apuzzo*, 758 F. Supp. 2d 136, 153 (D. Conn. 2010); *SEC v. Tecumseh Holdings Corp.*, No. 03 Civ. 5490, 2009 WL 4975263, at *5 (S.D.N.Y. Dec. 22, 2009); *Cedric Kushner*, 417 F. Supp. 2d at 335-36; *SEC v. Pasternak*, 561 F. Supp. 2d 459, 502 (D.N.J. 2008); *SEC* v. *Power,* 525 F. Supp. 2d 415, 422 (S.D.N.Y. 2007).

summary judgment, the court found these "allegations insufficient to demonstrate a triable claim for aiding and abetting liability." *Id.* at 1091.

In *Woodruff*, the SEC relied on testimony that Mohebbi provided feedback on outlines for investor conference calls, but could not point to "any particular feedback Mr. Mohebbi provided with regard to any particular conference call outline." *Id*. at 1092. The court concluded: "without any detail about Mr. Mohebbi's actual contributions to this process, the Court cannot say that Mr. Mohebbi caused or provided substantial assistance to Qwest's issuance of misleading statements . . . ." *Id*.

With regard to the press releases, Mohebbi participated in a "review process" with Qwest's CEO and CFO, plus public relations and investor relations personnel. *Id.* The court found that because the SEC was unable to provide details about Mr. Mohebbi's "actual participation in the review process regarding any particular press release," the SEC had failed to show

> that he substantially assisted another person to make misleading statements. Indeed, if general involvement in the review process was all that is necessary for aiding and abetting liability, Mr. Wolfe [Qwest's Director of Investor Relations] and the unnamed representatives of the public relations and investor relations departments would be just as culpable as Mr. Mohebbi for aiding and abetting violations based on the earnings releases.

*Id*.

The same is true here. Ms. Cook and Mr. Bisenius were merely two of many Freddie Mac employees who had "general involvement in the review process" that led to the dissemination of the alleged misrepresentations at issue here. *Id.* The SEC has not alleged that Ms. Cook and Mr. Bisenius drafted, edited or commented on the reports at issue. In short, the Complaint fails to allege any act or omission that could prove a violation of law or otherwise could have provided substantial assistance to another misleading statement.

Other cases reach the same conclusion as the *Woodruff* court.  In *SEC v. Patel*, the court dismissed the SEC's aiding and abetting claim against David Kirkpatrick, the former COO of a public company.  No. 07-cv-39-SM, 2009 WL 3151143, at *41 (D.N.H. Sept. 30, 2009).  The Commission alleged that Mr. Kirkpatrick (and others) had caused the company to make false statements in a Form 10-Q through a variety of different means, including because they "reviewed and approved" a certain Form 10-Q.  *Id*.  The court found this allegation insufficient to establish substantial assistance, stating that it did "not particularize Kirkpatrick's role, and does not allege what, exactly, went into the Form 10-Q as a result of Kirkpatrick's actions."  *Id*.  The court then emphasized that it had "already noted the insufficiency of 'review and approval' allegations . . . ."  *Id*. (citing cases).  The court also rejected aiding and abetting claims based on "false assurances to [an] outside auditor that there were no acts of fraud perpetrated in connection with the company's financial statements."  *Id*.  The court found such allegations too generalized to establish substantial assistance.  *Id*. at *41.  Such alleged "false assurances" are analogous to the sub-certifications at issue here.

In *SEC v. Apuzzo*, the court granted the defendant's motion to dismiss an aiding and abetting claim, holding that his "mere awareness and approval of the primary violation" did not amount to substantial assistance.  758 F. Supp. 2d at 153.  The court stated:  "In alleging the requisite 'substantial assistance' by the aider and abettor, the complaint must allege that the acts of the aider and abettor proximately caused the harm to the corporation on which primary liability is predicated. . . . Mere awareness and approval of the primary violation is insufficient . . . ."  *Id*. at 150.

The sub-certifications that Ms. Cook and Mr. Bisenius signed are no more than broadly-worded approvals of the portions of Freddie Mac's public filings that relate to "the matters that

[came] to [their] attention in fulfilling [their] responsibilities."  Compl. ¶ 76.  They do not mention the Company's disclosures about its exposure to "subprime" loans.  The sub-certifications are simply too generalized to constitute substantial assistance to any primary violation alleged to flow from the Company's "subprime" disclosures.

We are aware of no case in which a court has held that simply signing a generalized "sub-certification" is enough to create aiding and abetting liability.  Here, the Commission is attempting to enlarge the substantial assistance standard beyond what the case law will bear, from "proximate cause" to something resembling strict liability.  The Court should reject such a departure from established precedent.

> b.    The SEC's "Bystander" Liability Theory Fails.

The Complaint also alleges that Mr. Bisenius is liable for aiding and abetting an allegedly misleading statement that appeared in prepared remarks given by both Mr. Syron and Ms. Cook on separate occasions in May 2007.  *See* Compl. ¶¶ 96-97.  The gravamen of the allegations is that Mr. Bisenius "did not respond" to an email sent by Freddie Mac's then-head of External Reporting, which was primarily addressed to two Freddie Mac employees and copied to Mr. Bisenius and three others.  *See id.* at ¶ 97.  The email expressed caution about the following statement in a speech written for Mr. Syron:  "at the end of 2006, Freddie had basically no subprime exposure in our guarantee business."  *Id.* ¶ 96.

The Complaint, however, has selectively quoted the email Mr. Bisenius received.  In its entirety, including the italicized portion below, which the Complaint unfairly omitted, the quotation reads:

> We need to be careful how we word this.  Certainly our portfolio includes loans that under some definitions would be considered subprime.  *Look back at the subprime language in the annual report and use that as a guide for what to say.  Basically, we said we don't have a definition of subprime and we don't acquire loans*

> *from subprime lenders.*  We should reconsider making as sweeping
> a statement as we have "basically no subprime exposure."

Compl. ¶ 96; Non-Prosecution Agreement, SEC and Freddie Mac (Dec. 13, 2011) (Ex. 13).

The plain text of the email shows that, contrary to the SEC's allegation, the author did *not* warn "that it would be false to state that Freddie Mac has basically no exposure to subprime." *Id.*  Rather, the author expressed a "need to be careful" and a need to "reconsider," in light of varying definitions of "subprime" in the marketplace.  *Id.*  Moreover, the sentences omitted by the Complaint show that the author believed that the "subprime" disclosure in the 2006 Information Statement (summarized as "we don't have a definition of subprime and we don't acquire loans from subprime lenders") was accurate and should be used as a guide.  Considered as a whole, the email in question does *not* suggest that Freddie Mac or any of its executives made any misleading statements to investors, but merely that one employee thought it would be preferable for the language in question to more closely echo the accurate 2006 Information Statement.

In all events, the Complaint fails to explain how Mr. Bisenius's lack of a response to an email that advises Freddie Mac employees to use an accurate public disclosure as a guide when writing a speech could have aided and abetted a fraud.  Any such notion is baseless.  Further, the legal theory of "bystander" liability on which the SEC relies has been flatly rejected by the courts.  *IIT v. Cornfeld*, 619 F.2d 909, 927 (2d Cir. 1980), *overruled on other grounds by Cent. Bank v. First Interstate Bank*, 511 U.S. 164 (1994) ("[M]ere bystanders, even if aware of the fraud, cannot be held liable for inaction since they do not . . . associate themselves with the venture or participate in it as something they wish to bring about.").  Mr. Bisenius's inaction in response to an email on which he was copied cannot be considered substantial assistance to an alleged misstatement by Mr. Syron and Ms. Cook.

65

3.      The SEC Fails Adequately to Allege That Mr. Bisenius Knew That the
Company's Disclosures Were Misleading.

The Commission's aiding and abetting claims against Mr. Bisenius should also be dismissed because the Complaint has failed adequately to allege that he had "actual knowledge" of any disclosure violations by the Company or anyone else.  The Complaint does not plausibly allege that Mr. Bisenius actually believed that the disclosures at issue were false or misleading for failing to identify certain higher-risk loans as "subprime."

As discussed above, in its public disclosure documents, Freddie Mac declined to use the ambiguous term "subprime" when discussing the vast majority of mortgages underlying its Single Family portfolio, and instead provided detailed quantitative disclosures of the credit risk characteristics underlying the loans in the portfolio, so that investors could draw their own conclusions as to potential default scenarios.  This approach to disclosing credit risk would appear sensible to any reasonable investor and to Company executives such as Mr. Bisenius, who knew that, as federal regulatory guidance stated, "subprime" had no consistent meaning and was best understood by analyzing credit risk characteristics.

The Commission does not point to any communications suggesting that Mr. Bisenius believed, or was made aware that anyone else believed, that Freddie Mac's public disclosures regarding subprime exposure were false.  Instead, the Complaint attempts to cobble together an inference of actual knowledge based largely on internal Freddie Mac communications in which some employees used terms such as "subprime," "otherwise subprime" or "subprime-like" to describe certain loans purchased for Freddie Mac's Single Family portfolio.  The evidence on which the Complaint relies does not support such an inference; it merely shows that such terms were sometimes used by individuals as synonyms for "risky" or to refer to loans that had poor credit characteristics.  The casual use of such terminology in email messages and other

66

documents does not provide a basis for drawing a plausible inference that Mr. Bisenius actually knew that Freddie Mac's public statements—which expressly declined to classify loans as "subprime" and which accurately disclosed detailed credit characteristics of the loans in the Single Family portfolio—were false or misleading.  The use of colloquial language by individual employees differs from the language used in public documents that state the view of the Company, adopted after due consideration by relevant parties, including counsel, accountants and regulatory officials.  The Complaint contains no allegation to support an inference that Mr. Bisenius believed that the informal use of terms like "subprime" by individual employees within Freddie Mac was appropriate, much less mandatory, for the Company's public disclosures.

In addition, as demonstrated above, the very documents cited in the Complaint show that the term "subprime" did not have a consistent meaning in Freddie Mac's internal documents, but was used in a variety of different ways, including to refer to a market served by self-described "subprime" mortgage originators, whose loans the Company did not typically guarantee.  For example, a strategy document presented to the Company's Board described "subprime" as an "adjacent market" and a "market[] we have missed."  Freddie Mac's Business Strategy, Board of Directors Meeting, at 44-45, 70 (Mar. 2–3, 2007) (Ex. 14); *see* Compl. ¶ 59.  Such internal statements are fully consistent with the Company's public disclosure that "based on lender-type, underwriting practice and product structure," its "subprime" exposure was "not significant."

The Complaint points to Freddie Mac's development of a "Model Subprime Offering," ultimately called "SafeStep Mortgages," that was "targeted at customers of self-identified subprime originators" who deserved "a more consumer-friendly mortgage option."  Compl. ¶¶ 60, 61.  According to the Complaint, Mr. Bisenius was in charge of developing this new product.  *Id.* ¶ 61.  The Commission attempts to establish "actual knowledge" on the part of Mr. Bisenius

by alleging that he recognized that the Model Subprime Offering "actually competed with existing programs that Freddie Mac had internally recognized as 'subprime,' 'otherwise subprime,' or 'subprime-like,'" *id.* ¶ 62, and "that the credit characteristics of loans to be guaranteed under the Model Subprime Offering were similar to those of other existing Freddie Mac programs," *id.* ¶ 64.

These allegations do not support an inference that Mr. Bisenius knew there was anything wrong with the Company's "subprime" disclosures. The Model Subprime Offering simply represents another example of how Freddie Mac occasionally used the term "subprime" in the context of subprime lenders—as the Complaint concedes, this alternative product was "targeted at customers of self-identified subprime originators." Moreover, the Model Subprime Offering was appropriately disclosed in the Company's filings, not hidden. Referring to that program, the 2007 Information Statement states: "To support our mission, we announced in April 2007 that we will purchase up to $20 billion in fixed-rate and hybrid ARM products that will provide lenders with more choices to offer subprime borrowers. The products are intended to be consumer-friendly mortgages for borrowers that will limit payment shock . . . ." 2007 IS at 94 (Ex. 5). The fact that Mr. Bisenius recognized that the Model Subprime Offering was bound to overlap with existing Freddie Mac programs that also served borrowers with poor credit risk characteristics is irrelevant because Freddie Mac was not hiding that it served borrowers with poor credit characteristics—instead, it plainly disclosed such characteristics for its entire Single Family portfolio.

4.   The Complaint Fails Adequately to Allege That Ms. Cook Knew That the Company's Disclosures Were Misleading.

There is no allegation that anyone ever raised any concerns with Ms. Cook regarding the accuracy of Freddie Mac's public disclosures. Moreover, the Complaint's failure to allege that

Ms. Cook acted with scienter in connection with her May 17, 2007 statement is fatal to its claim that she had actual knowledge of any primary violation by Freddie Mac prior to that date. *See supra* Section II.B.

In addition, the Complaint fails to allege that Ms. Cook learned of any new information after her May 17, 2007 statement that constituted actual knowledge of any false or misleading statement in Freddie Mac's public disclosures. Ms. Cook is alleged to have attended meetings and received memoranda involving discussions about the increase in the "defect rate" and "delinquency rate" of loans purchased by Freddie Mac and the worsening performance of the Company's portfolio, *see id.* ¶¶ 69, 71-73, as well as how loans scored by alternative underwriting systems other than Loan Prospector were more likely to be "subprime-like" or "subprime in nature," *id.* ¶ 67. The Complaint again conflates the term "subprime" with terms such as "subprime-like." As discussed in Section II.B, *supra*, Ms. Cook believed that there was a distinction between loans with credit characteristics that made them "subprime-like" and loans that were generated by subprime originators using certain underwriting standards and product terms that made them "subprime." None of the alleged post-May 17, 2007 meetings or memoranda revealed this not to be the case. Given the absence of any allegations that Ms. Cook knew that the Company's disclosures regarding subprime exposure were false or misleading, the Complaint has failed adequately to allege that Ms. Cook had "actual knowledge."

## IV. CLAIMS ONE, TWO, FOUR AND FIVE SHOULD BE DISMISSED BECAUSE THE EXCHANGE ACT DOES NOT APPLY TO FREDDIE MAC OR ITS OFFICERS.

Relief cannot be granted on Claims One, Two, Four and Five, which allege violations of the Exchange Act or rules promulgated under it, Compl. ¶¶ 125-33, 137-43, because the Exchange Act does not apply to "officers" of "independent establishments of the United States," 15 U.S.C. § 78c(c).

### A.   The Ordinary Meaning of the Exchange Act Exempts Freddie Mac and Its Officers From Its Provisions.

Section 3(c) of the Exchange Act states that:

> No provision of this chapter shall apply to or be deemed to include any executive department or *independent establishment of the United States*, or any lending agency which is wholly owned, directly or indirectly, by the United States, or any *officer*, agent, or employee of any such department, establishment, or agency, acting in the course of his official duty as such, unless such provision makes specific reference to such department, establishment, or agency.

15 U.S.C. § 78c(c) (emphases added).  As shown below, this exemption applies to Defendants because they were "officers" of an "independent establishment of the United States."

The Exchange Act does not define the phrase "independent establishment of the United States."  The phrase therefore must be given its "ordinary meaning," as understood at the time of its enactment.  *Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 131 S. Ct. 1885, 1891 (2011); *see, e.g.*, *U.S. v. Martinez-Santos*, 184 F.3d 196, 204 (2d Cir. 1999).  According to contemporaneous dictionaries, the ordinary meaning of "independent establishment" included an institution that was "established" by the United States but that had a measure of "self-govern[ance]."  *Webster's New International Dictionary* 874, 1262 (2d ed. 1934).

This definition plainly applies to Freddie Mac.  Congress "established" Freddie Mac to fulfill federal housing goals.  *See* Federal Home Loan Mortgage Corporation Act (Charter Act) 12 U.S.C. § 1452 ("Establishment of the Corporation").[32]   These goals include providing

---

[32]   Citations are to the provisions of the charter in effect during the Relevant Period of the Complaint.  *See* Federal Housing Enterprises Financial Safety and Soundness Act of 1992, Pub. L. No. 102-550, § 1382.  Freddie Mac was originally owned entirely by the Federal Home Loan Banks and governed by their Board.  *See* Pub. L. 91-351, §§ 303, 304, 84 Stat. 452, 452-54 (1970).  In 1989, Congress reorganized Freddie Mac by allowing it to sell shares publicly and by creating a Board of Directors that consisted of 13 directors elected by shareholders and five directors appointed by the President.  Financial Institutions Reform, Recovery and Enforcement Act of 1989, Pub. L. No. 101-73, § 731(b), (d), 103 Stat. 183,

"ongoing assistance to the secondary market for residential mortgages (including activities relating to mortgages on housing for low- and moderate-income families involving a reasonable economic return that may be less than the return earned on other activities) . . . ." *Id.* § 1451 Note. As a corporate entity overseen by a board of directors, Freddie Mac was also self-governing and therefore "independent" within the ordinary meaning of the word. *See id.* § 1452 (a)(2)(A).

Case law interpreting Section 3(c) confirms that the plain language of the exemption applies to Freddie Mac and Defendants. Two of the three published cases construing section 3(c)'s exemption held that the exemption applies to corporate entities, like Freddie Mac, chartered by Congress to fulfill public purposes.[33] In *Colonial Bank & Trust Co. v. Am. Bankshares Corp.*, the Court held that "the clear language" of section 3(c) applied to the Federal Deposit Insurance Corporation, "an independent establishment of the United States created by 12 U.S.C. § 1811." 439 F. Supp. 797, 802 (E.D. Wis. 1977). The second case, citing "the clarity of [Section 3(c)]," held that the Chairman of the Board of Governors of the Federal Reserve System and the President of the Federal Reserve Bank of New York were exempt from Exchange Act liability. *Howe v. Bank for Int'l Settlements*, 194 F. Supp. 2d 6, 24 (D. Mass. 2002).

---

429-30, 432. At the same time, Congress vested the Department of Housing and Urban Development with new "general regulatory power over" Freddie Mac. *Id.* § 731(c), 103 Stat. 431. In 1992, Congress expanded HUD's regulatory powers by creating the Office of Federal Housing Enterprise Oversight specifically to regulate Fannie Mae and Freddie Mac. *See* Federal Housing Enterprises Financial Safety and Soundness Act of 1992, Pub. L. No. 102-550, tit. XIII, subtit. A, 106 Stat. 3944. The Housing and Economic Recovery Act of 2008 eliminated Presidentially-appointed directors from Freddie Mac's board. *See* Pub. L. 111-289, § 1162(b)(1)(A), 122 Stat. 2654, 2781-82.

[33] The third decision held that section 3(c) exempted officers and employees of the SEC. *See OKC Corp. v. Williams*, 461 F. Supp. 540, 549 (N.D. Tex. 1978).

There is no reason to apply a different rule here.  Just as it did with Freddie Mac, Congress established both the FDIC and the individual Federal Reserve banks as corporate entities chartered to perform government functions.  *See* 12 U.S.C. § 1811 (establishing the "Corporation"); 12 U.S.C. § 341 (providing for establishment of each reserve bank as "a body corporate").  And like Freddie Mac during the Relevant Period, the Federal Reserve banks are privately owned, and the shareholders of each bank elect a majority of the bank's directors.  *See* 12 U.S.C. § 282 (subscription to capital stock by national banking association); *id.* § 287 (value of shares of stock); *id.* § 302 (defining number of members and classes of board of directors); *id.* § 304 (defining procedure for selection to the board of directors of stockholding bank members and representatives of the public members).

Freddie Mac thus falls squarely within Section 3(c)'s plain meaning and the holdings of *Colonial Bank* and *Howe*.  The Exchange Act claims against Defendants concern their conduct as "officers" of Freddie Mac "acting in the course of [their] official dut[ies] as such," and therefore Section 3(c) bars the Exchange Act claims against them.  *Colonial Bank*, 439 F. Supp. at 802.  Section 3(c) withdraws this grant of immunity only for claims based on an Exchange Act "provision [that] makes specific reference to such department, establishment, or agency."  15 U.S.C. § 78c(c).  None of the Exchange Act provisions underlying Claims One, Two, Four or Five—Sections 10, 13 and 20—contain a "specific reference" to Freddie Mac or its officers.  *See* 15 U.S.C. §§ 78j(b), 78m(a), 78t(e).  Therefore, all of these claims should be dismissed.

### B.    Freddie Mac's Charter Confirms Congressional Intent to Exempt It From the Exchange Act.

There can be no doubt that Freddie Mac is an "instrumentality" for purposes of exemption from the securities laws, because the Company's charter legislation explicitly says that it is.  Congress required Freddie Mac to include language in its securities stating that they

72

"do not constitute a debt or obligation of the United States or any agency or *instrumentality thereof other than [Freddie Mac]*."  12 U.S.C. § 1455(h)(2) (emphasis added).  This proviso that Freddie Mac's securities are "the obligation of *no other* instrumentality of the Government" reflects an "obvious premise, that [Freddie Mac] is an instrumentality of the United States." *Kidder Peabody & Co. v. Unigestion Int'l Ltd.*, 903 F. Supp. 479, 495-96 (S.D.N.Y. 1995).

At the time of the enactment of the Exchange Act, Congress used the terms "independent establishment of the United States" and "instrumentality of the United States" interchangeably. This is demonstrated by the fact that the statute itself exempts "independent establishments," and both the House and Senate Committee Reports accompanying the Exchange Act state that the Act "shall not apply to *instrumentalities* and agencies of the United States."  S. Rep. 73-792, at 14 (1934) (emphasis added); *see also* H.R. Rep. 73-1383, at 17 (1934) (Exchange Act "shall not to apply to instrumentalities and agencies of the United States except where they are specifically included").  It is well-established that "Committee Reports are the most authoritative sources on the meaning of legislation . . . ."  *Xiao Ji Chen v. U.S. Dep't of Justice*, 471 F.3d 315, 325 (2d Cir. 2006).  Thus, by creating Freddie Mac as an "instrumentality of the United States," Congress confirmed its intent to include Freddie Mac within the 1934 exemption to the Exchange Act for "independent establishments of the United States."

### C.   Congress's Decision to Place Freddie Mac Under Section 17 of the Securities Act Confirms That Freddie Mac Is Not Subject to the Anti-Fraud Provisions of the Exchange Act.

When Congress wanted to grant the SEC authority over particular conduct of Freddie Mac and its officers, it did so explicitly and with precision.  Namely, in Section 17(c) of the Securities Act, Congress expressly abrogated the exemption for instrumentalities in Section 3(a)(2) of the Securities Act, which otherwise would have precluded enforcement of section

17(a)'s fraud prohibition against Defendants. *See* 15 U.S.C. § 77q(a). This confirms that when Congress wanted the securities laws to apply to GSEs, it said so clearly.

The fact that Freddie Mac has long considered itself "subject to the general antifraud provisions of the federal securities laws," does not alter its exemption as an "independent establishment of the United States" from the requirement of the Exchange Act. *E.g.*, 2007 IS at 1. Indeed, Congress reserved the authority to remove the exemption granted in Section 3(c) to itself. *See* 15 U.S.C. § 78c(c) ("No provision of this chapter shall apply to . . . any . . . independent establishment of the United States . . . unless such provision makes specific reference to such . . . establishment."). Even if Freddie Mac had the power to waive its exemption, it cannot deprive Defendants of the independent protection that Section 3(c) provides to "any officer, agent, or employee." *Id.*

## V.   CLAIM THREE FAILS ADEQUATELY TO ALLEGE THAT DEFENDANTS OBTAINED MONEY OR PROPERTY.

Claim Three's allegation under Securities Act Section 17(a)(2) should be dismissed for the additional reason that the SEC has not alleged facts sufficient to show that Mr. Syron or Ms. Cook personally "obtained money or property" by means of a material misrepresentation or omission. *See SEC v. Glantz*, No. 94-5737, 1995 WL 562180, at *5 (S.D.N.Y. Sept. 20, 1995); *see also SEC v. Daifotis*, No. 11-00137, 2011 WL 2183314, at *10 (N.D. Cal. June 6, 2011) (dismissing section 17(a)(2) claim for failure to allege defendant's receipt of money or property). This burden cannot be met through a general allegation that Defendants received compensation. *See Ferber v. Travelers Corp.*, 785 F. Supp. 1101, 1107 (D. Conn. 1991) (dismissing section 10(b) claims because "incentive compensation can hardly be the basis on which an allegation of fraud is predicated . . . . [W]ere the opposite true, the executives of virtually every corporation in the United States could be subject to fraud allegations").

74

Here, the Complaint alleges that Mr. Syron's and Ms. Cook's compensation was "tied, in part, to the 'Touch More Loans' initiative . . . and to quarterly financial reporting."  Compl. ¶¶ 15, 19.  But the Complaint fails to allege that Defendants received money or property that was "in connection with" or "tied to" a false statement.  *See, e.g.*, *Glantz*, 1995 WL 562180, at \*5; *SEC v. Forman*, No. 07-1151, 2010 WL 2367372, at \*8 (D. Mass. June 9, 2010) (granting defendant summary judgment on a Section 17(a)(2) claim where defendant's bonus was not tied specifically to corporate performance).  A complaint must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  Because the 17(a)(2) allegations are nothing more than a "formulaic recitation," Claim Three must be dismissed.

## VI.   THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE.

The Complaint should be dismissed with prejudice because any amendment would be futile.  *See Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (leave to amend may properly be denied for "futility of amendment"); *Olkey*, 98 F.3d at 9 (affirming dismissal without leave to amend because "[n]o amount of detail can save [the] complaint" that is premised "on flawed and unreasonable methodologies that lead to unsupported conclusions").  The Commission filed a nearly 50-page Complaint after conducting a three-year investigation, which involved review of millions of pages of documents and depositions of 32 individuals, including each Defendant.  Yet, the Commission has advanced a fundamentally flawed theory that cannot be reconciled with the disclosures at issue.  There is no reason to believe that the Commission would be able to cure this flaw through amendments.  The comprehensive, truthful disclosures say what they say.

## CONCLUSION

For the reasons set forth above, the Complaint should be dismissed with prejudice.

Dated:  New York, NY
         April 30, 2012

SIDLEY AUSTIN LLP

  */s/ Thomas C. Green*
Thomas C. Green
tcgreen@sidley.com
Mark D. Hopson
mhopson@sidley.com
Frank R. Volpe
fvolpe@sidley.com
1501 K Street NW
Washington, D.C. 20005
Telephone: (202) 736-8000
Facsimile: (201) 736-8711

*Attorneys for Defendant Richard F. Syron*

PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP

  */s/ Daniel J. Beller*
Daniel J. Beller
dbeller@paulweiss.com
Walter G. Ricciardi
wricciardi@paulweiss.com
David W. Brown
dbrown@paulweiss.com
1285 Avenue of the Americas
New York, N.Y. 10019
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

Charles E. Davidow
cdavidow@paulweiss.com
John H. Longwell
jlongwell@paulweiss.com
2001 K Street NW
Washington, D.C. 20006
Telephone:  (202) 223-7300
Facsimile:  (202) 223-7420

*Attorneys for Defendant Donald J. Bisenius*

ZUCKERMAN SPAEDER LLP

  */s/ Steven M. Salky*
Steven M. Salky
ssalky@zuckerman.com
Alexandra W.  Miller
smiller@zuckerman.com
1800 M Street, Suite 1000
Washington, D.C. 20036
Telephone:  (202) 778-1800
Facsimile:  (202) 822-8106

*Attorneys for Defendant Patricia L. Cook*