# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

———————————

No. 11 Civ. 9201 (RJS)

———————————

U.S. SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

VERSUS

RICHARD F. SYRON, *et al.*,

Defendants.

———————————

MEMORANDUM AND ORDER
March 28, 2013

———————————

RICHARD J. SULLIVAN, District Judge:

Plaintiff, the U.S. Securities and Exchange Commission ("SEC"), brings this action against Defendants Richard F. Syron, Patricia L. Cook, and Donald J. Bisenius (collectively, "Defendants"), former senior executives of the Federal Home Loan Mortgage Corporation ("Freddie Mac"), for violations of anti-fraud provisions of the federal securities laws. The SEC's claims arise from statements regarding the extent of Freddie Mac's subprime portfolio that allegedly misled investors into believing that Freddie Mac's exposure to subprime loans was significantly less than it actually was.

Before the Court is Defendants' motion to dismiss the Complaint ("Compl.") with prejudice for failure to state a claim, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons set forth below, the Court grants Defendants' motion to dismiss the claim against Syron and Cook under Section 17(a)(2) of the Securities Act of 1933, but denies Defendants' motion as to each of the SEC's other claims.

## I.  BACKGROUND

### A.  Facts

#### 1.  Freddie Mac

In 1970, Congress established Freddie Mac as a shareholder-owned Government Sponsored Entity ("GSE").[1] (Compl. ¶ 9.)

---

[1] Except where otherwise noted, the following facts are derived from the Complaint. In resolving the instant motion, the Court has also considered Defendants' Joint Memorandum of Law in Support of the Motion to Dismiss ("Defs.' Mem."), the SEC's Memorandum of Law in Opposition to the Motion to

Freddie Mac's purpose was to promote residential mortgage lending by providing liquidity to that industry through the purchase and guarantee of residential mortgage loans and mortgage-related securities. (*Id.*) At all times relevant to this action, Freddie Mac's common stock traded on the New York Stock Exchange. (*Id.*) Also at all relevant times, Freddie Mac issued annual and quarterly reports of its financial condition, initially in the form of Information Statements and Information Statement Supplements, and later – after July 2008, when Freddie Mac voluntarily registered its stock under Section 12(g) of the Exchange Act – in the form of Form 10-Ks and Form-10Qs. (*Id.*) Although Freddie Mac was exempt from the registration and disclosure requirements of federal securities laws until its voluntary registration in July 2008, the Information Statements and Information Statement Supplements were virtually identical to the typical reports of registered entities. (*Id.*)

Freddie Mac's business is organized into three main segments: Single Family Guarantee ("Single Family"), Investments, and Multifamily. (*Id.* ¶ 10.) Single Family represents Freddie Mac's primary business segment and is responsible for fulfilling the company's mission by purchasing residential mortgages and mortgage-related securities in the secondary market and securitizing them as Freddie Mac mortgage-backed securities, known as Participation Certificates ("PCs"). (*Id.* ¶¶ 11-12.) During the period between March 2007 and August 2008 (the "Relevant Period"), the reported size of Single Family's portfolio grew from $1.4 trillion to $1.8 trillion. (*Id.* ¶ 11.)

Single Family also included what Freddie Mac refers to as Structured Securities, which are securities issued by Freddie Mac that represent beneficial interests in pools of PCs and certain other mortgage-related assets. (Defs.' Mem. 9; *see* Decl. of Daniel J. Beller, dated Apr. 30, 2012, Doc. No. 53 ("Beller Decl."), Ex. 5 at 4-5.) A subset of Structured Securities, in turn, were known as Structured Transactions, in which Freddie Mac purchased senior interests in a trust holding mortgage-related collateral and then issued guaranteed Structured Securities backed by those senior interests. (Defs.' Mem. 9; *see* Beller Decl. Ex. 2 at 68-69; *id.* Ex. 5 at 5.) The collateral in those trusts typically consisted of mortgage-backed securities issued by private issuers rather than GSEs, which Freddie Mac's disclosures referred to as "non-agency mortgage-backed securities." (Defs.' Mem. 9; *see* Beller Decl. Ex. 2 at 68-69; *id.* Ex. 5 at 5.) During the Relevant Period, Structured Transactions amounted to approximately $20.4 billion to $29.4 billion, or 1% to 2%, of the Single Family portfolio. (*See* Beller Decl. Ex. 2 at 68; *id.* Ex. 7 at 76, tbl.48.)

## 2.  Defendants

Defendant Richard F. Syron was Chairman of the Board and Chief Executive Officer ("CEO") of Freddie Mac from December 2003 until September 2008. (Compl. ¶ 15.) As part of his responsibility for overseeing Freddie Mac, Syron chaired the Senior Executive Team ("SET"), which managed the company's strategic direction, and regularly attended Board of Directors ("Board") meetings, meetings of the Board's Mission, Sourcing, and Technology Committee ("MSTC"), and meetings of the Enterprise Risk Management Committee ("ERMC"), a committee of executives and senior management from Freddie Mac's three business segments that considered the

---

Dismiss ("Pl.'s Opp'n"), and Defendants' Joint Reply Memorandum of Law in Support of the Motion to Dismiss ("Reply"), as well as the various exhibits and declarations attached thereto.

credit, market, and operations risks to Freddie Mac. (*Id.* ¶ 16.) Prior to joining Freddie Mac, Syron served in senior positions at the Federal Reserve Bank of Boston and the Federal Home Loan Bank of Boston. (*Id.* ¶ 17.)

Defendant Patricia L. Cook was Freddie Mac's Executive Vice President ("EVP") of Investments and Capital Markets and Chief Business Officer from August 2004 through September 26, 2008. (*Id.* ¶ 19.) In those positions, Cook directly oversaw the Single Family business. (*Id.* ¶ 78.) Cook also served on the SET and attended meetings of the ERMC and MSTC. (*Id.* ¶ 20.)

Defendant Donald J. Bisenius held a number of senior positions at Freddie Mac during his nearly two-decade tenure there. He served as Senior Vice President ("SVP") of Credit Policy and Portfolio Management from November 2003 to April 2008, SVP of Single Family Credit Guarantee from May 2008 to May 2009, and EVP of Single Family Credit Guarantee from May 2009 to April 2011, when he left Freddie Mac. (*Id.* ¶ 24.) In those positions, Bisenius had direct responsibility for the credit risks associated with the Single Family business segment. (*Id.* ¶ 79.) Bisenius also served on the Disclosure Committee that reviewed Freddie Mac's Information Statement Supplement ("ISS") for the period ending March 31, 2008 and Form 10-Q for the period ending June 30, 2008. (*Id.* ¶ 27.)

### 3. Single Family's Acquisition of Loans with Greater Credit Risks

As part of the process whereby loans were purchased for Single Family, Freddie Mac began using an automated underwriting system called Loan Prospector in 1995. (*Id.* ¶ 31.) Loan Prospector classified loans by credit risk and assigned each loan a score reflecting the loan's risk of default. (*Id.*

¶¶ 32-33.) Freddie Mac grouped the scores into six categories corresponding to the level of anticipated risk. (*Id.* ¶ 33.) From least risky to riskiest, the categories were: A+, A1, A2, A3, C1, and C2. (*Id.*) Loans in the first four categories were designated "Accept Loans," which Freddie Mac could automatically underwrite. (*Id.* ¶¶ 33-34.) Loans with a C1 or C2 rating, on the other hand, were designated "Caution Loans." (*Id.* ¶ 33.) Such loans had multiple risky credit characteristics, including high loan-to-value ("LTV") ratios, borrowers with low credit scores, unusual property types, and high debt-to-income ratios. (*Id.* ¶ 35.) Unlike Accept Loans, Caution Loans generally had to be manually underwritten, and originators needed to produce additional documentation regarding borrowers' creditworthiness and to make particular representations concerning the loan's credit quality. (*Id.*)

Beginning in the late 1990s, however, Freddie Mac began to loosen the terms applicable to Caution Loans. In October 1997, it initiated the A-Minus Program, under which Single Family could purchase C1 loans on the same terms as Accept Loans with the payment of an additional fee by the seller. (*Id.* ¶ 36.) Single Family's sales and marketing materials for the program's roll-out stated that "A-minus loans account for approximately 50 percent of subprime loans" in the housing market. (*Id.* ¶ 37 (internal quotation marks omitted).) In November 1998, Freddie Mac revised its Credit Policy Book to reflect the influence of the A-Minus Program on Single Family's risk profile. The memorandum authorizing those revisions described mortgages eligible for the A-Minus Program as "mortgages generally includ[ing] 54% to 56% of the subprime market." (*Id.* ¶ 38 (internal quotation marks omitted).) It also characterized the credit quality of C2 loans as "subprime." (*Id.* (internal quotation

marks omitted).)   Bisenius signed and approved the revisions to the Credit Policy Book. (*Id.*)

In 1999, Bisenius also directed the creation of Segmentor, an econometric model designed to enhance Loan Prospector's ability to identify subprime loans for acquisition. (*Id.* ¶ 39.) Segmentor evaluated loans' credit characteristics and generated a "subprime score" for each loan. (*Id.*)  Loans with low scores received C1 or C2 ratings. (*Id.*)

Between 1999 and 2007, Freddie Mac introduced several other programs to acquire loans with riskier credit characteristics. (*Id.* ¶¶ 44-47.)  One of the most significant of the new programs was known as Expanded Approval ("EA").  Freddie Mac internally considered EA loans to have credit risk at best equivalent to A-minus loans – equivalent, that is, to C1 loans. (*Id.* ¶ 46.)  A Freddie Mac policy statement circulated internally in August 2005 described EA loans as "appear[ing] to be subprime in nature" and "high risk." (*Id.* (internal quotation marks omitted).)  The net effect of EA and similar programs was a dramatic increase in Single Family's portfolio of EA, C1, and C2 loans.  Between the first quarter of 2005 and the second quarter of 2008, the aggregate value of EA, C1 and C2 loans in Single Family ballooned from $75 billion to $244 billion. (*Id.* ¶ 48.)  As a percentage of Single Family's total portfolio, EA, C1, and C2 loans increased from six percent to fourteen percent during that time. (*Id.*)

Defendants allegedly learned the true extent of Freddie Mac's subprime exposure over the course of 2006 and early 2007.  In May 2006, Syron and Cook attended meetings of Board committees at which attendees were told that Freddie Mac was purchasing higher-risk loans and loosening underwriting standards, thereby increasing

the company's overall credit risk. (*Id.* ¶¶ 52-53.)   Several months later, in December 2006, Syron and Cook attended a Board meeting at which attendees received a presentation that included a glossary defining "subprime mortgages" as "mortgages that involve elevated credit risk" and that "are typically made to borrowers who have a blemished or weak credit history and/or a weaker capacity to repay." (*Id.* ¶ 55 (internal quotation marks omitted).) The following month, in January 2007, Syron and Cook attended an ERMC meeting at which attendees were told of the "likelihood that [Freddie Mac is] already purchasing subprime loans under existing acquisition programs" – a warning repeated in subsequent ERMC reports that Syron typically received. (*Id.* ¶ 56 (internal quotation marks omitted).)

Syron, Cook, and Bisenius all attended meetings in February and March of 2007 that addressed the mounting credit risk in the Single Family portfolio.  On February 6-7, they attended a SET meeting at which a presentation noted that Freddie Mac "already purchase[d] subprime-like loans"; that the "[w]orst 10% of the [Single Family] Flow Business" were "subprime-like loans"; and that Freddie Mac was purchasing greater percentages of "risk layer[ed] loans" bearing greater default costs and losses. (*Id.* ¶ 57 (alterations in original and internal quotation marks omitted).)  On March 2-3, Defendants attended a Board meeting at which Cook gave a presentation and stated that Freddie Mac "already purchase[d] subprime-like loans to help achieve our HUD goals"; "[s]ome of our current purchases have subprime-like risk"; and "fixed-rate subprime doesn't look all that different than the bottom of our purchases." (*Id.* ¶ 59 (internal quotation marks omitted).)  Cook and Bisenius received a similar message at an MSTC meeting in June 2007, where it was communicated that certain risky loans,

including Caution Loans, acquired by Freddie Mac were equivalent to subprime, "subprime-like," and "subprime in nature." (*Id.* ¶ 67 (internal quotation marks omitted).)

Bisenius's own writings echoed the same theme. In April 2007, when he began to develop a Model Subprime Offering (the "Offering") meant to expand Freddie Mac's subprime holdings, Bisenius recognized that the Offering would compete with existing acquisition programs and proposed abolishing the A-Minus Program "so as to not canabalize [sic]" the Offering. (*Id.* ¶ 63.) Bisenius reiterated this recommendation in an "Executive Summary" of the Offering that he sponsored and which Cook received in June 2007. The Executive Summary identified several existing Freddie Mac programs that were already acquiring and guaranteeing the same loans targeted by the Offering and noted that the A-Minus Program "has credit risk and product parameters . . . that match, and in some cases, are broader than those outlined in the proposed model Subprime offering." (*Id.* ¶ 68 (internal quotation marks omitted).) In respect to EA loans, Bisenius struck a similar tone in an August 20, 2007 email to Cook and others that described such loans as "clearly subprime." (*Id.* ¶ 46 (internal quotation marks omitted).)

Against this backdrop, the SEC alleges that between March 23, 2007 and August 6, 2008, Defendants misled investors into believing that Freddie Mac had far less exposure to subprime loans than it actually did. The essence of the SEC's claims is that (1) Syron and Cook misled investors through comments that each personally made and (2) all three Defendants aided and abetted the dissemination of misleading statements in Freddie Mac's quarterly and annual financial disclosures. The statements at issue allegedly caused investors to believe that Single Family's total exposure to

subprime loans was between $2 billion and $6 billion – 0.1% to 0.2% of the portfolio – when in fact it was between $141 billion and $244 billion – 10% to 14% – throughout that time. *See infra* Sections I.A.4.a to I.A.4.g.

Because the SEC's claims turn on the precise content of those comments and disclosures, the Court provides the following detailed summary.

4. The Allegedly Misleading Statements

a. 2006 Year-End Statements

On March 23, 2007, Freddie Mac issued its Information Statement and Annual Report to Stockholders for the fiscal year ending December 31, 2006 (the "2006 IS"). (Beller Decl. Ex. 2 at cover page). In it, Freddie Mac included the following disclosure:

> Participants in the mortgage market often characterize loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. There is no universally accepted definition of subprime. The subprime segment of the mortgage market primarily serves borrowers with poorer credit payment histories and such loans typically have a mix of credit characteristics that indicate a higher likelihood of default and higher loss severities than prime loans. Such characteristics might include a combination of high loan-to-value ratios, low [credit] scores or originations using lower underwriting standards such as limited or no documentation of a borrower's income. The subprime market helps certain borrowers by increasing the availability of mortgage credit.

While we do not characterize the single-family loans underlying the PCs and Structured Securities in our credit guarantee portfolio as either prime or subprime, we believe that, based on lender-type, underwriting practice and product structure, the number of loans underlying these securities that are subprime is not significant. Also included in our credit guarantee portfolio are Structured Securities backed by non-agency mortgage-related securities where the underlying collateral was identified as being subprime by the original issuer. At December 31, 2006 and 2005, the Structured Securities backed by subprime mortgages constituted approximately 0.1 percent and 0.2 percent, respectively of our credit guarantee portfolio.

(*Id.* Ex. 2 at 69; Compl. ¶ 84.) The 2006 IS also contained a table categorizing the loans in Single Family according to, *inter alia*, original loan-to-value ("LTV") ratios, current estimated LTV ratios, and borrowers' credit scores. (Beller Decl. Ex. 2 at 70.) Syron certified, and Cook and Bisenius each sub-certified, the 2006 IS. (Compl. ¶ 87.) The 2006 IS was later incorporated by reference into an Offering Circular dated April 10, 2007, pursuant to which Freddie Mac issued $500 million of preferred stock. (*Id.* ¶ 88.)

On the same day that Freddie Mac issued the 2006 IS, Syron participated in an earnings conference call in which an analyst noted the growth of subprime products and observed that Freddie Mac had abstained from purchasing loans with higher LTV ratios. (*Id.* ¶ 89.) Referring to the subprime market, Syron responded that Freddie Mac "[wasn't] involved in underwriting much of that business . . . directly" but was working

to "develop products in the subprime space . . . on a pretty accelerated basis." (*Id.* (internal quotation marks omitted).)

Syron made more detailed comments regarding Freddie Mac's subprime exposure on May 14, 2007 at the UBS Global Financial Services Conference. There, he stated that "at the end of 2006, Freddie had basically no subprime exposure in our guarantee business, and about $124 billion of AAA rated subprime exposure in our retained portfolio."[2] (*Id.* ¶ 92 (internal quotation marks omitted).) Cook repeated that statement verbatim three days later at the Lehman Brothers 10th Annual Financial Services Conference. (*Id.* ¶ 93.) Notably, before Syron and Cook made those statements, Freddie Mac's then-head of external reporting reviewed drafts of their speeches and warned Bisenius by email that Freddie Mac's "portfolio includes loans that under some definitions would be considered subprime" and that Freddie Mac "should reconsider making as sweeping a statement as we have 'basically no subprime.'" (*Id.* ¶ 96.) The Complaint does not allege, however, that Cook or Syron ever received that warning.

As of December 31, 2006, Single Family held approximately $141 billion of C1, C2, and EA loans, representing approximately 10 percent of its portfolio. (*Id.* ¶ 86.)

b. First Quarter of 2007

On June 14, 2007, Freddie Mac issued its ISS for the first quarter of 2007 (the

---

[2] Freddie Mac's retained portfolio ("Retained Portfolio") consisted of investments the company made and held. Those investments included mortgages and mortgage-related securities "with less attractive investment returns and with incremental risk," which Freddie Mac made to advance its affordable housing goals. (Defs.' Mem. 11 (internal quotation marks omitted).)

"1Q07 ISS"). (*Id.* ¶ 98.) That document incorporated the 2006 IS by reference. (*Id.* ¶ 99.) The 2006 IS and 1Q07 ISS, in turn, were incorporated by reference into Freddie Mac's July 17, 2007 Offering Circular, pursuant to which Freddie Mac issued $500 million of preferred stock. (*Id.* ¶ 100.)

### c.  Second Quarter of 2007

On August 30, 2007, Freddie Mac issued its ISS for the second quarter of 2007 (the "2Q07 ISS"). (*Id.* ¶ 101.) With respect to subprime loans, the 2Q07 ISS reproduced the first paragraph from the 2006 IS disclosure[3] (the "Prefatory Paragraph") and then added the following statement: "We estimate that approximately $2 billion, or 0.1 percent, and $3 billion, or 0.2 percent, of loans underlying our single-family mortgage portfolio, at June 30, 2007 and December 31, 2006, respectively, were classified as subprime mortgage loans." (*Id.* ¶ 101.) The 2Q07 ISS also disclosed that, as of those dates, Freddie Mac held "approximately $119 billion and $124 billion, respectively, of non-agency mortgage-related securities backed by subprime loans" in its Retained Portfolio, which was separate from the Single Family guarantee portfolio. (*Id.*) In addition, the 2Q07 ISS again included a table displaying the percentages of Single Family loans associated with various LTV ratios and credit scores. (Beller Decl. Ex. 3 at 32.) This ISS, however, for the first time added analysis of multiple risk factors, known as "risk layering," that discussed, for example, the average LTV ratio for loans

where the average credit score at origination was below 660 – one commonly used indicator of risky mortgages. (*See id.* Ex. 3 at 33; Defs.' Mem. 2.) Syron certified, and Cook and Bisenius each sub-certified, the 2Q07 ISS. (Compl. ¶ 105.)

On September 25, 2007, Freddie Mac issued an Offering Circular that incorporated by reference the 2Q07 ISS and 2006 IS. (*Id.* ¶ 106.) Pursuant to that offering, Freddie Mac issued another $500 million of preferred stock. (*Id.*)

As of the close of the second quarter of 2007, Single Family held approximately $182 billion of C1, C2, and EA loans, representing approximately 11 percent of its portfolio. (*Id.* ¶ 103.)

### d.  Third Quarter of 2007

On November 20, 2007, Freddie Mac issued its ISS for the third quarter of 2007 (the "3Q07 ISS"). That document again reproduced the Prefatory Paragraph, following which it stated, "We estimate that approximately $5 billion and $3 billion of loans underlying our Structured Transactions at September 30, 2007 and December 31, 2006, respectively, were classified as subprime mortgage loans." (*Id.* ¶ 107.) The 3Q07 ISS contained no general statement about Single Family's subprime holdings. (*See* Beller Decl. Ex. 4 at 32-33.) As in the previous quarter's ISS, however, the 3Q07 ISS went on to describe the amount of non-agency mortgage-related securities backed by subprime loans in the Retained Portfolio, to display a table with information about the LTV ratios and borrowers' credit scores of loans in Single Family, and to offer risk-layering information. (*Id.* Ex. 4 at 31-32.) Syron certified, and Cook and Bisenius each sub-certified, the 3Q07 ISS. (Compl. ¶ 110.)

---

[3]  The only differences in language between the paragraphs were that the 2Q07 ISS qualified the word "loans" in the first sentence with the term "single-family," and the last sentence used the word "broadening" instead of "increasing." None of the parties argues – and the Court does not find – that these changes altered the Paragraph's meaning in any way.

Three weeks after the publication of the 3Q07 ISS, Syron spoke at the Goldman Sachs & Co. Financial Services Conference. There, he stated:

> We didn't do any subprime business. . . . In terms of our insight into the subprime stuff, we didn't buy any subprime loans. I mean, we bought some securities, which we can go through, and we think we're fine in. We bought them for goal purposes. But we didn't buy in guarantee, essentially[,] any subprime loans. So we weren't in that business.

(*Id.* ¶ 112.) Then, on November 29, 2007, Freddie Mac issued an Offering Circular that incorporated by reference the 3Q07 ISS and 2006 IS. (*Id.* ¶ 111.) Pursuant to that offering, Freddie Mac issued $6 billion of preferred stock. (*Id.*)

As of the close of the third quarter of 2007, Single Family held approximately $206 billion of C1, C2, and EA loans, representing approximately 13 percent of its portfolio. (*Id.* ¶ 109.)

### e. 2007 Year-End Statements

On February 28, 2008, Freddie Mac issued its Information Statement and Annual Report to Stockholders for the 2007 fiscal year (the "2007 IS"). (Beller Decl. Ex. 5 at cover page.) Like previous disclosures, the 2007 IS reproduced the Prefatory Paragraph discussing the subprime market generally and then stated:

> While we have not historically characterized the single-family loans underlying our PCs and Structured Securities as either prime or subprime, we do monitor the amount of loans we have guaranteed with

characteristics that indicate a higher degree of credit risk. See "*Mortgage Portfolio Characteristics -- Higher Risk Combinations*" for further information. We estimate that approximately $6 billion and $3 billion of loans underlying our Structured Transactions at December 31, 2007 and 2006, respectively, were classified as subprime mortgage loans.

(Compl. ¶ 114; Beller Decl. Ex. 5 at 93-94.) The 2007 IS also disclosed the amount of subprime exposure in the Retained Portfolio and provided a table of information about the LTV ratios and credit scores of the loans in Single Family. (Compl. ¶ 114; Beller Decl. Ex. 5 at 96.) Syron certified, and Cook sub-certified, the 2007 IS. (Compl. ¶ 117.)

As of the close of the 2007 fiscal year, Single Family held approximately $226 billion of C1, C2, and EA loans, representing approximately 13 percent of its portfolio. (*Id.* ¶ 116.)

### f. First Quarter of 2008

On May 14, 2008, Freddie Mac issued its ISS for the first quarter of 2008 (the "1Q08 ISS"). (*Id.* ¶ 118.) The 1Q08 ISS reproduced the Prefatory Paragraph and tacked on the following language:

> While we have not historically characterized the single-family loans underlying our PCs and Structured Securities as either prime or subprime, we do monitor the amount of loans we have guaranteed with characteristics that indicate a higher degree of credit risk (see "*Higher Risk Combinations*" for further information). In addition, we estimate that approximately $4

8

billion of security collateral underlying our Structured Transactions at both March 31, 2008 and December 31, 2007 were classified as subprime.

(*Id.*; Beller Decl. Ex. 6 at 41.)  Once again, Freddie Mac also disclosed the subprime exposure in its Retained Portfolio, included a table with information about the LTV ratios and credit scores of Single Family loans, and provided risk-layering information.  (Compl. ¶ 118; Beller Decl. Ex. 6 at 40-41.)

As of the close of the first quarter of 2008, Single Family held approximately $239 billion of C1, C2, and EA loans, representing approximately 14 percent of its portfolio.  (*Id.* ¶ 119.)

g.   Second Quarter of 2008

On August 6, 2008, Freddie Mac issued its Form 10-Q for the second quarter of 2008 (the "2Q08 Form 10-Q").  (Beller Decl. Ex. 7 at cover page.)  That disclosure contained the standard Prefatory Paragraph, followed by the statement:

While we have not historically characterized the single-family loans underlying our PCs and Structured Securities as either prime or subprime, we do monitor the amount of loans we have guaranteed with characteristics that indicate a higher degree of credit risk (see "Higher Risk Combinations" for further information).  In addition, we estimate that approximately $6 billion of security collateral underlying our Structured Transactions at both June 30, 2008 and December 31, 2007 were classified as subprime.

(Compl. ¶ 121.)  The 2Q08 Form 10-Q went on to state:

Although we do not categorize our single-family loans into prime or subprime, we recognize that certain of the mortgage loans in our retained portfolio exhibit higher risk characteristics.  Total single-family loans include $1.3 billion at both June 30, 2008 and December 31, 2007, of loans with higher-risk characteristics, which we define as loans with original LTV ratios greater than 90% and borrower credit scores less than 620 at the time of loan origination.

(*Id.*)  In addition, as in past disclosures, the 2Q08 Form 10-Q discussed subprime exposure in the Retained Portfolio, displayed a table categorizing the loans in Single Family according to credit characteristics, and provided risk-layering information.  (*See* Beller Decl. Ex. 7 at 59-61.)

As of the close of the second quarter of 2008, Single Family held approximately $244 billion of C1, C2, and EA loans, representing approximately 14 percent of its portfolio.  (Compl. ¶ 122.)

B.   Procedural History

The SEC initiated this action on December 16, 2011.  (Doc. No. 1.)  The SEC alleges that (1) Syron and Cook violated Section 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b); (2) Syron, Cook, and Bisenius aided and abetted violations of Section 10(b) and Rule 10b-5(b); (3) Syron and Cook violated Section 17(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77q(a)(2); (4) Syron violated Exchange Act Rule 13a-14, 17 C.F.R. §

240.13a-14; and (5) Syron, Cook, and Bisenius aided and abetted violations of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20 and 13a-13, 17 C.F.R. §§ 240.12b-20, 240.13a-13. Defendants moved to dismiss the SEC's Complaint with prejudice on April 30, 2012 (Doc. No. 52), arguing that (1) all claims should be dismissed for failure to adequately allege any actionable misrepresentation or omission; (2) claims one, two, and five should be dismissed for failure to adequately allege scienter; (3) claims two and five should also be dismissed for failure to adequately allege substantial assistance; (4) claims two, four, and five should be dismissed because Section 3(c) of the Exchange Act exempts Defendants from liability; and (5) claim three should be dismissed for failure to state a claim under Section 17(a)(2). Defendants' motion was fully briefed as of July 2, 2012 (Doc. No. 72), and on August 20, 2012, the Court held oral argument on the motion.

## II. LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must "provide the grounds upon which [the] claim rests." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). Plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns*, 493 F.3d at 98.

However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. Thus, a pleading that only offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. If the plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Id.* at 570.

Where a complaint alleges fraud, the heightened pleading standard of Federal Rule of Civil Procedure 9(b) also applies. Under Rule 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* This standard requires the plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir. 1999) (internal quotation marks omitted).

## III. DISCUSSION

Defendants argue that the Court must dismiss each of the SEC's five causes of action for failure to allege facts adequate to state a claim. The common thread running through those five causes of action is the SEC's allegation that Freddie Mac's financial disclosures and Syron and Cook's statements misled investors into believing that Single Family's subprime exposure was far less than it actually was. These alleged misrepresentations would offer a natural starting point for the Court's discussion were it not for the fact that Defendants question, as an initial matter, whether the Exchange Act of 1934, 15 U.S.C. § 78a *et*

*seq.*, the basis of four of the SEC's claims, even applies to them. Accordingly, the Court turns to that question first.

A.   Applicability of the Exchange Act

Section 3(c) of the Exchange Act states that the Act shall not apply to "any . . . independent establishment of the United States" or to "any officer . . . of any such . . . establishment."   15 U.S.C.   § 78c(c). Defendants argue that they are exempt from liability under the Exchange Act because Freddie Mac is an "independent establishment of the United States," and they are its officers.

Defendants' argument obviously turns on what, exactly, the term "independent establishment" means.   As in any case involving statutory interpretation, the inquiry must begin with the text of the statute.   *See Virgilio v. City of New York*, 407 F.3d 105, 112 (2d Cir. 2005) ("When interpreting a statute, the 'first step . . . is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.'" (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997))).   The Exchange Act, however, neither defines the term "independent establishment" nor uses it again.   *See SEC v. Mudd*, 885 F. Supp. 2d 654, 662 (S.D.N.Y. 2012).   The term does appear elsewhere in the U.S. Code, and one provision even purports to define it, but all to little avail in shedding light on its application here.   *See* 5 U.S.C. § 104 (defining an "independent establishment" as, among other things, "an establishment in the executive branch . . . which is . . . part of an independent establishment").

Defendants attempt to demonstrate that the plain meaning of "independent establishment" includes Freddie Mac by cobbling together dictionary definitions of the words "independent" and "establishment."   (*See* Defs.' Mem. 70-71.) However, although dictionaries can illuminate the meanings of words and phrases, *see, e.g.*, *Schindler Elevator Corp. v. United States ex rel. Kirk*, 131 S. Ct. 1885, 1891 (2011), this is not a case where they do, *cf. MCI Telecommc'ns Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 240 (1994) ("Dictionaries can be useful aids in statutory interpretation, but they are no substitute for close analysis of what words mean as used in a particular statutory context.").   The fact that "independent establishment" is defined elsewhere in the U.S. Code – however unhelpfully – is strong evidence that it is a term of art and not a simple adjective-noun pair.   *See Devlin v. United States*, 352 F.3d 525, 534 (2d Cir. 2003) ("When giving a term a uniform definition for purposes of a statute . . . , the term can either be given its ordinary or natural meaning or be treated as a term of art that has a conventional meaning."   (internal quotation marks omitted)).   Thus, the Court shares Judge Crotty's view in *SEC v. Mudd*, an enforcement action against Fannie Mae executives, that the dictionary definitions of the words "independent" and "establishment" "do not clarify whether [Freddie Mac,] a governmental sponsored private corporation, falls within Section 3(c)'s exception."   885 F. Supp. 2d at 662.

Case law addressing the meaning of "independent establishment" suggests that, contrary to Defendants' arguments, Freddie Mac is not covered by the term.   In the deepest treatment of the matter to date, Judge Crotty determined that Freddie Mac's sister entity, Fannie Mae, is not an independent establishment within the meaning of Section 3(c) by applying a set of criteria developed by the Seventh Circuit in *Mendrala v. Crown Mortg. Co.*, 955 F.2d 1132 (7th Cir. 1992).   *See Mudd*, 885 F. Supp. 2d at 663.   *Mendrala* presented the

question of whether Freddie Mac was a federal agency within the meaning of the Federal Tort Claims Act ("FTCA"). *See* 955 F.2d at 1133. The FTCA defines a "federal agency" to include "the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States." 28 U.S.C. § 2671. To determine whether Freddie Mac fell within that definition, the Seventh Circuit considered: "(1) the federal government's ownership interest in the entity; (2) federal government control over the entity's activities; (3) the entity's structure; (4) government involvement in the entity's finances; and (5) the entity's function or mission." *Mendrala*, 955 F.2d at 1136. The Seventh Circuit concluded that Freddie Mac satisfied none of the first four criteria. The federal government had no ownership interest in it; exercised only limited control over its Board; exercised no control over its day-to-day operations; and gave it no appropriations. *Id.* at 1138-39. With respect to the fifth factor, the Seventh Circuit recognized that Freddie Mac "furthers an important federal mission" but noted that that is equally true of "[a]ll federally chartered corporations," and "the fact that an entity is federally chartered does not make it a federal agency under the [FTCA]." *Id.* at 1139. Based on this analysis, the court in *Mendrala* held that Freddie Mac is not a federal agency under the FTCA, thereby holding implicitly that Freddie Mac must not be an "independent establishment." *Id.*; *see also Mudd*, 885 F. Supp. 2d at 663 (discussing *Mendrala*).

In addition to offering a thorough and persuasive analysis in its own right, *Mendrala* has the added benefit of being in harmony with Second Circuit precedent. Although the Second Circuit has never definitively interpreted what "independent establishment" means, it has suggested that independent establishments are defined by a "substantial governmental role in funding and oversight," *Johnson v. Smithsonian Inst.*, 189 F.3d 180, 189 (2d Cir. 1999) (quoting *Expeditions Unlimited Aquatic Enters., Inc. v. Smithsonian Inst.*, 566 F.2d 289, 296 (D.C. Cir. 1977)) – a characteristic that Freddie Mac, for reasons explained in *Mendrala*, clearly lacked during the Relevant Period.

Defendants offer no compelling reason as to why the Court should not adopt *Mendrala*'s reasoning. Instead, they argue that Freddie Mac is analogous to the Federal Deposit Insurance Co. ("FDIC") and to the Federal Reserve Bank, each of which has been held to be an "independent establishment" by a district court outside the Second Circuit. (*See* Defs.' Mem. 71-72; Defs.' Reply 26-27); *Howe v. Bank for Int'l Settlements*, 194 F. Supp. 2d 6, 23-24 (D. Mass. 2002) (Federal Reserve Bank); *Colonial Bank & Trust Co. v. Am. Bankshares Corp.*, 439 F. Supp. 797, 803 (E.D. Wis. 1977) (FDIC).

The Court, however, finds that the FDIC and Federal Reserve cases offer virtually no guidance for the instant matter. First, they contain no analysis of *why* the FDIC and Federal Reserve are independent establishments, holding in cursory fashion that Section 3(c) of the Exchange Act plainly exempts those entities. *See Howe*, 194 F. Supp. 2d at 24 (noting the "clarity of the statutory text" and holding that Section 3(c) "seems directly applicable to Federal Reserve officials"); *Colonial Bank*, 439 F. Supp. at 803 ("[T]he clear language of [Section 3(c)] makes it applicable to the FDIC."); *see also OKC Corp. v. Williams*, 461 F. Supp. 540, 549 (N.D. Tex. 1978) (holding summarily that Section 3(c) exempts officers and employees of the SEC

12

from Exchange Act liability). *But see Lewis v. United States*, 680 F.2d 1239, 1241 (9th Cir. 1982) (holding that the Federal Reserve Bank is not a federal agency, and therefore implicitly not an independent establishment, for purposes of the FTCA). Second, even if the Court were to find those cases' holdings to be persuasive, it still finds that Freddie Mac is distinguishable from the FDIC, Federal Reserve, and SEC. Whereas officers at those entities are federal employees, during the Relevant Period Freddie Mac's officers were not. *Cf. Howe*, 194 F. Supp. 2d at 24 (interpreting the case law on Section 3(c) to stand for the proposition that "*government* officials are immune from Exchange Act claims" (emphasis added)). Moreover, during the Relevant Period Freddie Mac was a publicly-traded corporation governed by a board comprising a supermajority of members elected by shareholders, whereas members of the governing bodies of the SEC, Federal Reserve, and FDIC are appointed by the President of the United States and confirmed by the Senate. *Compare* 12 U.S.C. § 1452(a)(2)(A) (establishing Freddie Mac's 13-member, shareholder-elected board), *with* 12 U.S.C. § 241 (establishing a Board of Governors for the Federal Reserve Bank and requiring that the governors be presidentially appointed and Senate-confirmed), *and* 12 U.S.C. § 1812 (establishing the FDIC's five-member board of directors and requiring that all five directors be presidentially appointed and Senate-confirmed), *and* 15 U.S.C. § 78d (establishing the SEC and requiring that its five commissioners be presidentially appointed and Senate-confirmed).

The fact is, with few exceptions, the only entities deemed to be "independent establishments" are those that Congress has explicitly designated as such. *See Mudd*, 885 F. Supp. 2d at 664 (listing such entities). Congress did not so designate Freddie Mac

when it established the corporation in 1970 and has not done so since. There is also scant evidence to suggest that Congress ever intended Freddie Mac to have independent-establishment status. Defendants point only to the Senate committee report for the Exchange Act, which stated that the act "shall not apply to instrumentalities and agencies of the United States." S. Rep. No. 73-792, at 14 (1934). Based on that statement, Defendants argue that Congress intended to exempt Freddie Mac from the Exchange Act by designating the entity a federal instrumentality. (Defs.' Mem. 72-73 (citing *Kidder Peabody & Co. v. Unigestion Int'l Ltd.*, 903 F. Supp. 479, 495-96 (S.D.N.Y. 1995), which held that 12 U.S.C. § 1455(g) establishes that Freddie Mac is an instrumentality of the United States)). Federal law, however, clearly distinguishes between instrumentalities and independent establishments. *See, e.g.*, 28 U.S.C. § 2671 (defining federal agency, for FTCA purposes, to include both "independent establishments" and "corporations primarily acting as *instrumentalities* . . . of the United States" (emphasis added)). Indeed, the very Congress that enacted the Exchange Act drew such a distinction. *Compare* 15 U.S.C. § 77c(a)(2) (exempting any "instrumentality of the Government of the United States" from liability under the Securities Act of 1933), *with id.* § 78c(c) (exempting "independent establishments," but not instrumentalities, from liability under the Exchange Act of 1934). Congress's record over the ensuing decades confirms that when Congress wishes to designate an entity as an independent establishment, it does so explicitly. *See Mudd*, 885 F. Supp. 2d at 664.

Accordingly, the Court concludes that, had Congress in 1970 or at any time since then wished to designate Freddie Mac as an independent establishment, it would have done so. Because Congress has not, the

Court holds that Freddie Mac is not an independent entity and that Defendants are in fact subject to Exchange Act liability.

### B.  Misrepresentations

Having determined that Defendants are not exempt from the Exchange Act, the next question is whether the SEC's allegations establish the misrepresentations required to state a claim for each of the five causes of action against Defendants.  The essence of the SEC's allegations is that, in 2007 and 2008, "when Freddie Mac purported to quantify its exposure to subprime loans in its Single Family guarantee portfolio[,] . . . it used an undisclosed and extremely narrow definition of 'subprime' that was not at all evident on the face of the Company's disclosures" and that misled investors as to the true extent of Single Family's subprime exposure.  (Pl.'s Opp'n 23.)

Defendants offer a multi-layered argument for why the SEC's allegations, even if true, establish no actionable misrepresentation or omission.  First, they argue that Freddie Mac never defined "subprime" to refer to its loans' credit characteristics; rather, to the extent Freddie Mac's disclosures employed the term, Defendants contend they made clear that they were using it narrowly to refer to one or more *non-credit* characteristics.  (Defs.' Mem. 29-32.)  Second, Defendants argue that Freddie Mac's subprime disclosures, on their face, referred only to a small subset of Single Family, not the entire portfolio.  Finally, they argue that to the extent Freddie Mac's disclosures and Defendants' comments *were* potentially misleading, Freddie Mac's detailed quantitative disclosures presented enough accurate information to correct any misimpressions that the statements, by themselves, might have created.

The Court will address each of Defendants' points in turn.

### 1.  Freddie Mac's Definition of "Subprime"

At its core, this case turns on a single question: when Freddie Mac and its executives used the term "subprime," what did reasonable investors understand them to mean by it?  The SEC alleges that, based mainly on Freddie Mac's financial reports, investors reasonably understood Freddie Mac's statements about its "subprime" exposure to refer to the size of its portfolio of loans posing high credit risk – that is, loans Freddie Mac internally classified as C1, C2, or EA.  Conversely, Defendants argue that Freddie Mac's disclosures made clear that "subprime" was used more narrowly: sometimes to refer to loans from self-identified subprime originators, other times to refer to loans identified as subprime by their originators, but always to refer to *non-credit* characteristics, and always in a manner apparent to investors.

Much of the parties' dispute concerns the significance of the Prefatory Paragraph, which appeared in each of Freddie Mac's financial disclosures during the Relevant Period except for the 1Q07 ISS.  (*See* Compl. ¶¶ 84, 101, 107, 114, 118, 121.)  The SEC argues that as "the only definition of subprime that was evident on the face of Freddie Mac's written disclosures," the Prefatory Paragraph led investors to believe that Freddie Mac understood "subprime" to refer to the "credit characteristics" the paragraph discussed.  (Pl.'s Opp'n 25-28.)  Defendants, by contrast, describe the Prefatory Paragraph as merely an "illustrative and impressionistic characterization" of the subprime market, and "not a 'definition' that any reasonable investor would believe is subject to quantification."  (Defs.' Mem. 26-27.)

There is support for each side's interpretation. As Defendants note, the Prefatory Paragraph does not purport to ascribe a definitive meaning to "subprime." Indeed, it states that "[t]here is no universally accepted definition" of the term and offers only examples of credit characteristics that subprime loans "*might*" possess. (*See, e.g.*, Compl. ¶ 84 (emphasis added).) On the other hand, the SEC is correct that the Prefatory Paragraph contains the disclosures' most detailed discussion of the characteristics of subprime loans. Moreover, as a logical matter, just because Freddie Mac acknowledges that there is no universally accepted definition of subprime does not necessarily mean it has not adopted a particular definition for its own purposes. Here, particularly given the importance of the term "subprime" to the mortgage industry, a reasonable investor plausibly could have interpreted the Prefatory Paragraph to be setting forth Freddie Mac's definition of the term.

That risk was especially great in the 2006 IS, which each ISS in 2007 incorporated by reference. Immediately following the Prefatory Paragraph, the 2006 IS stated: "While we do not characterize the single-family loans underlying the PCs and Structured Securities in our credit guarantee portfolio as either prime or subprime, we believe that, based on lender-type, underwriting practice and product structure, the number of loans underlying these securities that are subprime is not significant." (*Id.* ¶ 84.) This statement is confusing in its own right – Freddie Mac first states that it does not characterize Single Family loans as subprime and then proceeds to do just that. The confusion surrounding Freddie Mac's use of the term "subprime" only deepens when the statement following the Prefatory Paragraph is viewed in context. In the Prefatory Paragraph, Freddie Mac stated that subprime

loans "typically have a mix of *credit characteristics* that indicate a higher likelihood of default and higher loss severities than prime-loans. Such characteristics might include . . . originations using *lower underwriting standards* such as limited or no documentation of a borrower's income." (*Id.* (emphasis added).) This portion of the Prefatory Paragraph belies Defendants' argument that "underwriting practice," as used in the 2006 IS, "plainly did not refer to a 'mix of credit characteristics' of the loans but rather to the characteristics of the loans' *issuers*." (Defs.' Mem. 31.) In fact, the Prefatory Paragraph identifies underwriting practice as a credit characteristic, placing it in the same category as metrics such as LTV ratios and credit scores. Thus, when the 2006 IS stated that, "based on . . . underwriting practice . . . , the number of loans underlying [Single Family] securities is not significant," a reasonable investor could have believed that Freddie Mac was using "subprime" in the sense of risky credit characteristics. That understanding would have generated a misimpression regarding Single Family's exposure, for with $141 billion of C1, C2, and EA loans (Compl. ¶ 86), Single Family's exposure to loans with risky credit characteristics was quite significant.

The surrounding terms "lender-type" and "product structure" did not mitigate this risk of misrepresentation. Defendants insist that those terms unambiguously referred to non-credit characteristics – "lender-type" to "self-described subprime originators" and "product structure" to such features of loans as pre-payment penalties and adjustable interest rates. (Defs.' Mem. 31-32.) However, while Freddie Mac may have understood those terms in those ways, Defendants point to no statements in the 2006 IS that would have apprised investors of those definitions. As a result, investors

had nothing to go on but context, and the context in which those terms were used – immediately following the Prefatory Paragraph's discussion of the credit characteristics of subprime loans – could plausibly suggest to a reasonable investor that the terms referred back to that discussion.[4]

Thus, the Court finds that reasonable investors could have understood the Prefatory Paragraph to set forth Freddie Mac's operative definition of "subprime." This fact has important implications for whether the SEC's allegations support a plausible inference of misrepresentation. The Prefatory Paragraph appeared in each of Freddie Mac's disclosures during the Relevant Period, and the disclosures, in turn, provided the background against which investors understood the comments by Syron and Cook that are at issue here. If investors reasonably believed that the Prefatory Paragraph set forth Freddie Mac's operative definition of "subprime," it follows that throughout the Relevant Period investors would have reasonably believed

---

[4] The Court notes that none of the foregoing discussion is meant to deny the possibility that investors could reasonably have understood terms like "subprime" and "underwriting practice" in exactly the way that Freddie Mac perhaps intended. To advance beyond the pleadings stage, however, the SEC need show only that Defendants' liability is *a* plausible inference from the facts alleged, not the *only* one. Where factual allegations support multiple plausible inferences, the Court cannot decide among those interpretations on a motion to dismiss. *See, e.g., Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) ("The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion."); *Sedighim v. Donaldson, Lufkin & Jenrette, Inc.*, 167 F. Supp. 2d 639, 647 (S.D.N.Y. 2001) ("[T]he court may not choose among plausible interpretations of . . . disclosure documents – if a trier of fact could agree with plaintiffs' interpretation of the relevant language, the motion to dismiss must be denied.").

that when Freddie Mac and its executives discussed the extent of Freddie Mac's "subprime" exposure, what they meant was the extent of Freddie Mac's exposure to loans with risky credit characteristics – that is, loans Freddie Mac classified as C1, C2, and EA.

That understanding, of course, is not dispositive of whether Freddie Mac and its executives misrepresented the company's subprime exposure. It merely establishes the baseline against which to judge the accuracy of the company's disclosures. The Court turns to that inquiry next.

## 2. The Scope of Freddie Mac's Subprime Disclosures

Defendants next argue that Freddie Mac's statements could not have misled reasonable investors as to Single Family's *total* subprime exposure because, on their face, the statements purported to describe the exposure of only a *part* – and a small part, at that – of the larger portfolio. (Defs.' Mem. 28-30.)

As an initial matter, the factual premise of Defendants' argument is inaccurate. Although several of the allegedly misleading statements did, on their face, describe only a narrow slice of Single Family's assets, the 2Q07 ISS was not so cabined. Immediately after the Prefatory Paragraph, it stated: "We estimate that approximately $2 billion, or 0.1 percent, and $3 billion, or 0.2 percent, of loans underlying our single-family mortgage portfolio, at June 30, 2007 and December 31, 2006, respectively, were classified as subprime mortgage loans." (Compl. ¶ 101.) As discussed above, a reasonable investor could have understood this statement to mean that Single Family held only $2-3 billion of loans with risky credit characteristics. Understood that way, the statement was clearly inaccurate; as of the

dates mentioned, Single Family held $144 billion and $182 billion, respectively, of C1, C2, and EA loans. (*Id.* ¶¶ 86, 103.) Defendants in effect concede as much by suggesting that the statement "probably was a drafting error," which, they note, Freddie Mac fixed in the next report. (Defs.' Mem. 29 n.16.) Whether that was the case, however, is a factual question outside the pleadings, and accordingly is not appropriate for consideration on a motion to dismiss.

The statements attributed to Syron and Cook are similarly problematic. Each one purported to describe all of Single Family's subprime exposure, and each failed to set forth the narrow manner in which Defendants assert they employed the term "subprime." The statements were categorical: "[we] weren't involved in underwriting much of that subprime business" (Compl. ¶ 89); "at the end of 2006, Freddie had basically no subprime exposure in our guarantee business" (*id.* ¶ 92); and "[w]e didn't do any subprime business" (*id.* ¶ 112). Furthermore, the contexts of those statements only magnified the danger of misrepresentation. For example, Syron made the first of the foregoing comments in response to a question from an analyst who used the term "subprime" to refer to "higher LTV products" – that is, to loans defined by a credit characteristic. (Beller Decl. Ex. 12 at 5.) A reasonable investor could believe that by responding as he did, without clarifying his different understanding of "subprime," Syron implicitly adopted the questioner's definition of the term.

Syron and Cook's statements remain problematic when read in light of Freddie Mac's financial disclosures. Defendants argue that Syron and Cook's statements were not misleading because they were consistent with the 2006 IS. (Defs.' Mem. 40-42.) Such consistency helps Defendants, however, only if the 2006 IS, in turn, was consistent "with reality" (*id.* at 40), and the Court has already found that the Complaint sufficiently alleges that it was not. As explained above, a reasonable investor could have interpreted the 2006 IS to assert that Single Family's exposure to risky loans was "not significant." Against this backdrop, a reasonable investor could have interpreted Syron and Cook's statements in much the same way, reinforcing the misimpression that Single Family contained few loans at risk of default.[5]

The remaining set of allegedly misleading statements appeared in the 2006 IS, the 3Q07 ISS, and all disclosures during the Relevant Period subsequent to the 3Q07 ISS. All of those statements were substantially similar, providing estimates of the value of subprime mortgage loans underlying Freddie Mac's Structured Transactions as of various dates. (*See* Compl. ¶¶ 84, 112, 114, 118, 121.) On their face, those statements were accurate, and there appears to be no allegation to the contrary. Rather, the SEC argues that the statements were misleading in context. Specifically, the SEC contends that by quantifying only the subprime loans underlying Structured Transactions while describing the rest of Single Family's

---

[5] For the same reasons, this case is different from *Dodds v. Cigna Securities, Inc.*, a case cited by Defendants, in which the Second Circuit held that a plaintiff cannot "rely on misleading oral statements . . . when the offering materials contradict the oral assurances." 12 F.3d at 351. In that case, the Second Circuit found, as a matter of law, that the official corporate disclosures were *not* misleading. *Id.* at 350-51. The same is true of *Brown v. E.F. Hutton Grp., Inc.*, a case the Second Circuit relied upon in *Dodds*. *Id.* (citing *Brown*, 991 F.2d at 1031). Unlike the plaintiffs in those cases, the SEC here has alleged sufficient facts to demonstrate that Freddie Mac's disclosures were inaccurate and potentially misleading.

subprime exposure as "not significant," Freddie Mac suggested that "Single Family effectively had no subprime exposure other than to a small amount of loans underlying its Structured Transactions." (Pl.'s Opp'n 33.)

"The law is well settled . . . that so called 'half truths' – literally true statements that create a materially misleading impression – will support claims for securities fraud." *SEC v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011), *rev'd on other grounds sub nom.*, *Gabelli v. SEC*, 133 S. Ct. 1216 (2013). Thus, once a party chooses to discuss material issues, it "'ha[s] a duty to be both accurate and complete'" so as to avoid rendering statements misleading. *In re MBIA, Inc. Sec. Litig.*, 700 F. Supp. 2d 566, 578 (S.D.N.Y. 2010) (quoting *Caiola v. Citibank N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002)). Here, each of the alleged "half truths" immediately followed statements broadly discussing Single Family's subprime exposure. In the 2006 IS, the statement regarding Structured Transactions was preceded by the assertion that Single Family's subprime exposure was "not significant." (Compl. ¶ 84.) In the 3Q07 IS, it was preceded by the Prefatory Paragraph. (*Id.* ¶ 107.) And in the 2007 IS, 1Q08 ISS, and 2Q08 Form 10-Q, the statements immediately followed the sentence, "While we have not historically characterized the single-family loans underlying our PCs and Structured Securities as either prime or subprime, we do monitor the amount of loans we have guaranteed with characteristics that indicate a higher degree of credit risk." (*Id.* ¶¶ 114, 118, 121.) Based on this context, the Court finds that a reasonable investor could plausibly have been misled by the disclosures into believing that the subprime loans underlying Structured Transactions represented the extent of Single Family's subprime exposure.

Having found that the SEC's allegations support the plausible inference that Freddie Mac and Defendants Syron and Cook misrepresented Single Family's subprime exposure, the Court next turns to whether Freddie Mac's quantitative disclosures corrected and cured that misrepresentation.

3. Freddie Mac's Quantitative Disclosures

Defendants contend that even if Freddie Mac's disclosures and Syron and Cook's statements *verbally* misrepresented the extent of Single Family's subprime exposure, the *quantitative* tables detailing the LTV ratios and credit scores in each of the disclosures "refute any suggestion that a reasonable investor could have concluded that only 0.1% to 0.2% of the entire guarantee portfolio was comprised of risky loans." (Defs.' Mem. 33.) Defendants also highlight the risk-layering information in the 2Q07 ISS and subsequent disclosures as a further example of Freddie Mac's transparency. (*Id.* at 35-36.) The essence of Defendants' argument is that using all the quantitative information the disclosures provided, investors easily could have calculated the full extent of Single Family's exposure to loans with high-risk credit characteristics and understood that the exposure was not limited to the $3-6 billion of loans underlying the Structured Transactions. (*Id.* at 35.)

Whatever its merits, however, this argument is ultimately about the materiality of the alleged misrepresentations, not whether those misrepresentations existed in the first place. That is, Defendants' argument is really that, in light of the quantitative disclosures, the alleged misrepresentations did not "significantly alter[] the total mix of information made available" and thus were immaterial. *Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1988) (internal quotation marks omitted).

Materiality is an element of any securities fraud claim, *see Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008), but the Second Circuit has cautioned that materiality presents a "mixed question of law and fact [that] . . . will rarely be dispositive in a motion to dismiss," *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010) (internal quotation marks omitted). Thus, "'a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)).

In this case, the Court cannot conclude that no reasonable investor could have found the alleged misrepresentations and omissions to be material in light of the quantitative disclosures. Because the Prefatory Paragraph described subprime as a "mix of credit characteristics" not limited to LTV ratios and credit scores, it is not clear that the quantitative data would have corrected the misimpression created by Freddie Mac's disclosure that Single Family's subprime exposure was "not significant" and represented a negligible percentage of the overall portfolio. *See Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991) ("[N]ot every mixture with the true will neutralize the deceptive. If it would take a financial analyst to spot the tension between the one and the other, whatever is misleading will remain materially so, and liability should follow."); *see also Mudd*, 885 F. Supp. 2d at 667 (finding that quantitative disclosures were inadequate to render immaterial Fannie Mae's misleading disclosures of subprime exposures). *But see Kuriakose v. Fed. Home*

*Loan Mortg. Corp.*, No. 08 Civ. 7281 (JFK), 2012 WL 4364344, at *11 (S.D.N.Y. Sept. 24, 2012) (finding that Freddie Mac's "extensive disclosures" rendered the alleged misrepresentations immaterial because a reasonable investor, "with little effort," could "take his own measure of risk in Freddie Mac's loan portfolio").[6] Furthermore, even a reasonable and *savvy* investor might have believed, for instance, that loans to borrowers with low credit scores were nevertheless not risky because of other mitigating factors. Thus, it would be inappropriate to dismiss the Complaint on materiality grounds. *See Ganino*, 228 F.3d at 167 ("[T]he corrective information must be conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." (internal quotation marks omitted)).

\*      \*      \*

In sum, the Court finds that the SEC has sufficiently alleged that Freddie Mac's disclosures and Syron and Cook's statements misrepresented the extent of Single Family's exposure to subprime loans. Accordingly, Defendants have failed to establish grounds for dismissing the entire Complaint. The Court next turns to whether claims one and two should be dismissed for failure to adequately allege scienter.

## C.  Scienter

A complaint alleging securities fraud must satisfy the heightened pleading requirements of Rule 9(b) by alleging "facts that give rise to a strong inference of fraudulent intent." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000). An inference

---

[6] The Court discusses *Kuriakose* in greater depth *infra* Section III.C.

19

of fraudulent intent is sufficiently strong when it is "at least as likely as any plausible opposing inference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 328 (2007). A plaintiff may establish a strong inference of fraudulent intent by alleging either (1) "facts that show 'the defendants had both motive and opportunity to commit fraud,'" or (2) "facts that 'constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *SEC v. Espuelas*, 698 F. Supp. 2d 415, 426 (S.D.N.Y. 2010) (quoting *Acito v. IMCERA Grp. Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)).

Here, Defendants argue that the SEC has failed to establish a strong inference of fraudulent intent through either method. (*See* Defs.' Mem. 42-54.) The SEC's opposition memorandum effectively concedes Defendants' point with respect to the first method by discussing only whether the Complaint sufficiently alleged circumstantial evidence of recklessness. (*See* Pl.'s Opp'n 42-52); *In re UBS AG Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *11 (S.D.N.Y. Sept. 28, 2012) (holding that a plaintiff who does not respond to a point raised by a defendant on a motion to dismiss "concedes" that point "through silence"); *see also Gortat v. Capala Bros., Inc.*, No. 07 Civ. 3629 (JLG), 2010 WL 1423018, at *11 (E.D.N.Y. Apr. 9, 2010) (considering an argument not addressed in an opposition brief waived). Therefore, the Court will likewise limit its scienter analysis to recklessness.

Reckless conduct is, "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Novak*, 216 F.3d at 308 (internal quotation marks omitted). "[A]n allegation that a defendant merely ought to have known is not sufficient to allege recklessness," *Hart v. Internet Wire, Inc.*, 145 F. Supp. 2d 360, 368 (S.D.N.Y. 2001) (internal quotation marks omitted), but "'[a]n egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness.'" *SEC v. Czarnik*, No. 10 Civ. 745 (PKC), 2010 WL 4860678, at *6 (S.D.N.Y. Nov. 29, 2010) (quoting *Novak*, 216 F.3d at 308)). Securities fraud claims "typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Id.* (quoting *Novak*, 216 F.3d at 308). However, the Court also bears in mind that because the SEC has not demonstrated that Defendants had a motive for fraud, it "must produce a stronger inference of recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 143 (2d Cir. 2001).

Because Defendants attack the sufficiency of the Complaint's scienter allegations against both Syron and Cook, the Court will address each Defendant in turn. Starting with Syron, Defendants argue that the Complaint "does not allege a single fact that suggests [Syron] was on notice that Freddie Mac somehow misrepresented its exposure to risk by not disclosing as subprime the value of loans categorized internally as Caution or EA." (Defs.' Mem. 45.) In fact, however, the Complaint contains several allegations that Syron was aware of particularized facts that contradicted his specific statements.

First, the Complaint alleges that in January 2007, two months before the start of the Relevant Period, Syron attended an ERMC meeting at which attendees were told of the "likelihood that [Freddie Mac] is already purchasing subprime loans under existing acquisition programs." (Compl. ¶ 56.) Subsequent ERMC reports, which

Syron typically received, repeated this warning. (*Id.*) Furthermore, a month later, Syron attended a two-day SET meeting that delivered substantially the same message, only using the term "subprime-like" to characterize the risky loans Freddie Mac was already purchasing in significant numbers. (*Id.* ¶ 57.) A presentation at that meeting also noted that Freddie Mac was purchasing a greater percentage of "risk layer[ed] loans," which was "leading to more 'Cautions' and a higher "[d]efect rate." (*Id.* (internal quotation marks omitted).) These allegations establish a strong inference that Syron knew the term "subprime" could be used to describe loans with high credit risk; that he knew Freddie Mac was already acquiring such loans; that he knew Freddie Mac classified such loans as "Caution" loans; and thus that he knew of or was willfully blind to the risk that sweeping statements like "we have basically no subprime exposure in our guarantee business" and "[w]e didn't do any subprime business" would mislead investors.

Allegations regarding the December 2006 MST meeting that Syron attended bolster this conclusion. The Complaint alleges that at that meeting, attendees received a presentation that, in its glossary definition of "subprime mortgages," noted that "[t]here is no longer a clear-cut distinction between prime and subprime mortgages" and explained that "[s]ubprime mortgages generally are mortgages that involve elevated credit risk." (*Id.* ¶ 55.) This allegation reinforces the fact that, going into the Relevant Period, Syron was aware that the term "subprime" generally referred to mortgages with risky credit characteristics. Thus, he had a sufficient basis to know that Freddie Mac's disclosures and his own statements would mislead investors.

The Complaint contains similar, and sometimes identical, allegations against Cook. For example, the Complaint alleges that, like Syron, Cook attended the board meeting at which attendees received a presentation defining "subprime" according to credit risk. (*Id.* ¶ 55.) In addition, contrary to Defendants' assertion that the Complaint never alleges that Cook heard the term "EA" or knew that employees referred to EA loans as subprime (Defs.' Mem. 50), the Complaint alleges that on August 20, 2007, in an email to Cook and others, Bisenius described EA loans as "'clearly subprime'" (Compl. ¶ 46). This allegation not only suggests Cook's awareness of the multi-billion-dollar EA program, but it also demonstrates that she knew that employees – including ones as senior and expert in credit risk as Bisenius – were rather emphatic that such loans met the definition of subprime.

The Complaint further alleges that, like Syron, Cook was aware that Freddie Mac was purchasing higher-risk loans and loosening underwriting standards. (*Id.* ¶¶ 52-53.) Indeed, the Complaint alleges that Cook attended the ERMC meeting where Syron and other attendees were told of the "'likelihood that [Freddie Mac is] already purchasing subprime loans under existing acquisition programs." (*Id.* ¶ 56.) Finally, the Complaint alleges that in June 2007, Cook attended a meeting of the Board's MST Committee where it was conveyed that certain risky loans Freddie Mac had acquired were equivalent to subprime and "'subprime in nature.'" (*Id.* ¶ 67.) These allegations strongly support an inference that Cook was aware of, or willfully blind to, the misleading nature of both Freddie Mac's disclosures and her own statement that, "at the end of 2006, Freddie had basically no subprime exposure in our guarantee business." (*Id.* ¶ 93.)

Defendants' remaining arguments go mainly to the weight of the SEC's evidence, not the sufficiency of their allegations. For instance, Freddie Mac executives may indeed, on occasion, have used the term "subprime" in its narrower sense of loans from self-described subprime originators (*see* Defs.' Mem. 48, 51-52), but that does not negate the allegations that Syron and Cook understood that subprime generally referred to the types of risky loans that they knew Freddie Mac was already acquiring. Similarly, the fact that Freddie Mac's disclosures truthfully described the subprime exposure of the Retained Portfolio may weaken the inference of scienter but does not, as a matter of law, negate it. The few cases Defendants cite in support of the contrary proposition – that truthful disclosures *do* negate an inference of scienter – are distinguishable. The most recent such case, *Kuriakose v. Federal Home Loan Mortgage Co.*, involved a putative class action against Freddie Mac, Syron, Cook, and Freddie Mac's former chief financial officer over some of the same alleged misrepresentations at issue here. *See* 2012 WL 4364344, at *1, *12. In dismissing the plaintiff's second amended complaint, Judge Keenan found that the allegations failed to establish a strong inference of recklessness in part because Freddie Mac's disclosures negated such an inference. *See id.* at *14. The scienter analysis in *Kuriakose*, however, is not on all fours with the analysis here. To establish an inference of recklessness, the plaintiff in *Kuriakose* relied mainly on factual allegations concerning a post hoc report by the Federal Housing Finance Agency ("FHFA"), despite the fact that the report contained no findings "suggest[ing] that the [d]efendants were reckless in not knowing that their statements . . . were incorrect." *Id.* at *13-*14. In the instant case, by contrast, the SEC establishes Defendants' state of mind through allegations regarding prior meetings, emails, and presentations – most of which were not alleged in the *Kuriakose* complaint – that alerted Defendants to the misrepresentations at issue; the FHFA report is never mentioned.

Defendants also cite *In re BearingPoint, Inc. Securities Litigation*, in which the court found that truthful disclosures of negative information negated scienter where the complaint had failed to "allege any specific fact suggesting that any individual at BearingPoint knew that the internal controls were in disarray prior to discovery of the accounting error [at issue]." 525 F. Supp. 2d 759, 769-70 (E.D. Va. 2007), *aff'd in part, rev'd in part on other grounds sub nom.*, *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172 (4th Cir. 2009). The court in *Ferber v. Travelers Corp.* reached a similar conclusion against the backdrop of highly general allegations that failed to attribute any particular knowledge or awareness to the defendants. 802 F. Supp. 698, 714 (D. Conn. 1992); *see also In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1425 (9th Cir. 1994) (following *Ferber*). Thus, to the extent these cases suggest a rule, it is that truthful disclosures of negative information will negate weak and generalized allegations of recklessness. That rule, however, does not apply here, where the Complaint contains numerous, mutually reinforcing allegations that Defendants knew specific facts contradicting Freddie Mac's disclosures and their own statements.

Thus, the Court finds that the Complaint has alleged sufficient facts to support a strong inference that Syron and Cook acted recklessly by certifying and sub-certifying, respectively, Freddie Mac's misleading disclosures and by personally making misleading statements.

The Court next turns to Defendants' arguments concerning the sufficiency of claims two and five – the aiding and abetting claims against all three Defendants.

### D.  Aiding and Abetting Liability

The SEC asserts two claims of aiding and abetting against each Defendant: one arising from Defendants' certifications and sub-certifications of Freddie Mac's allegedly misleading disclosures prior to the voluntary registration of its securities in July 2008, and the other from their certifications and sub-certifications of Freddie Mac's disclosures after July 2008.  The two claims thus relate to substantially the same conduct but, because of Freddie Mac's registration during the Relevant Period, proceed under different portions of the Exchange Act.  (*See* Pl.'s Opp'n 56-58, 60-61, 63-64.)  In addition, the SEC alleges that Cook aided and abetted Syron's primary violation (*id.* at 60-61) and that Bisenius aided and abetted the primary violations of both Syron and Cook (*id.* at 64).  For the reasons set forth below, the Court finds that the Complaint sufficiently alleges that Defendants aided and abetted Freddie Mac's misleading disclosures.  Accordingly, it does not reach the question of whether the SEC's alternate theories of liability in fact state claims for aiding and abetting.

To state a claim of aiding and abetting securities fraud, the SEC must allege that (1) there was a securities violation by a primary wrongdoer; (2) the defendant had actual knowledge of the primary violation; and (3) the defendant rendered substantial assistance to the primary violation.  *See Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir. 1983).  Defendants contest the sufficiency of the Complaint's allegations with respect to each element, but the Court has already held that the Complaint adequately alleges primary violations in the

form of Freddie Mac's misleading disclosures.  *See supra* Section III.B.  In addition, the Court has found the allegations sufficient to support a strong inference that Syron and Cook knew of the violations.  *See supra* Section III.C.  Thus, with respect to the sufficiency of the aiding and abetting claims, the only remaining issues are whether the Complaint has adequately alleged that (1) Bisenius acted with actual knowledge and (2) Defendants provided substantial assistance to Freddie Mac's primary violation.

### 1.  Bisenius's Actual Knowledge

The Complaint contains several allegations supporting a strong inference that Bisenius knew of facts contradicting Freddie Mac's subprime disclosures.  Indeed, the allegations concerning Bisenius's involvement in managing Single Family's credit risk date back to the 1990s, when Bisenius approved and signed a credit policy document for the A-Minus Program that described C1 loans as "[m]ortgages that generally comprise the first and second tier of *subprime* lender risk grades" and that comprise "54% to 56% of the *subprime* market." (Compl. ¶ 38 (emphasis added).)  During the Relevant Period, the Complaint alleges that Bisenius continued to regard such risky mortgages as "subprime."  In fact, in April 2007, while developing the Model Subprime Offering, Bisenius proposed abolishing the A-Minus Program "'so as to not canabalize [sic]'" the new offering. (*Id.* ¶ 63.)  Around the same time, Bisenius received an email from Freddie Mac's then-head of external reporting warning that the texts of speeches Syron and Cook planned to give in May 2007 were potentially problematic.  In reference to the statement that "at the end of 2006, Freddie had basically no subprime exposure in our guarantee business," the email stated:

We need to be careful how we word this. Certainly our portfolio includes loans that under some definitions would be considered subprime. Look back at the subprime language in the annual report and use that as a guide for what to say. Basically, we said we don't have a definition of subprime and we don't acquire loans from subprime lenders. We should reconsider making as sweeping a statement as we have "basically no subprime exposure."

(Beller Decl. Ex. 13 at 9; *see id.* ¶ 96.) Finally, the Complaint alleges that in August 2007, in an email to Cook and others, Bisenius characterized loans under the EA program as "clearly subprime." (*Id.* ¶ 46.)

All together, these allegations support strong inferences that Bisenius knew that Freddie Mac internally classified risky loans as C1, C2, and EA, that he regarded such loans as subprime, and thus that he knew Freddie Mac's disclosures were misleading as to the extent of Single Family's subprime exposure. Accordingly, the Court finds that the SEC has satisfactorily alleged that Bisenius had the requisite knowledge for aiding and abetting liability.[7]

2. Substantial Assistance

The Second Circuit has recently clarified the definition of substantial assistance required to prove aiding and abetting liability in SEC enforcement actions. To show substantial assistance, the SEC must demonstrate that the defendant "'in some

sort associate[d] himself with the venture, that he participate[d] in it as something that he wishe[d] to bring about, [and] that he [sought] by his action to make it succeed.'" *SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012) (alterations in original) (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938)) (alterations in original). "In other words, the defendant must 'consciously assist[] the commission of the specific [violation] in some active way.'" *Mudd*, 885 F. Supp. 2d at 670-71 (quoting *Apuzzo*, 689 F.3d at 212 n.8).

As noted above, the SEC alleges that Defendants substantially assisted Freddie Mac's primary violation by certifying or sub-certifying the company's misleading disclosures. Defendants acknowledge that Syron's certification was legally required and that Cook and Bisenius's sub-certifications, though not legally mandated, were required by Freddie Mac's internal policy. (Defs.' Mem. 20.) The certifications and sub-certifications thus appear to meet the standard of substantial assistance, for by providing their approval to disclosures, Defendants enabled Freddie Mac to disseminate the misleading disclosures to investors.

Defendants, however, argue that even if the disclosures were misleading, merely certifying and sub-certifying them does not rise to the level of substantial assistance. (Defs.' Mem. 57-58; Oral Argument Tr., 54:11-56:13, Aug. 20, 2012.) That argument is unavailing. With respect to Syron's certification, several courts in this circuit have found similar conduct sufficient to establish substantial assistance. *See, e.g.*, *SEC v. Stanard*, No. 06 Civ. 7736 (GEL), 2009 WL 196023, at *26, *30-32 (S.D.N.Y. Jan. 27, 2009); *see also SEC v. Spongetech Delivery Sys., Inc.*, No. 10 Civ. 2031 (DLI), 2011 WL 887940, at *10 (E.D.N.Y. Mar. 14, 2011) (holding that the SEC had

---

[7] Because the Court finds that the Complaint adequately alleges that Defendants had actual knowledge of the primary violation, it does not reach the question of whether recklessness is sufficient to satisfy the knowledge requirement for aiding and abetting liability.

demonstrated a "substantial likelihood" that the defendant aided and abetted violations of the Exchange Act by making false statements in public disclosures and signing false SEC filings). None of the cases Defendants cite establishes the contrary proposition that such conduct is insufficient. Indeed, such a proposition would be strange in light of the fact that knowingly providing false certifications of corporate financial disclosures can carry stiff *criminal* penalties, including the possibility of up to ten years' imprisonment. *See* 18 U.S.C. § 1350(c)(1). If knowingly providing a false certification suffices to establish serious criminal conduct, then *a fortiori* it should be sufficient in a civil context to establish substantial assistance to a violation of the securities laws. *Cf. Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061-62 (9th Cir. 2000) ("[W]hen a corporate officer signs a document on behalf of the corporation, that signature will be rendered meaningless unless the officer believes that the statements in the document are true. . . . Key corporate officers should not be allowed to make important false financial statements knowingly or recklessly, yet still shield themselves from liability to investors simply by failing to be involved in the preparation of those statements.").

With respect to Cook and Bisenius's sub-certifications, Defendants argue that because they were not *legally* required, the sub-certifications constitute mere "review and approval" and thus fall short of the substantial assistance threshold. (Defs.' Mem. 61-64.) That argument, however, is based on the pre-*Apuzzo* requirement that the aider and abettor's substantial assistance have proximately caused the primary violation.[8] *See SEC v. Treadway*, 430 F.

Supp. 2d 293, 339 (S.D.N.Y. 2006) ("The aider and abettor's substantial assistance must be a proximate cause of the primary violation. Thus, mere awareness and approval of the primary violation is insufficient to make out a claim for substantial assistance." (citation omitted)). *Apuzzo*, however, unambiguously rejected the requirement of proximate causation in SEC enforcement actions. *See Apuzzo*, 689 F.3d at 213 ("We now clarify that, in enforcement actions brought under 15 U.S.C. § 78t(e), the SEC is not required to plead or prove that an aider and abettor proximately caused the primary securities law violation."). Moreover, even *Treadway* appears to have understood "mere awareness and approval" to be limited to inaction. *See Treadway*, 430 F. Supp. 2d at 339; *see also SEC v. Tecumseh Holdings Corp.*, No. 03 Civ. 5490 (SAS), 2009 WL 4975263, at *5 (S.D.N.Y. Dec. 22, 2009) (discussing "mere awareness and approval" in the context of the SEC's allegation that a defendant's failure to act constituted substantial assistance). The Complaint, however, does not allege that Cook and Bisenius simply stood by and allowed a violation to happen. Rather, by alleging that Cook and Bisenius signed sub-certifications for disclosures they knew to be misleading, the Complaint alleges a concrete, affirmative step by which Defendants associated themselves with the primary violation and acted to bring it about. *See Mudd*, 885 F. Supp. 2d at 671 (finding that signing sub-certifications of financial disclosures constitutes substantial assistance). Thus, under *Apuzzo*, the SEC has sufficiently pled that Defendants Cook and Bisenius gave substantial assistance to Freddie Mac's primary violations.

\*       \*       \*

Because the Court finds that the Complaint adequately alleges that Bisenius had the requisite knowledge and that

---

[8] The Second Circuit decided *Apuzzo* on August 8, 2012, after Defendants' motion was fully briefed but before the Court held oral argument.

Defendants all rendered substantial assistance to Freddie Mac's misleading disclosures, the Court holds that the Complaint states claims for aiding and abetting violations of federal securities laws against all Defendants.

### E.  Section 17(a)(2)

Section 17(a)(2) of the Securities Act provides:

> It shall be unlawful for any person in the offer or sale of any securities . . . directly or indirectly . . . to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading . . . .

15 U.S.C. § 77q.  The Complaint charges Syron and Cook with violating this provision in connection with the offer and sale of Freddie Mac stock during the Relevant Period.  (Compl. ¶¶ 134-136.) Defendants argue, however, that the Complaint fails to allege that Syron and Cook obtained money or property in connection with the stock offerings and thus fails to state a claim under Section 17(a)(2).

During the Relevant Period, Freddie Mac issued stock totaling $7.5 billion through four separate offerings.  (*Id.* ¶¶ 88, 100, 106, 111.)  Each of those offerings incorporated by reference the 2006 IS, and several incorporated an ISS from 2007 as well.  (*Id.*)  Thus, the Complaint alleges two essential elements of a Section 17(a)(2) claim: the offer or sale of securities and the existence of a material misrepresentation or omission.  *See SEC v. Wolfson*, 539 F.3d 1249, 1263-64 (10th Cir. 2008) (finding that the incorporation of false financial statements into a stock offering can create liability for executives under Section 17(a)(2)).

The SEC advances two theories of how the Complaint satisfies the third essential element that Syron and Cook "obtain[ed] money or property by means of the" offerings.  First, the SEC argues that Syron and Cook obtained money for themselves because the offerings were within the scope of their employment, for which Freddie Mac compensated them.  (Pl.'s Opp'n 69-70.) The SEC, however, identifies no case supporting the proposition that such a tenuous connection is sufficient, and the plain text of the statute, which requires the defendant to have obtained money "by means of" a material misrepresentation, seems to require a closer causal relationship. Neither of the Complaint's two allegations regarding Syron and Cook's compensation creates such a connection to Freddie Mac's stock offerings.  The Complaint alleges that their compensation was tied, in part, to two things: the Touch More Loans initiative, which was a program to acquire and guarantee loans posing greater credit risks, and Freddie Mac's quarterly financial reporting. (Compl. ¶¶ 15, 19, 45.) Although Freddie Mac's quarterly reports were incorporated by reference into the documents accompanying the various stock offerings, the plain language of Section 17(a)(2) requires more; Defendants must have obtained money or property "in the offer or sale of any securities."  The Complaint simply lacks any allegation that Syron and Cook's compensation was affected, in any way, by the stock offerings.

The SEC's second theory is that even if Syron and Cook did not personally obtain money or property, they are liable because Freddie Mac obtained money through stock offerings that incorporated material misrepresentations that Syron and Cook

both made and aided and abetted. (Pl.'s Opp'n 66-68.) This theory's validity clearly turns on whether Syron and Cook can be said to have "obtained" money or property when they did not, in fact, gain personal possession of either. "When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning." *Smith v. United States*, 508 U.S. 223, 228 (1993).[9] Dictionaries roughly contemporary with the 1933 passage of the Securities Act all define "obtain" in substantially similar ways: "to acquire; to get hold of by effort; to get and retain possession of; as, in the offense of 'obtaining' money or property by false pretenses," *Black's Law Dictionary* 1278 (3d ed. 1933); "to get hold of by effort; to gain possession of; to procure; to acquire, in any way," *Webster's New International Dictionary* 1682 (2d ed. 1934); "to get hold of; to obtain possession of; to acquire; to maintain a hold upon; to keep; to possess," *Cyclopedia Law Dictionary* 780 (3d ed. 1940). These definitions make clear that to obtain an object is to gain possession of it. That is not what happened in this case, however. Syron and Cook's alleged misrepresentations caused investors to give money to Freddie Mac, but the SEC makes no allegation that Syron or Cook received any money or property in turn. Therefore, Freddie Mac may be said to have obtained money, but Defendants clearly did not.

The case law applying Section 17(a)(2) splits over how to interpret "obtain." Defendants identify two cases that affirmatively require, based on the statutory text's plain meaning, that the "*defendant*

himself be alleged to have obtained money or property." *SEC v. Daifotis*, No. C11-00137 (WHA), 2011 WL 2183314, at *10 (N.D. Cal. June 6, 2011); *see also SEC v. Burns*, No. 84-0454, 1986 WL 36318, at *3-*4 (S.D. Cal. Feb. 19, 1986) (finding a defendant not liable under Section 17(a)(2) because "[t]here is no evidence . . . that [the defendant] personally acquired money or property"). Conversely, two recent cases in this district take the opposite view, holding that a defendant may be liable under Section 17(a)(2) even if he did not personally obtain money or property. *See SEC v. Stoker*, 865 F. Supp. 2d 457, 463 (S.D.N.Y. 2012); *see also Mudd*, 885 F. Supp. 2d at 669-70 (applying *Stoker*).

In *Stoker*, the court rejected the argument that Section 17(a)(2) requires personal gain by the defendant, reasoning that the statute, "on its face, does not state that a defendant must obtain the funds personally or directly," and that it would defeat the statute's remedial purpose "to allow a corporate employee who facilitated a fraud that netted his company millions of dollars to escape liability for the fraud by reading into the statute a narrowing requirement not found in the statutory language itself." 865 F. Supp. 2d at 463. *Stoker* further observed that to narrow the statute would be to ignore the Supreme Court's instruction that "'Congress intended securities legislation enacted for the purpose of avoiding frauds to be construed 'not technically and restrictively, but flexibly to effectuate its remedial purpose.'" *Id.* (quoting *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151 (1972)).[10]

---

[9] Unlike the phrase "independent establishment," which was clearly meant as a term of art, *see supra* Section III.A, there is nothing to suggest that Section 17(a)(2) uses the term "obtain" in any manner other than its ordinary meaning, recorded in the pages of dictionaries.

[10] *Stoker* also based its interpretation on the fact that Section 17(a) is modeled on the federal mail fraud statute, 18 U.S.C. § 1341, which, *Stoker* argues, the Second Circuit has held "does not require that 'the defendant must receive the same money or property that the deceived party lost, but only that the party

Of course, the Supreme Court's forty-year-old decision in *Affiliated Ute Citizens* was not its last word on the construction of federal securities laws. Just a few years later, in *Aaron v. SEC*, the Court quoted the same passage from *Affiliated Ute Citizens* but then added:

> [T]he Court has also noted that generalized references to the remedial purposes of the securities laws will not justify reading a provision more broadly than its language and the statutory scheme reasonably permit. Thus, if the language of a provision of the securities laws is sufficiently clear in its context and not at odds with the legislative history, it is unnecessary to examine the additional considerations of policy . . . that may have influenced the lawmakers in their formulation of the statute.

446 U.S. 680, 695 (1980) (citations and internal quotation marks omitted). *Aaron*, in other words, stated what is – or, at least, ought to be – a truism of statutory interpretation: the starting point of inquiry must be the text of the statute, and where the text is unambiguous, that must be the ending

point as well. *See Robinson*, 519 U.S. at 340 ("[The Court's] inquiry must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240 (1989))).

Because the Court does not find the text of Section 17(a)(2) to be ambiguous, it disagrees with *Stoker*'s resort to purposive analysis. The Court respectfully observes that *Stoker* begs the question of what "obtain" means when it states that Section 17(a)(2), "on its face, does not state that a defendant must obtain the funds personally or directly"; the requirement of personal gain inheres in the word "obtain." Of course, this is not to say that a defendant may not be liable if he obtains money or property in a highly roundabout manner. The statute clearly creates liability where a defendant "indirectly" obtains money or property, and several cases have recognized liability where a defendant was the final link in a chain of possession of the proceeds of a fraud. *See, e.g.*, *Wolfson*, 539 F.3d at 1264; *SEC v. Glantz*, No. 94 Civ. 5737 (CSH), 1995 WL 562180, at *5 (S.D.N.Y. Sept. 20, 1995). But that final step, whereby the defendant personally gains money or property from the fraud, is essential, for otherwise the defendant may have fraudulently induced the victim to part with money or property, but he has not obtained that money or property himself. The SEC's failure to allege that Syron and Cook personally gained money or property from Freddie Mac's stock offerings thus means that the SEC has not stated a claim under Section 17(a)(2). Accordingly, the Court dismisses that claim.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted in part and

---

deceived must lose money or property.'" *Stoker*, 865 F. Supp. 2d at 463 n.7 (quoting *United States v. Evans*, 844 F.2d 36, 39-40 (2d Cir. 1988)). Contrary to *Stoker*'s suggestion, however, *Evans* does not actually stand for the proposition that whenever a deceived party loses money or property from a fraud, a defendant may automatically be said to have obtained it. That question simply was not before the court in *Evans*. Rather, the passage *Stoker* quotes addressed the question of whether a party may be liable under the mail fraud statute if the proceeds the party gains from the fraud are not obtained directly from the victim. *See Evans*, 844 F.2d at 39-40. That question sheds little light on the meaning of "obtain," particularly since the court in *Evans* assumed for the sake of argument that the defendant had personally gained from the fraud. *See id.*

denied in part. Defendants' motion to dismiss the SEC's claim under Section 17(a)(2) is HEREBY GRANTED. Defendants' motion to dismiss the SEC's remaining claims is HEREBY DENIED.

IT IS FURTHER ORDERED that, by April 18, 2013 at 4:00 p.m., the parties shall submit to the Court a proposed case management plan and scheduling order. A template for the order is available at http://www.nysd.uscourts.gov/judge_info.php?id=99. IT IS FURTHER ORDERED THAT the parties shall appear for a status conference in this matter on May 3, 2013 at 12:00 p.m. in Courtroom 905 of the United States District Court for the Southern District of New York, 40 Foley Square, New York, New York.

The Clerk of the Court is respectfully directed to terminate the motion pending at Doc. No. 52.

SO ORDERED.

_____
RICHARD J. SULLIVAN
United States District Judge

Dated: March 28, 2013
         New York, New York

The U.S. Securities and Exchange Commission is represented by Suzanne Romajas, Christian D.H. Schultz, Giles T. Cohen, David S. Karp, Kevin P. O'Rourke, and Matthew A. Rossi, 100 F Street NE, Washington, DC 20549.

Defendant Richard F. Syron is represented by Thomas C. Green, Mark D. Hopson, Frank R. Volpe, Matthew D. Krueger, Katie M. Durick, and Judith C. Gallagher of Sidley Austin LLP, 1501 K Street NW, Washington, DC 20005; and by

Steven M. Bierman and Andrew D. Hart of Sidley Austin LLP, 787 Seventh Avenue, New York, NY 10019.

Defendant Patricia L. Cook is represented by Steven M. Salky, Alexandra W. Miller, and Adam Fotiades of Zuckerman Spaeder LLP, 1800 M Street NW, Washington, DC 20036; and by Laura E. Neish of Zuckerman Spaeder LLP, 1185 Avenue of the Americas, New York, NY 10036.

Defendant Donald J. Bisenius is represented by Daniel J. Beller, Walter G. Ricciardi, and David W. Brown of Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10019; and by Charles E. Davidow and John H. Longwell of Paul, Weiss, Rifkind, Wharton & Garrison LLP, 2001 K Street NW, Washington, DC 20006.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3-28-13

29